## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| ANDREW KNIGHT, BENJAMIN PRUSKY and SAWBILL COMPANIES, INC. and all others similarly situated, | Civil Action No. 3:18cv850 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| JELD-WEN, INC. and MASONITE CORPORATION, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Defendants JELD-WEN, Inc. and Masonite Corporation locked out competition in the market for interior molded doors (hereinafter "Doors") and conspired to fix prices, resulting in lock-step price increases. As a result of Defendants' illegal conduct, Plaintiffs and the other purchasers they seek to represent have been forced to pay anticompetitive prices for Doors as a result of fixed prices and the lack of viable substitutes. Plaintiffs bring this action on behalf of themselves individually and on behalf of a plaintiff class (the "Class") consisting of all individuals and entities who purchased Doors indirectly from a Defendant or co-conspirator in the United States, for their own use and not for resale, at least as early as October 24, 2012 until the Present (the "Class Period"). Plaintiffs bring this action for injunctive relief under Section 1 of the Sherman Act, and for treble damages under the antitrust laws, unfair competition laws, consumer protection laws, and unjust enrichment common laws of the several States against Defendants, and demand a trial by jury.

**NATURE OF ACTION**

1. Interior molded doors are not made from solid wood. Rather, they are generally hollow, with an interior frame construction that is masked by a molded doorskin. Molded doorskins are a facing molded from synthetic materials that are much less expensive than wood, and are formed into shapes that mimic the look of a paneled wood door (hereinafter "Doorskins").

2. Doorskins are referred to as "molded" to distinguish them from flush doorskins, which are simply flat. Two facings may be glued over a wooden frame to make a hollow core door that is much less costly than a solid wood door.

3. A Doorskin is formed from a fibrous mat that is molded into a raised panel design in a press under extreme pressure and at high temperatures. Doorskins are designed to provide the appearance of solid wood doors at a much lower price.

4. Doorskins are the largest input cost of a molded door, comprising up to 70% of the cost of manufacturing a molded door.

5. Defendants manufacture both Doors and Doorskins.

6. The markets for both Doors and Doorskins are highly concentrated and characterized by high barriers to entry due to time and capital requirements.

7. Other types of doors are not adequate substitutes for molded interior doors due to aesthetic and cost differences.

8. The markets for Doors and Doorskins are limited to the contiguous United States due to the high shipping costs associated with foreign-made Doors and/or Doorskins.

9. On October 24, 2012, Defendant JELD-WEN merged with Craftmaster, one of only two manufacturers that had competed with Defendants in the Doorskins market. Following

J-1578589.1

the merger, Masonite was JELD-WEN's only remaining competitor in the Doorskins market. Thus, the merger created a duopoly in the Doorskins market whereby Defendants controlled 100% of the Doorskins market.

10.    Defendants also manufacture completed Doors, the product at issue, utilizing their own Doorskins.

11.    Following the 2012 merger, Defendants controlled 75% to 80% of the Doors market, with the remaining market share divided among smaller door manufacturers that do not manufacture their own Doorskins or have nationwide distribution networks.

12.    Thus, Defendants' competitors in the Doors market were simultaneously their customers in the Doorskins market and completely dependent on Defendants for the Doorskins necessary to manufacture their Doors.

13.    Elements of Defendant JELD-WEN's anticompetitive conduct have already been proven as a matter of law. On June 29, 2016, Steves and Sons, Inc., filed an antitrust action against JELD-WEN. *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545 (E.D. Va. June 29, 2016).

14.    Steves and Sons manufactures Doors. Accordingly, it directly competes with Defendants in the Doors market.

15.    Steves and Sons alleged violations of the Clayton Act, breach of contract, breach of warranty, and trespass to chattels against JELD-WEN. Steves and Sons also sought a declaratory judgment and specific performance.

16.    On February 5, 2018, the jury returned a verdict in Steves and Sons' favor, finding JELD-WEN had violated Section 7 of the Clayton Act, awarding $9,933,602 in damages arising from overcharges on Doorskins and $46,480,581 for future lost profits.

17.     On October 5, 2018, the district court granted Steves and Sons' motion for "extraordinary" equitable relief, i.e., the divestiture of a Doorskins manufacturing plant in Towanda, Pennsylvania that was acquired by JELD-WEN through its 2012 merger with Craftmaster. The court noted that this was the first such instance of divestiture in a private Section 16 action. *See* Opinion at 51, 148.[1]

18.     As a result of Defendants' anticompetitive conduct described herein, Plaintiff and other putative class members paid more for Doors than they would have paid absent Defendants' anticompetitive conduct.

## THE PARTIES

19.     Plaintiff Andrew Knight, was a resident at all relevant times of Cocoa, Florida. During the Class Period and while residing in Florida, Plaintiff Knight indirectly purchased one or more Doors, for his own use and not for resale, that was produced by one or more Defendants. Plaintiff Knight suffered injury as a result of Defendants' conduct alleged herein.

20.     Plaintiff Benjamin Prusky, was a resident at all times relevant of New York, New York. During the Class Period and while residing in New York, Plaintiff Prusky indirectly purchased one or more Doors, for his own use and not for resale, that were produced by one or more Defendants. Plaintiff Prusky suffered injury as a result of Defendants' conduct alleged herein.

21.     Plaintiff Sawbill Companies, Inc., was a resident at all times relevant of Oakdale, Minnesota.   During the Class Period and while residing in Minnesota, Plaintiff Sawbill Companies indirectly purchased one or more Doors, for its own use and not for resale, that were

---

[1] The Memorandum Opinion in *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545 (E.D. Va. Oct. 5, 2018) is cited herein as "Opinion at __."

produced by one or more Defendants. Plaintiff Sawbill Companies suffered injury as a result of Defendants' conduct alleged herein.

22.     Defendant JELD-WEN, Inc. is a Delaware Corporation with a principal place of business at 2645 Silver Crescent Drive, Charlotte, North Carolina 28273.  At the time of the 2012 merger and other anti-competitive conduct alleged herein, JELD-WEN was an Oregon corporation headquartered in Oregon. JELD-WEN is a wholly owned subsidiary of JELD-WEN Holding, Inc.  JELD-WEN is registered with the Virginia State Corporation Commission as a foreign corporation and maintains a registered agent in Virginia.

23.     Defendant Masonite Corporation is a Delaware corporation with its principal place of business at One Tampa City Center, 201 North Franklin Street, Suite 300, Tampa, Florida 33602.  Masonite is a wholly owned subsidiary of Masonite International Corporation. Masonite is registered with the Virginia State Corporation Commission as a foreign corporation and maintains a registered agent in Virginia.

## JURISDICTION AND VENUE

24.     Plaintiffs bring this state law class action on behalf of all the Classes to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by Defendants' conduct in anticompetitively increasing the price of Doors.  Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1).  This court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

25.     Plaintiffs also assert claims for actual and exemplary damages and injunctive relief pursuant to state antitrust, unfair competition, and consumer protection laws, and seek to

I-1578389.1

obtain restitution, recover damages, and secure other relief against Defendants for violation of those state laws. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d) and 1367, in that; (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from some defendants; and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

26.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), (c) and (d) because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

27.     This court has personal jurisdiction over each defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, shipped, sold, and/or delivered substantial quantities of Doors throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and/or engaged (d) in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

28.     The activities of the Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

## TRADE AND COMMERCE

29.     During the Class Period, each Defendant, directly sold Doors in the United States

6

in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial District.

30.     During the Class Period, Defendants collectively controlled a majority of the market for Doors in the United States.

31.     Defendants' business activities substantially affected interstate trade and commerce in the United States and caused injury in the United States.

## FACTUAL BACKGROUND

32.     Interior molded residential doors are the most popular type of interior doors in North America. The vast majority of interior doors sold in North America are molded doors, and that share has consistently grown over time. Interior molded doors simulate the aesthetics of solid wood doors, but can be manufactured and sold at lower prices.

### *Industry History*

33.     As of September 30, 2000, Defendant JELD-WEN was a door manufacturer that was vertically integrated, i.e., it manufactured both interior Doorskins and interior molded doors. Premdor was a second door manufacturer that was somewhat vertically integrated; according to the DOJ, it was a "small, but significant" competitor in the Doorskin market.

34.     Defendant Masonite was manufacturing Doorskins in 2000 to sell to independent Door manufacturers, but the company had not yet begun selling completed Doors. At that time, Masonite was wholly owned by International Paper.

35.     Such market conditions made for a competitive market. At the downstream level of Doors, it was not feasible for the two major players, JELD-WEN and Premdor, to coordinate their price on Doors. If they coordinated to raise prices, Masonite would have had an incentive to increase its production of Doorskins, which would have allowed its customers (Door

manufacturers that competed with JELD-WEN and Premdor) to purchase more Doorskins from Masonite and undercut any Door price increases instituted by JELD-WEN and Premdor, thereby thwarting any attempt by the two to collude on Door prices.

36.     At the upstream level of Doorskins, Masonite had an incentive to maximize production of Doorskins, because it did not also sell Doors. The existence of Masonite as a source of Doorskins incentivized the other two Doorskin manufacturers, JELD-WEN and Premdor, to sell Doorskins at reasonable prices to independent door manufacturers who competed with JELD-WEN and Premdor in the Doors market.

37.     On September 30, 2000, Masonite's then-parent company, International Paper, and Premdor announced their intention for International Paper to sell Masonite to Premdor. At the time, Masonite owned two Doorskin plants in the United States: one plant located in Towanda, Pennsylvania, and a second plant in Laurel, Mississippi.

38.     On August 3, 2001, the United States filed suit to enjoin the merger. *United States v. Premdor, et al.*, No. 1:01-CV-01696 (D.D.C.).

39.     In its complaint, the United States alleged the merger would harm competition in the markets for both Doorskins and Doors. Among other aspects of competitive harm, the United States alleged: "Presently, non-vertically integrated door manufacturers can purchase doorskins from Masonite and thereby increase production of interior molded doors in the event that Premdor and [ JELD-WEN][2] seek to raise prices or reduce output. Post-merger, Masonite would no longer be independent, and Premdor would have the incentive to raise doorskins prices and/or restrict doorskin sales to non-vertically integrated firms, thereby increasing the benefits to Premdor and [JELD-WEN] of coordinated interaction." *Premdor* Complaint at ¶ 35.

---

[2] The *Premdor* Complaint refers to JELD-WEN as "the nonparty firm."

40.     The same day it filed suit, the United States also filed a proposed final judgment that would permit the merger to take place, but only if the Towanda Doorskin plant were divested from Masonite and spun off to a buyer acceptable to the United States. Following the required public comment period, this judgment became final and was entered by the court on April 5, 2002. With the merger thus approved, Premdor acquired Masonite and, going forward, operated the combined businesses under the name of "Masonite."

41.     On March 29, 2002, Craftmaster purchased the Towanda Doorskin plant. Through that acquisition, Craftmaster became a vertically integrated Doorskin and Door company, producing Doorskins for itself, selling Doorskins to independent Door manufacturers, and selling Doors in competition with JELD-WEN, Masonite, and smaller independent Door fabricators.

### The 2012 JELD-WEN/Craftmaster Merger

42.     On or about June 18, 2012, JELD-WEN publicly announced its intent to merge with and acquire Craftmaster.

43.     JELD-WEN's acquisition of Craftmaster closed on or about October 24, 2012. By that acquisition, JELD-WEN gained ownership of the Towanda plant, leaving itself and Masonite as the only two potential suppliers of Doorskins in the United States.

### The 2012 Merger and Its Anticompetitive Effects

#### A. Relevant Market

### Interior Molded Doors

44.     No close substitutes exist for interior molded doors. Solid wood doors or stile and rail[3] doors are not close substitutes for molded doors because they are significantly more

---

[3] "Stile and rail" refers to a technique whereby a door is assembled from several pieces of wood. The vertical pieces are referred to as "stiles" and the horizontal pieces are "rails." A basic design would be a rectangular shape of two stiles and two rails supporting a thinner panel of wood,

expensive.  Flush doors are not close substitutes for molded doors, as they lack molded doors' aesthetically pleasing designs and are therefore less attractive to certain consumers.

45.     A small but significant increase in the price of interior molded doors in the United States would not cause a significant number of purchasers of interior molded doors to substitute other doors.

46.     The sale of interior molded doors in the United States is a line of commerce and relevant product market within the meaning of Section 7 of the Clayton Act.

47.     The relevant geographic market ("Relevant Market") within the meaning of the Sherman and Clayton Acts for interior molded doors is the contiguous United States. The number of imported interior molded doors sold in the United States is negligible. The *Steves and Sons* court found that the primary component of interior molded doors, Doorskins, cannot be economically or practically imported. Opinion at 35.

48.     A small but significant increase in the price of interior molded doors for sale in the United States would not cause a significant number of customers to purchase molded doors produced outside of the contiguous United States.

**B. Market Structure**

*Interior Molded Doors*

49.     Before the 2012 Merger, Craftmaster competed with three other suppliers of Doors in all regions of the United States except the West Coast.

50.     At the time JELD-WEN acquired Craftmaster, the Doors market was already highly concentrated. Following the 2012 Merger, it became substantially more concentrated.

---

resembling the structure of a picture frame. More complex stile and rail doors may include multiple panels and/or windows.

I-1578589.1

51.     The following graphic represents the merger activity whereby Defendants came to control 72% of the Doors market and 100% of the Doorskins market :



Source: J.P. Morgan, Masonite investor presentation.

52.     The Herfindahl-Hirschman Index ("HHI") is a commonly-accepted measure of market concentration used by the Department of Justice to assess market competitiveness The HHI for the interior door industry is greater than 2,669, which falls under the "highly concentrated" industry threshold in the DOJ's horizontal merger guidelines and is visibly evident from the graph below.



1-1578589.1

## C. Anticompetitive Effects

53.     The 2012 Merger substantially lessened competition, and has tended to create a monopoly.

### *Interior Molded Doors*

54.     Since the 2012 Merger, Defendants have repeatedly and consistently announced nearly identical price increases for Doors.

55.     The following chart illustrates Defendants' parallel price increases for Doors since the 2012 Merger:

| Company | Notice Date | Effective Date | Increase |
|---------|-------------|----------------|----------|
| JELD-WEN | 11/15/2012 | 02/04/2013 | 3%-5% |
| Masonite | 12/06/2012 | 03/18/2013 | 3%-6% |
| JELD-WEN | 08/06/2013 | 10/07/203 | 4% |
| Masonite | 08/13/2013 | 09/30/2013 | 5% |
| Masonite | 10/31/2013 | 02/03/2014 | 5% |
| JELD-WEN | 11/18/2013 | 01/27/2014 | 5% |
| JELD-WEN | 06/09/2014 | 08/11/2014 | 9.5% |
| Masonite | 06/17/2014 | 08/18/2014 | 8% |
| Masonite | 12/01/2014 | 03/02/2015 | 5% |
| JELD-WEN | 12/03/2014 | 03/02/2015 | 5% |
| Masonite | 10/26/2015 | 02/01/2016 | 3%-5% |
| JELD-WEN | 10/28/2015 | 02/01/2016 | 3%-5% |

12

56.    Reflected graphically, Defendants' price increases would be as follows:



57.    By comparison, inflation (as measured by the Consumer Price Index) ranged between a high of 2.1% in 2012 and a low of 0.1% in 2015 for this same time period. Graphically, this would be:



58.   Defendants' steady, lock-step price increases are not the result of competitive market forces, such as cost or demand factors, as shown by the graph below.   Rather, these increases are attributable to an explicit or tacit result of an agreement to fix prices.



59.   Specifically, the *Steves and Sons* court found JELD-WEN's Doorskin manufacturing costs actually declined as a result of improvement in the manufacturing process and that the costs of the improvements were more than offset by savings in manufacturing costs. *See* Opinion at 22-23 and ¶¶ 105-112 *infra*. Since Doorskins are the primary cost/input to Door manufacturing, the cost of manufacturing Doors also likely declined during the same period that Defendants were instituting anticompetitive price increases.

60.   Unsurprisingly, Defendant JELD-WEN reported profit margins in excess of 20% in 2016 and 2017.[4] A recent JP Morgan Analyst Report found that due to market structure factors, JELD-WEN has been able to achieve "solid pricing power over the last several years."

---

[4] http://investors.jeld-wen.com/~/media/Files/J/Jeld-Wen-IR/documents/annual-reports-and-proxies/2017-annual-report.pdf

JP Morgan notes that company-wide, JELD-WEN's gross margin expansion over the period of 2013-2016 was driven by improved pricing compared to the period of 2011-2013 and the company's success in implementing price increases. In fact, company-wide, prices had increased at an average rate of 5% per year in North America, significantly outstripping its price increases in Europe or Australasia.

61. Similarly, JP Morgan also found that Masonite had recently exhibited strong "EBITDA margin expansion…driven by further price increases" and that Masonite also had solid pricing power. In fact, JP Morgan found that—consistent with the Steve and Sons complaint—Masonite had announced five price increases since Q2 2013 and had realized ten consecutive quarters of price increases, with those increases ranging from 3-7%. The publication Barrons noted in December 2014 that "[in] the September quarter, pricing rose 4.2%, compared with the year-earlier level, and that followed two earlier increases this year. The price for a standard bifold door has jumped 27%, to $52, since October 2013."

**D. Market Concentration**

62. In its 2001 suit seeking to block the industry consolidation that would have resulted without the divestiture of the Towanda plant, the DOJ alleged that the proposed merger might in the future "tend substantially to lessen competition by making it easier for the remaining firms in the relevant markets to engage in coordinated interaction that harms consumers."

63. The 2012 Merger has resulted in exactly such coordinated interaction by Defendants, because industry concentration has made such conduct by Defendants feasible and profitable.

64.     Notably, in addition to a jury verdict, the *Steves and Sons* court held a three-day evidentiary hearing and issued factual findings that the merger had "substantially lessened" competition in the Doorskins market and ordered the divestiture of the Towanda plant. Order at 6, 148.

### *Interior Molded Doorskins*

65.     On June 25, 2014, Masonite stated, during a public presentation to industry analysts:

> Only Masonite and JELD-WEN service the entire North American market. And other door assembly companies are smaller and much more regionally focused. And importantly, the other smaller . . . door assembly manufacturers have to get their facings [i.e., doorskins] from somebody else. They're not vertically integrated in their facings. And we, at Masonite, have determined that we will not sell our facings into –to competition. So, that only leaves one other outlet for them to get their facings from in North America.

66.     Before this public announcement, JELD-WEN knew, or expected, that this was or would be Masonite's position, and, armed with such knowledge, (a) reduced the quality of its output of Doorskins; (b) raised the price of its Doorskins; and (c) breached its long-term supply agreement with at least one independent Door manufacturer.

67.     As the United States' Competitive Impact Statement in *Premdor* warned, "post-acquisition, the two vertically integrated firms could weaken their downstream rivals by raising their molded doorskin prices." This is precisely what Defendants JELD-WEN and Masonite have done.

### *Interior Molded Doors*

68.     As noted above, on three occasions since the 2012 Merger, Masonite has quickly followed price increase announcements by JELD-WEN on Doors. On three other occasions, Masonite took the lead and was promptly followed by JELD-WEN. Defendants' six parallel

price increases of Doors has resulted in a substantial cumulative price increase for Doors over the Class Period.

69.     As discussed *infra,* Masonite and JELD-WEN both used to supply Doorskins to independent, third-party Door manufacturers, such as Steves and Sons. However, on June 24, 2014, Masonite announced it would no longer supply Doorskins to these competitors in the Doors market.

70.     As a result, independent Door manufacturers have no choice but to purchase their Doorskins from JELD-WEN.

71.     Additional coordinated interaction between Masonite and JELD-WEN is likely to occur in the future.

**E. Barriers to Entry**

72.     The barriers to entry in the Doorskin manufacturing business are high.

73.     Analysts covering the Doorskin and Door markets have noted that Masonite and JELD-WEN's market leading positions are safe given the "substantial barriers to entry." In the Doorskin market, there are three overarching types of barriers: 1) cost prohibitive upstart costs to open manufacturing facilities that can provide an ample variety of molded door styles; 2) significant IP and trademarks, which can result in costly litigation; and 3) a national distribution network.

74.     In the Steves and Sons action, the plaintiff alleged the construction of a new Doorskin manufacturing facility, with necessary molds and other capital equipment, could involve capital investments substantially in excess of $100 million, take over four years, and be subject to substantial uncertainties.

75.     According to Steves and Sons, a new entrant could not successfully enter with a single style of Doorskins; rather, an entrant would have to offer the full range of styles currently demanded by consumers, each of which requires substantial capital investment in a mold. This is because home improvement centers and other Doors customers demand a range of products to be available, in turn, to offer their own customers a range of choices. Moreover, supply contracts for Doorskins are sole-source contracts, meaning Door manufacturers cannot buy certain Doorskin models from one manufacturer and other models from a second manufacturer. Thus, no Door manufacturer will enter into a supply agreement with a new manufacturer unless that company can supply the full range of Doorskin models the Door manufacturer requires.  Any hypothetical entrant would need to capture essentially all the business of the non-vertically integrated Door manufacturers to achieve efficient, competitive scale and to make a reasonable return on its investment in entry. In fact, no new entrant has entered the market since the 2012 Merger, and future entry is unlikely to be timely or sufficient to deter further coordination between Defendants.

76.     Even if a new entrant had adequate resources to commit to the development of a new Doorskin business, such an entrant might then be subject to protracted and expensive patent litigation brought by Defendants.

77.     In a filing with the United States Securities and Exchange Commission, JELD-WEN represented that:

> We rely primarily on patent, trademark, copyright, and trade secret laws and contractual commitments to protect our intellectual property and other proprietary rights.[5]

---

[5] See https://www.sec.gov/Archives/edgar/data/1674335/000119312517345857/ d459059d424b4.htm.

78.     Similarly, in a 2016 filing with the United States Securities and Exchange Commission, Masonite represented that:

> We protect the intellectual property that we develop through, among other things, filing for patents in the United States and various foreign countries. In the United States, we currently have 213 design patents and design patent applications and 172 utility patents and patent applications. We currently have 197 foreign design patents and patent applications and 283 foreign utility patents and patent applications.[6]

79.     According to the American Intellectual Property Law Association's ("AIPLA") 2015 Report of the Economic Survey, the median cost of litigating a patent infringement suit through trial in which more than $25 million is at risk is $5 million.

80.     There is no reason to believe that either Defendant would be willing to voluntarily license their intellectual property to a new entrant at price that would otherwise be available in a fair and competitive market.

## CLASS ACTION ALLEGATIONS

81.     Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking injunctive relief pursuant to federal law, and damages pursuant to various state antitrust, unfair competition, unjust enrichment, and consumer protection laws of the states listed below on behalf of the members of the following classes:

A.     **Nationwide Injunctive Relief Class**: All individuals and entities who indirectly purchased Doors from Defendants or co-conspirators in the United States during the Class Period for their own use and not for resale.

---

[6] See https://www.sec.gov/Archives/edgar/data/893691/000089369116000072/a2015form10-k.htm.

19

B.     **Florida Class**: All individuals and entities who indirectly purchased Doors from Defendants or co-conspirators in the Florida during the Class Period for their own use and not for resale.

C.     **Minnesota Class**: All individuals and entities who indirectly purchased Doors from Defendants or co-conspirators in Minnesota during the Class Period for their own use and not for resale.

D.     **New York Class**: All individuals and entities who indirectly purchased Doors from Defendants or co-conspirators in New York during the Class Period for their own use and not for resale.

82.     The State Classes are collectively referred to as the "Classes" unless otherwise indicated. Specifically excluded from the Classes are the following:

A.     Purchases of Doors directly from Defendants;

B.     Purchases of Doors for resale;

C.     Defendants;

D.     The officers, directors or employees of any Defendant;

E.     Any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant;

F.     Any federal, state governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff;

G.     Any juror assigned to this action; and

H.     Any co-conspirator identified in this action.

83.     Numerosity: Plaintiffs do not know the exact size of the class; however, based upon the nature of the trade and commerce involved, Plaintiffs believe that the class numbers in

the thousands.   Therefore, joinder of all class members would be impracticable, and class treatment is the superior method for fairly and efficiently adjudicating this controversy.

84.   Class Identity: The above-defined Classes are readily identifiable and are ones for which records should exist.

85.   Typicality: Plaintiffs' claims are typical of other class members' claims because they were injured through Defendants' uniform misconduct and paid a supra-competitive price for Doors.   Accordingly, by proving their own claims, Plaintiffs will necessarily prove the other class members' claims.

86.   Common Questions Predominate: Common legal and factual questions predominate within the class, including but not limited to the following:

A.   Whether the 2012 merger had the effect of substantially lessening competition or tended to create a monopoly;

B.   Whether Defendants explicitly or implicitly agreed to fix prices;

C.   Whether the 2012 merger resulted in higher prices for Doors than would prevail in a competitive market;

D.   Whether Defendants' price-fixing resulted in higher prices for Doors than would prevail in a competitive market;

E.   The existence of high barriers to entry;

F.   Whether Defendants have market power;

G.   Whether Plaintiffs and class members were injured; and

H.   The amount of damages to which Plaintiffs and other class members are entitled.

87.   Adequacy: Plaintiffs can and will fairly and adequately represent and protect the class members' interests, and have no interests that conflict with or are antagonistic to those of

the class.   Moreover, Plaintiffs' attorneys are experienced and competent in complex, class-action, and antitrust litigation

88.     Superiority: Class certification is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted because:

A.     Common questions of law and fact overwhelmingly predominate over any individual questions that exist within the class and, consequently, economies to the Court and parties exist in litigating the common issues on a class-wide basis instead of on a repetitive individual basis;

B.     Each class member's damage claim is too small to make individual litigation an economically viable alternative, and few class members have any interest in individually controlling the prosecution of separate actions;

C.     Class treatment is required for optimal deterrence and compensation and for limiting the Court-awarded, reasonable legal expenses incurred by class members; and

D.     No unusual difficulties are likely to be encountered in this class action's management in that all legal and factual questions are common to the class.

89.     The prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

90.     Pursuant to Rule 23, Plaintiffs bring these claims on behalf of all persons and entities that, as residents of various states, indirectly purchased one or more Doors from a Defendant during the Class Period for their own use and not for resale.

I-1578589.1

91.     Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief appropriate with respect to the Classes as a whole.

## ANTITRUST INJURY

92.     Defendants' anticompetitive conduct had the following effects, among others:

A.      Price competition has been restrained or eliminated with respect to Doors;

B.      The prices of Doors have been fixed, raised, stabilized, or maintained at artificially inflated levels;

C.      Indirect purchasers of Doors have been deprived of free and open competition; and

D.      Indirect purchasers of Doors, including Plaintiffs, paid artificially inflated prices.

93.     It is well recognized that in a multi-level chain of distribution, such as exists here, an overcharge will be felt throughout the chain of distribution.    As Professor Herbert Hovenkamp, a noted antitrust scholar has stated in his treatise, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) at 564:

> A monopoly overcharge at the top of a distribution chain generally results in higher prices at every level below.  For example, if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum. In most cases they will absorb part of these increased costs themselves and pass part along to cookware wholesalers. The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers. Every person at every stage in the chain likely will be poorer as a result of the monopoly price at the top.

> Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level.

94.     Similarly, Professor Jeffrey K. MacKie-Mason, a professor in the Department of Economics at the University of California, Berkeley and the former Arthur W. Burks Professor of Information and Computer Science and Professor of Economics and Public Policy at the

University of Michigan, has stated, it is "well known in economic theory and practice, (that) at least some of the overcharge will be passed on by distributors and end consumers."

95.     Consequently, while the direct purchasers were the first to pay supra-competitive prices, some or all of the overcharge was passed along the distribution chain and absorbed by Plaintiffs and Class Members when they purchased Doors from stores or distributors.

96.     Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charges passed through the chain of distribution. Thus, the economic harm to Plaintiffs and the class members can be quantified.

97.     The purpose of the conspiratorial conduct of Defendants was to raise, fix or maintain the prices of Doors and, as a direct and foreseeable result, Plaintiffs and the Classes paid supra-competitive prices for Doors during the Class Period.

98.     By reason of the alleged violations of the antitrust laws, Plaintiffs and the Classes have sustained injury to their business or property, having paid higher prices for Doors than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result have suffered damages.

99.     This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

100.     Plaintiffs and members of the Classes had neither actual nor constructive knowledge of the facts constituting their claims for relief. Plaintiffs and members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint. Defendants

engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs or the Classes on inquiry notice that there was a conspiracy to fix prices of Doors.

101.    In addition, by virtue of the fraudulent concealment of their wrongful conduct by Defendants, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and the other Class members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

**COUNT I**
**Price Fixing in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**
**(On Behalf of Nationwide Class for Injunctive and Equitable Relief)**

102.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs.

103.    Defendants are direct competitors in the Doors market throughout the United States.

104.    Defendants have explicitly or implicitly colluded to raise prices in the Doors Market, executing lock-step price increases despite the presence of excess production capacity.

105.    Such price increases in the presence of excess supply are evidence of price fixing. In an industry with large fixed costs, such as this one, had the market been competitive, Defendants would have attempted to raise sales in order to be close to capacity because high sales would have allowed them to spread their fixed costs over a larger quantity, and thus reduce per unit cost.

106.    Instead of lowering prices to reduce excess production capacity, Defendants increased their prices in nearly identical, lock-step fashion.

107.    Doors are a commodity-like product, which makes the market more susceptible to price fixing, as products are nearly uniform with the primary competition being based upon

25

price. This commodity-like nature of their product allows Defendants to more easily monitor and detect defections from their price-fixing agreement.

108.    There are many buyers in the market, which reduces the probability that either Defendant would cheat on their price-fixing agreement since each potential sale is small while the risk of disrupting their collusive pricing would carry a large penalty.

109.    Defendants' large profit margins are consistent with  a price-fixed/cartelized market.

110.    The Department of Justice has already investigated this market in 2001, when Premdor acquired Masonite. In that instance, DOJ concluded that permitting the merger without any divestitures would have resulted in a duopoly in the Doorskin market and in the Doors market and therefore harmed competition.  The DOJ's proposed solution -- that the Towanda, PA Doorskins manufacturing facility be divested -- was accepted by Premdor and the Towanda plant was sold off to become Craftmaster. The 2012 purchase of Craftmaster by JELD-WEN resulted in the same formation of upstream and downstream duopolies that was a concern to the DOJ in 2001.

111.    In fact, it was JELD-WEN's acquisition of Craftmaster and subsequent perceived exertion of market power that led Steve and Sons to sue JELD-WEN in 2016, claiming that as a result of the merger, JELD-WEN and Masonite a) coordinated on price increase announcements; and 2) raised the prices it charged Steve and Sons for Doorskins while simultaneously worsening the product quality.  A jury accordingly awarded Steves and Sons nearly $12 million in overcharges, as well as, approximately $46 million in lost profits.

112.    Beginning at a time currently unknown to Plaintiffs, but as least as early as October 24, 2012, and continuing through the present, the exact dates being unknown to

Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize prices for Doors in the United States, in violation of the Sherman Act (15 U.S.C. § 1).

113.    In formulating and  carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following among others: fixing, raising, stabilizing and pegging the price of Doors.

114.    The combination and conspiracy alleged herein has had the following effects, among others:

A.    Price competition in the sale of Doors has been restrained, suppressed, and/or eliminated in the United States;

B.    Prices for Doors sold by Defendants and all of their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

C.    Those who purchased Doors indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

115.    Plaintiffs and members of the Classes have been injured and will continue to be injured by paying more for Doors purchased indirectly from Defendants than they would have paid and will pay in the absence of the combination and conspiracy as alleged herein.

116.    Plaintiffs and members of the Classes are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

I-1578589.1

## VIOLATIONS OF STATE ANTITRUST LAWS

117.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

118.    The following are pleaded under the antitrust laws of each State or jurisdiction identified below, on behalf of the indicated Class.

### COUNT II
**Violation of Section 340 of the New York General Business Law**
**(On Behalf of the New York Class)**

119.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

120.    Article 22 of the New York General Business Law generally prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. N.Y. Gen. Bus. Law § 340 (1).

121.    Plaintiffs purchased Doors within the State of New York during the Class Period. But for Defendants' conduct set forth herein, the price of Doors would have been lower, in an amount to be determined at trial.

122.    Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340 (6).

123.    Defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of Doors and restrained competition in the free exercise of the conduct of the business of Doors within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, *et seq.*

1-1578589.1

124.    Plaintiffs and members of the Class were injured with respect to purchases of Doors in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000.00, and reasonable attorneys' fees.

**COUNT III**
**Violation of the Minnesota Antitrust Law, Minn. Stat. § 325D.49, *et seq*.**
**(On Behalf of the Minnesota Class)**

125.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

126.    The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination or conspiracy when any part thereof was created, formed, or entered into in Minnesota; any contract, combination or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power, whenever any of these affect Minnesota trade or commerce.

127.    Plaintiffs purchased Doors within the State of Minnesota during the Class Period. But for Defendants' conduct set forth herein, the price of Doors would have been lower, in an amount to be determined at trial.

128.    Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.56. Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the market for Doors within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the market for Doors within the intrastate commerce of and outside of Minnesota; and fixed prices and allocated markets for Doors within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, *et seq*.

1-1518589.1

129.    Plaintiffs and members of the Minnesota Class were injured with respect to purchases of Doors in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

## VIOLATIONS OF STATE UNFAIR AND DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAWS

130.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

131.    The following Claims for Relief are pleaded under the consumer protection or similar laws of each State or jurisdiction identified below, on behalf of the indicated class.

132.    Each of the unfair and deceptive trade practices and consumer protection claims pled in the following claims are pled properly on behalf of the Plaintiffs and Classes in this Complaint.

## COUNT IV
### Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201(2) *et seq.* (On behalf of Florida Class)

133.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

134.    The Florida Deceptive and Unfair Trade Practices Act, Florida Stat. 501.201, *et seq.*, (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Florida Stat. § 501.204(1).

135.    The primary policy of the FDUTPA is "(t)o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or

30

unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.202(2).  The members of the Florida class are covered by this Statute.

136.    A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

137.    Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. Fla. Stat. § 501.211(a) ('...anyone aggrieved by a violation of this (statute) may bring an action...").

138.    Plaintiffs purchased Doors within the State of Florida during the Class Period. But for Defendants' conduct set forth herein, the price of Doors would have been lower, in an amount to be determined at trial.

139.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Doors market, a substantial part of which occurred within Florida.

140.    Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for Doors, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as October 24, 2012, and continuing through the date of this filing.

141.    Accordingly, Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

142.    Defendants' conduct substantially affected Florida's trade and commerce.

143.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Florida Class have been injured by virtue of overcharges for Doors and are threatened with further injury.

144.   By reason of the foregoing, Plaintiffs and the members of the Florida Class are entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. § 501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

## COUNT V
### Violation of the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.68, *et seq.*
### (On Behalf of the Minnesota Class)

145.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

146.   By reason of the conduct alleged herein, Defendants have violated Minn. Stat. § 325F.68, et seq.

147.   Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

148.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Doors market, a substantial part of which occurred within Minnesota, for the purpose of controlling, fixing, or maintaining prices in the Doors market.

149.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Minnesota.  Defendants' conduct, specifically in the form of fraudulent concealment of their horizontal agreement, created a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

32

I-1578589.1

150. Defendants' unlawful conduct substantially affected Minnesota's trade and commerce.

151. Defendants' conduct was willful.

152. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Minnesota Class have been injured in their business or property and are threatened with further injury.

153. By reason of the foregoing, Plaintiffs and the members of the Minnesota Class are entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs under Minn. Stat. § 325F.68, et seq. and applicable case law.

**COUNT VI**
**UNJUST ENRICHMENT**

154. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

155. As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits of Doors.

156. Under common law principles of unjust enrichment, defendants should not be permitted to retain the benefits conferred on them by overpayments by Plaintiffs and members of the Classes in the following States: Florida, Minnesota and New York.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Classes of all others so similarly situated, respectfully request judgment against defendants as follows:

1. The Court determines that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and its counsel of record as Class Counsel, and direct that notice of this action,

as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

     2.     The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act and listed state antitrust laws, unfair competition laws, state consumer protection laws, and common law;

     3.     Plaintiffs and the Class recover damages, to the maximum extent allowed under the applicable state laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Classes be entered against Defendants in an amount to be trebled to the extent such laws permit;

     4.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

     5.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits identification of company's information;

I-1578589.1

6.      Plaintiffs and the members of the Classes be awarded pre-and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint;

7.      Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

8.      Plaintiffs and the members of the Classes have such other and further relief as the case may require and the Court deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, on all issues so triable.

Dated:  December 11, 2018                  Respectfully submitted,

/s/
Conrad M. Shumadine
VSB #4325
Counsel for Plaintiffs
Willcox & Savage, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, VA 23510
Telephone: (757) 628-5500
Fax: (757) 628-5566
cshumadine@wilsav.com


Joseph R. Saveri (*pro hac vice* to be filed)
Steve Williams (*pro hac vice* to be filed)
Kyla J. Gibboney (*pro hac vice* to be filed)
**JOSEPH SAVERI LAW FIRM**
601 California Street, Suite 1000
San Francisco, CA 94108
Tel: (415) 500-6800
Fax: (415) 395-9940
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
kgibboney@saverilawfirm.com

Marc H. Edelson (*pro hac vice* to be filed)
**EDELSON & ASSOCIATES, LLC**
3 Terry Drive, Suite 205
Newtown, PA 18940
Tel: (215) 867-2399
Medelson@edelson-law.com


Brian Douglas Penny (*pro hac vice* to be filed)
**GOLDMAN SCARLATO & PENNY, P.C.**
Eight Tower Bridge, Suite 1025
161 Washington Street
Conshohocken, PA 19428
Tel.: (484) 342-0700
Fax: (484) 580-8747
penny@lawgsp.com


Daniel E. Gustafson (*pro hac vice* to be filed)
Daniel C. Hedlund (*pro hac vice* to be filed)
Michelle J. Looby (*pro hac vice* to be filed)
Kaitlyn L. Dennis (*pro hac vice* to be filed)
**GUSTAFSON GLUEK PLLC**
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
kdennis@gustafsongluek.com


Joshua H. Grabar, Esq. (*pro hac vice* to be filed)
**GRABAR LAW OFFICE**
1735 Market Street
Suite 3750
Philadelphia, PA 19103
Tel: (267) 507-6085
Fax: (267) 507-6048
jgrabar@grabarlaw.com


*Counsel for Plaintiffs*

1-1578589.1