## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| IN RE: INTERIOR MOLDED DOORS INDIRECT PURCHASER ANTITRUST LITIGATION | Lead Case  3:18-cv-00850-JAG<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

### CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs, on behalf of themselves individually and on behalf of all others similarly situated (the "Classes" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action to recover injunctive relief, treble damages, and other relief as is appropriate, based on Defendants Masonite Corporation ("Masonite") and JELD-WEN, Inc.'s ("JELD-WEN") (together, "Defendants") violations of federal and state antitrust laws, unfair competition laws, consumer protection laws, and unjust enrichment laws of the several States. Plaintiffs demand a trial by jury.

### NATURE OF ACTION

1.      This action arises from an unlawful agreement between Defendants Masonite and JELD-WEN—the only two vertically-integrated manufacturers of doorskins and interior molded doors in North America—to artificially increase and fix the prices of interior molded doors ("Interior Molded Doors").[1]

---

[1] To be "vertically integrated" means that a company controls more than one stage of the supply chain (e.g., here Defendants manufacture both finished doors in addition to one of the major components of the finished doors).

1

2.      Defendants locked out competition in the market for Interior Molded Doors, conspired to fix prices, and thereafter implemented a series of lock-step price increases. As a result of this illegal conduct by Defendants, Plaintiffs and the other purchasers they seek to represent have been forced to pay supracompetitive prices for Interior Molded Doors.

3.      Plaintiffs seek to represent two classes consisting of persons and entities who purchased Doors, for their own use and not for resale, in the United States from at least as early as October 24, 2012 through the present (the "Class Period") indirectly from either of the Defendants, or through Defendants' subsidiaries, affiliates, or joint-ventures.

4.      Interior Molded Doors are a type of interior door made through a process of sandwiching a wood frame and a hollow or solid core between two molded doorskins, rather than making the entire door from solid wood. Defendants control the majority of the Interior Molded Doors Market.

5.      Molded doorskins ("Doorskins") are facings molded from synthetic materials much less expensive than wood, which are formed into shapes that mimic the look of a paneled wood door. Interior Molded Doors are the most popular type of interior door in North America, in part because they can simulate the aesthetic of solid wood doors at a lower price.

6.      Doorskins are necessary components in the creation of Interior Molded Doors and constitute up to 70% of the cost of manufacturing a completed door. Doorskins are formed from fibrous mats that are molded into raised panel designs in a press under extreme pressure and at high temperatures.

7.      As Doorskins are critical and expensive components of Interior Molded Doors, the Doorskins Market and the Interior Molded Door Markets are inextricably connected.

2

Defendants Masonite and JELD-WEN manufacture both Interior Molded Doors and Doorskins, and thus have significant power in both of the relevant product markets.

8.      Historically, there has been at least one significant non-integrated manufacturer of Doorskins, at least one significant non-integrated manufacturer of Interior Molded Doors, and numerous other non-integrated Interior Molded Door manufacturers. However, as a result of Defendants' conduct as described herein, the Interior Molded Doors Market and Doorskins Market have rapidly consolidated, and this is no longer the case.

9.      Before 2001, Masonite manufactured Doorskins, but not Interior Molded Doors. During that same period, Premdor, Inc. and Premdor U.S. Holdings, Inc. (together, "Premdor") manufactured Interior Molded Doors, but did not manufacture a large amount of Doorskins relative to Masonite or JELD-WEN.[2]

10.     In 2001, Premdor acquired Masonite, creating a vertically-integrated manufacturer of both Doorskins and Interior Molded Doors.

11.     The United States Department of Justice ("DOJ"), recognizing the strong incentive by Interior Molded Door manufacturers to collude to increase the price of Interior Molded Doors and the history of anticompetitive conduct in the market, conditioned the acquisition of Masonite by Premdor on the divestiture of a Doorskins manufacturing plant in Towanda, Pennsylvania. The divestiture created a new entity called CMI Manufacturing, Inc. ("CMI"). CMI was intended to stand alone as a competitive force in the Doorskins Market.

12.     However, on October 24, 2012, Defendant JELD-WEN acquired CMI, thereby removing the safeguard on competition in the Doorskins Market established by the DOJ's

---

[2] In the DOJ's 2001 Competitive Impact Statement of the proposed Masonite-Premdor merger, the DOJ described Premdor as being a "small, but significant, participant in the interior molded doorskin market."

mandated divestiture. The acquisition of CMI by JELD-WEN initially resulted in a duopoly whereby Defendants JELD-WEN and Masonite controlled virtually the entirety of the Doorskins Market.

13.     Following the 2012 acquisition of CMI by JELD-WEN, Defendants controlled over 72% of the Interior Molded Doors market, with the remaining market share divided among a handful of smaller Interior Molded Door manufacturers that do not manufacture their own Doorskins or have nationwide distribution networks.

14.     Even before the 2012 merger, both JELD-WEN and Masonite had methodically eliminated their competition in the Interior Molded Doors Market through a series of acquisitions of smaller residential Interior Molded Door manufacturers.

15.     More recently, Defendants have jointly sought to eliminate competition in the Interior Molded Door Market by halting their longstanding practices of supplying Doorskins to smaller Interior Molded Door manufacturers. Specifically, pursuant to Defendants' unlawful agreement, Masonite announced in 2014 that it would no longer sell Doorskins to other Interior Molded Door manufacturers that competed against it—leaving JELD-WEN as the sole supplier of Doorskins in the market.

16.     Masonite's decision to halt its Doorskins sales to independent Interior Molded Door manufacturers was an unprecedented shift in business practice and, if not for the unlawful conspiracy alleged herein, would have been entirely contrary to Masonite's own economic interests. By halting its Doorskins sales, Masonite handed over the entire Doorskins Market to JELD-WEN.

17.     Around the time of Masonite's announcement that it was halting sales to competing Interior Molded Door manufacturers, JELD-WEN began taking adverse actions

4

against independent Interior Molded Door manufacturers with which it had long-term supply agreements by, among other things, raising prices of Doorskins notwithstanding its own declining costs and terminating supply agreements prematurely. JELD-WEN's conduct concerning its sales of Doorskins undermined the ability of independent Interior Molded Door manufacturers to compete with Defendants for the sale of Interior Molded Doors.

18.     The markets for both Interior Molded Doors and Doorskins are highly concentrated and characterized by high barriers to entry due to time and capital requirements. Other types of doors are not adequate substitutes for Interior Molded Doors due to aesthetic and cost differences.

19.     The markets for Interior Molded Doors and Doorskins are limited to the contiguous United States due to the high shipping costs associated with foreign-made Interior Molded Doors and/or Doorskins.

20.     Both Defendants also manufacture completed Interior Molded Doors, the product at issue, utilizing their own Doorskins.

21.     Defendants' competitors in the Interior Molded Doors Market were also their customers in the Doorskins Market and were completely dependent on Defendants for the Doorskins necessary to manufacture their Interior Molded Doors.

22.     This market structure that resulted from Defendants' conduct as alleged herein has enabled Defendants to repeatedly impose uniform price increases on Interior Molded Doors without any competitive constraints.

23.     Defendants also communicated regularly regarding their pricing intentions. Numerous high-ranking executives have crossed over from one Defendant company to the other and have maintained close relationships dating back to the 1980s.

24.     Certain elements of Defendant JELD-WEN's anticompetitive conduct as alleged in this complaint have already been proven as a matter of law. On June 29, 2016, Steves and Sons, Inc. ("Steves"), filed an antitrust action against JELD-WEN alleging violations of Section 7 of the Clayton Act, breach of contract, breach of warranty, and trespass to chattels.[3]  Steves also sought a declaratory judgment and specific performance.

25.     Steves manufactures Interior Molded Doors. Accordingly, it directly competes with Defendants in the Interior Molded Door Market.

26.     On February 5, 2018, the jury returned a verdict in Steves' favor, finding JELD-WEN had violated Section 7 of the Clayton Act, awarding $9,933,602 in damages arising from overcharges on Doorskins and $46,480,581 for future lost profits, trebled to over $170 million.[4]

27.     On October 5, 2018, the district court granted Steves' motion for "extraordinary" equitable relief and ordered the divestiture of a Doorskins manufacturing plant in Towanda, Pennsylvania that was acquired by JELD-WEN through its 2012 merger with CMI. The court noted that this was the first such instance of divestiture in the context of a private action under Section 16 of the Clayton Act.[5]

28.     As a result of Defendants' anticompetitive conduct described herein, Plaintiff and other putative class members paid more for Interior Molded Doors than they would have paid absent Defendants' anticompetitive conduct.

---

[3] *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545 (E.D. Va. June 29, 2016) (ECF No. 1) (Payne, J.).
[4] *Id.* at ECF No. 1786.
[5] *Steves & Sons, Inc. v. JELD-WEN, Inc.*, --- F. Supp. 3d ----, 2018 WL 4855459, at *36 (E.D. Va., Oct. 5. 2018).

## **THE PARTIES**

**Plaintiffs**

29.     Plaintiff Twin City Development, LLC is an Arkansas corporation with its principal place of business located in Arkansas. During the Class Period and while located in Arkansas, Plaintiff Twin City Development indirectly purchased one or more Interior Molded Doors, for its own use and not for resale, that was produced by one or more Defendants. Plaintiff Twin City Development suffered injury as a result of Defendants' conduct alleged herein.

30.     Plaintiff Margaret Preece was a resident at all relevant times of Arizona. During the Class Period and while residing in Arizona, Plaintiff Preece indirectly purchased one or more Interior Molded Doors, for her own use and not for resale, that was produced by one or more Defendants. Plaintiff Preece suffered injury as a result of Defendants' conduct alleged herein.

31.     Plaintiff Trinidad Corona was a resident at all relevant times of California. During the Class Period and while residing in California, Plaintiff Corona indirectly purchased one or more Interior Molded Doors, for her own use and not for resale, that were produced by one or more Defendants. Plaintiff Corona suffered injury as a result of Defendants' conduct alleged herein.

32.     Plaintiff Melanie Lopez was a resident at all relevant times of California. During the Class Period and while residing in California, Plaintiff Lopez indirectly purchased one or more Interior Molded Doors, for her own use and not for resale, that were produced by one or more Defendants. Plaintiff Lopez suffered injury as a result of Defendants' conduct alleged herein.

33.     Plaintiff Robyn Adler was a resident at all relevant times of Florida. During the Class Period and while residing in Florida, Plaintiff Adler indirectly purchased one or more

Interior Molded Doors, for her own use and not for resale, that were produced by one or more Defendants. Plaintiff Adler suffered injury as a result of Defendants' conduct alleged herein.

34.     Plaintiff Gregory Allen Reitmeyer was a resident at all relevant times of Florida. During the Class Period and while residing in Florida, Plaintiff Reitmeyer indirectly purchased one or more Interior Molded Doors, for his own use and not for resale, that were produced by one or more Defendants. Plaintiff Reitmeyer suffered injury as a result of Defendants' conduct alleged herein.

35.     Plaintiff Justin Verschoore was a resident at all relevant times of Illinois. During the Class Period and while residing in Illinois, Plaintiff Verschoore indirectly purchased one or more Doors, for his own use and not for resale, that were produced by one or more Defendants. Plaintiff Newcomb suffered injury as a result of Defendants' conduct alleged herein.

36.     Plaintiff Kenneth Dallamora was a resident at all relevant times of Massachusetts. During the Class Period and while residing in Massachusetts, Plaintiff Dallamora indirectly purchased one or more Interior Molded Doors, for his own use and not for resale, that were produced by one or more Defendants. Plaintiff Dallamora suffered injury as a result of Defendants' conduct alleged herein.

37.     Plaintiff Thomas J. Riley was a resident at all relevant times of Massachusetts. During the Class Period and while residing in Massachusetts, Plaintiff Riley indirectly purchased one or more Interior Molded Doors in New Hampshire, for his own use and not for resale, that were produced by one or more Defendants. Plaintiff Riley suffered injury as a result of Defendants' conduct alleged herein.

38.     Plaintiff Jane E. Swim was a resident at all relevant times of Michigan. During the Class Period and while residing in Michigan, Plaintiff Swim indirectly purchased one or more

Interior Molded Doors, for her own use and not for resale, that were produced by one or more Defendants. Plaintiff Swim suffered injury as a result of Defendants' conduct alleged herein.

39.     Plaintiff Gary Bendickson was a resident at all relevant times of Minnesota. During the Class Period and while residing in Minnesota, Plaintiff Bendickson indirectly purchased one or more Interior Molded Doors, for his own use and not for resale, that were produced by one or more Defendants. Plaintiff Bendickson suffered injury as a result of Defendants' conduct alleged herein.

40.     Plaintiff Sawbill Companies, Inc. is a Minnesota corporation with its principal place of business located in Minnesota. During the Class Period and while located in Minnesota, Plaintiff Sawbill Companies indirectly purchased one or more Interior Molded Doors, for its own use and not for resale, that were produced by one or more Defendants. Plaintiff Sawbill Companies suffered injury as a result of Defendants' conduct alleged herein.

41.     Plaintiff Elliott Massey was a resident at all relevant times of Mississippi. During the Class Period and while residing in Mississippi, Plaintiff Massey indirectly purchased one or more Doors, for his own use and not for resale, that were produced by one or more Defendants. Plaintiff Massey suffered injury as a result of Defendants' conduct alleged herein.

42.     Plaintiff Wally Bloss was a resident at all relevant times of Missouri. During the Class Period and while residing in Missouri, Plaintiff Bloss indirectly purchased one or more Doors, for his own use and not for resale, that were produced by one or more Defendants. Plaintiff Bloss suffered injury as a result of Defendants' conduct alleged herein.

43.     Plaintiff Allison Dellatore was a resident at all relevant times of New York. During the Class Period and while residing in New York, Plaintiff Dellatore indirectly purchased one or more Interior Molded Doors, for her own use and not for resale, that were produced by

one or more Defendants. Plaintiff Dellatore suffered injury as a result of Defendants' conduct alleged herein.

44.     Plaintiff Benjamin Prusky was a resident at all relevant times of New York. During the Class Period and while residing in New York, Plaintiff Prusky indirectly purchased one or more Interior Molded Doors, for his own use and not for resale, that were produced by one or more Defendants. Plaintiff Prusky suffered injury as a result of Defendants' conduct alleged herein.

45.     Plaintiff Larry Day Fox was a resident at all relevant times of North Carolina. During the Class Period and while residing in North Carolina, Plaintiff Fox indirectly purchased one or more Interior Molded Doors, for his own use and not for resale, that were produced by one or more Defendants. Plaintiff Fox suffered injury as a result of Defendants' conduct alleged herein.

46.     Plaintiff Chris Best was a resident at all relevant times of Oregon.  During the Class Period and while residing in Oregon, Plaintiff Best indirectly purchased one or more Interior Molded Doors, for his own use and not for resale, that were produced by one or more Defendants. Plaintiff Best suffered injury as a result of Defendants' conduct alleged herein.

47.     Plaintiff Julie Whalen was a resident at all relevant times of Oregon.  During the Class Period and while residing in Oregon, Plaintiff Whalen indirectly purchased one or more Interior Molded Doors, for her own use and not for resale, that were produced by one or more Defendants. Plaintiff Whalen suffered injury as a result of Defendants' conduct alleged herein.

48.     Plaintiff Nigel Gay was a resident at all relevant times of South Carolina. During the Class Period and while residing in South Carolina, Plaintiff Gay indirectly purchased one or

more Interior Molded Doors, for his own use and not for resale, that were produced by one or more Defendants. Plaintiff Gay suffered injury as a result of Defendants' conduct alleged herein.

49.     Plaintiff Geoff Hurdle was a resident at all relevant times of Tennessee. During the Class Period and while residing in Tennessee, Plaintiff Hurdle indirectly purchased one or more Interior Molded Doors, for his own use and not for resale, that were produced by one or more Defendants. Plaintiff Hurdle suffered injury as a result of Defendants' conduct alleged herein.

**Defendants**

50.     Defendant JELD-WEN, Inc. is a Delaware Corporation with a principal place of business at 2645 Silver Crescent Drive, Charlotte, North Carolina 28273.  At the time of the 2012 merger, JELD-WEN was an Oregon corporation headquartered in Oregon. JELD-WEN is a wholly owned subsidiary of JELD-WEN Holding, Inc.  JELD-WEN is registered with the Virginia State Corporation Commission as a foreign corporation and maintains a registered agent in Virginia.

51.     Defendant Masonite International Inc. is a Delaware Corporation with a principal place of business at One Tampa City Center, 201 North Franklin Street, Suite 300, Tampa, Florida 33602.  Masonite is a wholly owned subsidiary of Masonite International Corporation. Masonite is registered with the Virginia State Corporation Commission as a foreign corporation and maintains a registered agent in Virginia.

## JURISDICTION AND VENUE

52.     Plaintiffs bring this state law class action on behalf of the Damages Class to recover actual and/or compensatory damages, double and treble damages as permitted. This class action is brought on behalf of the Classes (defined below) for pre- and post-judgment interest,

costs, and attorneys' fees for the injury caused by Defendants' conduct in anticompetitively increasing the price of Interior Molded Doors. Plaintiffs bring this action on behalf of the Nationwide Class (defined below) under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). This court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

53.     Plaintiffs also assert claims for actual and exemplary damages and injunctive relief pursuant to state antitrust, unfair competition, and consumer protection laws, and seek to obtain restitution, recover damages, and secure other relief against Defendants for violation of those state laws. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that: (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from some defendants; and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

54.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), (c) and (d) because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

55.     This court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, shipped, sold, and/or delivered substantial quantities of Interior Molded Doors throughout the United States, including this District; (c) had substantial contacts with the United

States, including this District; and/or engaged (d) in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

56.     The activities of Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

<u>**TRADE AND COMMERCE**</u>

57.     During the Class Period, each Defendant, sold Interior Molded Doors in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial District.

58.     During the Class Period, Defendants collectively controlled a majority of the market for Interior Molded Doors in the United States.

59.     Defendants' business activities substantially affected interstate trade and commerce in the United States and caused injury in the United States.

<u>**FACTUAL BACKGROUND**</u>

60.     Doors used in the interiors of new homes throughout the United States are predominantly Interior Molded Doors, which simulate the aesthetics of solid wood doors but can be manufactured and sold at significantly lower prices. An Interior Molded Door is made by sandwiching a wood frame and a hollow or solid core between two Doorskins.

61.     Manufacturers sell the Interior Molded Doors to distributors, building supply outlets, home centers, and lumber yards. End-users who purchase doors to repair, renovate, or remodel an existing home typically purchase Interior Molded Doors from retail building supply

outlets or through a contractor or builder, who in turn purchases Interior Molded Doors primarily from distributors, lumber yards, home centers, and building supply outlets.

62.     A Doorskin is the component which makes up the front and back of an Interior Molded Door. Doorskins are formed from a fibrous material, such as wood chips or sawdust, which is softened in a digester, refined with wax and resin, and then formed into a mat. The mat is cut into sheets and then loaded into a hot press. After coming off the press, the resulting Doorskins are sized, trimmed, primed or painted, packed, and shipped to an Interior Molded Door manufacturer.

63.     Before Masonite's exit from the Doorskins Market in 2014, JELD-WEN and Masonite were the only two suppliers that sold Doorskins to independent Interior Molded Door manufacturers in North America. Since 2014, JELD-WEN has controlled 100% of the Doorskins Market.

64.     Since Doorskins are a necessary input for Interior Molded Doors, entry into the Interior Molded Door Market requires access to Doorskins. There are at least three barriers to entry in the Doorskins Market: (1) prohibitive startup costs to open manufacturing facilities that can provide an ample variety of molded doors styles; (2) significant IP and trademarks, which can result in costly litigation; and (3) a national distribution network. Masonite has estimated that an investment of approximately $160 million to $204 million would be required to enter the Interior Molded Door Market, and that each step of production "[p]oses [u]nique [c]hallenges."

### I.   Industry Consolidation in the Interior Molded Doors and Doorskins Markets

65.     In the last few decades, there has been considerable consolidation among manufacturers of Interior Molded Doors. In the 1990s, JELD-WEN became vertically-integrated and subsequently purchased a number of independent Interior Molded Door manufacturers and

Interior Molded Door manufacturing plants over a short period of time, including Michigan Birch Door and its Doorcraft division,[6] an Interior Molded Door manufacturing plant from Young Door,[7] and Morgan Door Co.[8]

66.     In 2000, Premdor was the largest manufacturer and merchandiser of all varieties of doors in the world. Premdor had achieved this market position through an aggressive series of mergers and acquisitions in the late 1980s and 1990s, including a 1989 merger with Century Wood Door, which had been one of Premdor's chief rivals.[9] In 1998, Premdor acquired Georgia Pacific's fabrication operations, enabling Premdor "to launch a network of logistical and fabrication centers to serve the big box home improvement chains in the United States such as The Home Depot and Lowe's."[10]

67.     In 2000, Defendant JELD-WEN was an Interior Molded Door manufacturer that was vertically integrated, i.e., it manufactured both Doorskins and Interior Molded Doors. Premdor was a second Interior Molded Door manufacturer that was somewhat vertically

---

[6] *Door Maker to Plead Guilty to Price-Fixing*, Wall Street Journal, (Aug. 30, 1996, 12:01 A.M.), https://www.wsj.com/articles/SB841356486145864500.
[7] *JELD-WEN Closing Alabama Door Plant*, Window & Door (Oct. 21, 2010), https://windowanddoor.com/news-item/companies/jeld-wen-closing-alabama-door-plant.
[8] *JELD-WEN Closing Oshkosh Door Plant*, Window & Door (June 8, 2009), https://windowanddoor.com/news-item/companies/jeld-wen-closing-oshkosh-door-plant.
[9] *Masonite International Corporation History*, Funding Universe, http://www.fundinguniverse.com/company-histories/masonite-international-corporation-history/ (last accessed Jan. 23, 2019).
[10] George Stalk, et. al, Hardball: Are You Playing to Win? 134 (2004), *available at* https://books.google.com/books?id=cscGBgAAQBAJ&pg=PA134&lpg=PA134&dq=premdor+g eorgia+pacific+1998&source=bl&ots=PvSPkDKsMD&sig=JNDEqee8okVJbPI7rRJru9phKAE &hl=en&sa=X&ved=2ahUKEwjYysiVo6reAhVL2oMKHZ6VB_UQ6AEwAXoECAgQAQ#v= onepage&q=premdor%20georgia%20pacific%201998&f=false (last accessed Jan. 23, 2019).

integrated at that time; according to the DOJ, it was a "small, but significant" competitor in the Doorskins Market.[11]

68.     In 2000, Defendant Masonite was manufacturing Doorskins to sell to independent Interior Molded Door manufacturers, but the company had not yet begun selling completed Interior Molded Doors. At that time, Masonite was wholly owned by International Paper.

69.     Masonite and JELD-WEN dominated the Doorskins Market in 2000. A third entity, Fibramold, a Chilean joint venture in which Premdor had an equity interest, accounted for less than 10% of the Doorskins used for the manufacture of Interior Molded Doors in the United States. These were the only three firms with significant sales of Doorskins in the United States at that time, as a small number of other Doorskins manufacturers each sold less than one percent of the Doorskins in the United States.

70.     In 2000, Premdor was the dominant manufacturer in the Interior Molded Door Market, with more than 40% of that market. JELD-WEN was the only other large domestic producer of Interior Molded Doors. Nine other non-vertically-integrated Interior Molded Door manufacturers each had a market share of less than 5%.

71.     Such conditions made for a competitive, if extremely concentrated, market. At the downstream level of Interior Molded Doors, it was not feasible for the two major players, JELD-WEN and Premdor, to coordinate their price on Interior Molded Doors. If JELD-WEN and Premdor had coordinated to raise prices, Masonite would have had an incentive to increase its production of Doorskins, which would have allowed its customers (i.e., the downstream Interior Molded Door manufacturers that competed with JELD-WEN and Premdor) to purchase more Doorskins from Masonite. The independent Interior Molded Door manufacturers could thereby

---

[11] Before its acquisition of Masonite, Premdor owned 48.5% of Fibramold S.A., a Chilean Doorskin manufacturer.

undercut any Interior Molded Door price increases instituted by JELD-WEN and Premdor, thwarting any attempt by the two to collude on Interior Molded Door prices.

72.     At the upstream level of Doorskins, Masonite had an incentive to maximize production of Doorskins because it did not also sell Interior Molded Doors. The existence of Masonite as an outside source of Doorskins incentivized the other two major Doorskins manufacturers, JELD-WEN and Premdor, to sell their Doorskins at reasonable prices to independent Interior Molded Door manufacturers.

***Premdor's Acquisition of Masonite***

73.     On September 30, 2000, Masonite's then-parent company, International Paper, and Premdor announced that International Paper intended to sell Masonite to Premdor. At the time, Masonite owned two Doorskins plants in the United States: one plant located in the Towanda, Pennsylvania, and a second plant in Laurel, Mississippi.

74.     On August 3, 2001, the DOJ filed suit to block the merger, alleging that Premdor's acquisition of Masonite and its related assets would violate Section 7 of the Clayton Act. *United States v. Premdor, et al.,* No. 1:01-CV-01696 (D.D.C.).

75.     As the DOJ explained, allowing Premdor to acquire Masonite's Doorskins business would create a new vertically-integrated manufacturer that would harm competition in the downstream market for Interior Molded Doors by creating incentives to limit the supply of Doorskins:

> Masonite acts as a significant competitive constraint in the interior molded door market. Premdor and the non-party firm [JELD-WEN] have an incentive to attempt to coordinate pricing by reducing output. Coordination would reduce the output of interior molded doors, and lead to higher door prices. However, such an output reduction would also reduce the output of interior molded doorskins sold in the United States, harming Masonite. Thus, Masonite would have an incentive to disrupt such coordination through increased sales to the other non- vertically integrated door manufacturers. After the proposed transaction, a vertically

integrated Premdor/Masonite combination will not have the same incentive to defeat coordination in the interior molded door market by increasing sales to the non-integrated door manufacturers since the combined company would be competing against those door manufacturers, and would benefit from an increase in the prices of interior molded doors.[12]

76.     The DOJ further explained that a vertically-integrated Masonite/Premdor would have an incentive to coordinate with the already vertically-integrated JELD-WEN:

> Documentary evidence obtained from the defendants suggests that the non-party firm [JELD-WEN], as a fully vertically integrated manufacturer, has certain cost advantages over Masonite and Premdor that it has used to lower prices to build market share. This differing cost structure among the dominant firms is an impediment to coordination. The evidence from the defendants suggests that post-acquisition, the cost structures of the two vertically integrated firms would be more closely aligned, decreasing the opportunity for the non-party firm [JELD-WEN] to increase its market share profitably through lower prices, and thus increasing the non-party firm's incentive to coordinate with the combined Premdor/Masonite. In fact, Masonite recognized that the non-party firm's [JELD-WEN's] incentive to gain market share by lowering price would diminish if it faced a strong, integrated competitor.[13]

77.     The same day it filed suit, the United States also filed a proposed final judgment that would permit the merger to take place, but only if the Towanda Doorskins plant—in conjunction with an exclusive world-wide right to the "CraftMaster" name and design names for Doorskins, intellectual property related to the manufacture and sale of Doorskins, a customer list, and the right to hire Masonite employees—was divested from Masonite and spun off to a buyer acceptable to the United States. Following the required public comment period, this judgment became final and was entered by the court on April 5, 2002. With the merger thus approved,

---

[12] *United States v. Premdor Inc., Premdor U.S. Holdings, Inc., International Paper Company, and Masonite Corporation; Proposed Final Judgment and Competitive Impact Statement,* FEDERAL REGISTER (Aug. 28, 2001), *available at* https://www.federalregister.gov/documents/2001/08/28/01-21645/united-states-v-premdor-inc-premdor-us-holdings-inc-international-paper-company-and-masonite.
[13] *Id.*

Premdor acquired Masonite and, going forward, operated the combined businesses under the name of "Masonite."

78.    This divestiture resulted in the creation of CMI. On March 29, 2002, CMI purchased the Towanda Doorskins plant. Through that acquisition, CMI became a third major competitor in the Doorskins Market, selling Doorskins to independent Interior Molded Door manufacturers in competition with JELD-WEN and Masonite. CMI was created to maintain competition in the Interior Molded Door Market with CMI manufacturing and selling all designs and sizes of Doorskins that Masonite sold at the time in the United States.

79.    After the acquisition of Masonite by Premdor and the creation of CMI, there was substantial additional consolidation that eroded competition in the Doorskins Market. In 2002, Masonite International, Masonite's parent company, acquired the remaining interests in Fibramold—the only other Doorskins manufacturer besides JELD-WEN and Masonite that the DOJ considered to be significant when evaluating Premdor's acquisition of Masonite in 2000.[14] In 2002, Masonite International also acquired a majority ownership interest in Sacopan Inc., a Canadian company which manufactured Doorskins in Quebec and from that point on operated as a subsidiary of Masonite;[15] in 2008, Masonite International acquired the remaining interest in Sacopan.[16]

---

[14] Form 40-F, U.S. Securities and Exchange Commission, (Dec. 2002), *available at* https://www.sec.gov/Archives/edgar/data/893691/000090956703000655/t09675e40vf.htm.
[15] *Company Overview of Sacopan, Inc.*, Bloomberg, https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=11810529 (last accessed Jan. 23, 2019).
[16] *Masonite International Corporation Announces Acquisition of Additional Shares of a Canadian Subsidiary*, BusinessWire, (June 20, 2008, 3:20 P.M.), https://www.businesswire.com/news/home/20080630006418/en/Masonite-International-Corporation-Announces-Acquisition-Additional-Shares.

80.     Consolidation in the Doorskins Market continued as JELD-WEN, Masonite International, and the newly-formed CMI continued to acquire Interior Molded Door manufacturers.

81.     In 2005, CMI acquired C&S Door, a residential door manufacturer with plants in Christiansburg, Virginia, and Ozark, Alabama. This made CMI another vertically integrated Doorskins and Interior Molded Door company. In 2010, CMI also acquired Illinois Flush Door Co. in Plainfield, Illinois, a manufacturer and distributor of a full line of interior doors that had been established in 1944

82.     Masonite acquired two additional Interior Molded Door manufacturers in 2010: Ledco, Inc. (previously Lake Erie Door Company), a premier interior door manufacturer that had been in the business of selling door products since 1964, and had a strong wholesale customer base east of the Rockies; and Lifetime Doors, Inc., an interior door manufacturer specializing in molded, veneer, prefinished, and bifold doors that had manufactured and sold doors since 1947.

83.     JELD-WEN also continued to acquire Interior Molded Door companies, acquiring CMI in 2012 (discussed in more detail *infra*); Karona, Inc., a Michigan-based manufacturer of residential doors, in 2015; Milliken Millwork, Inc., a leading provider of doors in the Midwest United States, in 2017; and most recently, American Building Supply, Inc., a provider of residential doors based in Sacramento, California, in 2018.

84.     This industry consolidation has resulted in JELD-WEN and Masonite controlling a commanding share of the market for Interior Molded Doors with the rest controlled by a handful of small, regional Interior Molded Doors manufacturers, as illustrated by this excerpt from a Masonite investor presentation:



85.    On or about June 18, 2012, JELD-WEN publicly announced its intent to merge with and acquire CMI.

86.    JELD-WEN's acquisition of CMI closed on or about October 24, 2012. By that acquisition, JELD-WEN gained ownership of the Towanda Doorskins plant, leaving itself and Masonite as the only two potential suppliers of Doorskins in the United States.

87.    The competitive landscape that resulted from JELD-WEN's 2012 acquisition of CMI ("the 2012 Merger") was two dominant, vertically-integrated Interior Molded Door manufacturers with incentives to coordinate—exactly what the DOJ had warned of when it required Premdor to divest the assets represented by CMI in 2001.

21

88.     The Herfindahl-Hirschman Index ("HHI") is a commonly-accepted measure of market concentration used by the Department of Justice to assess market competitiveness. The HHI for the interior door industry is greater than 2,669, which falls under the "highly concentrated" industry threshold in the DOJ's horizontal merger guidelines and is visibly evident from the graph below.



89.     In an October 5, 2018 post-trial opinion on the issue of divestiture in *Steves & Sons, Inc. v. JELD-WEN, Inc.*, Civ. No. 3:16-cv-545, 2018 WL 4855459 (E.D. Va. Oct. 5, 2018), a case in which Steves, an independent Interior Molded Door manufacturer, successfully brought a Section 7 claim against JELD-WEN, Judge Payne stated the following:

> Here, as the jury found, and the record shows, **the merger [between JELD-WEN and CMI] substantially reduced competition in the doorskin industry.** Less than two years after the merger reduced the number of suppliers from three to two, one of those suppliers essentially withdrew from the market, **thereby depriving the Independents [non-vertically integrated door manufacturers] of that key component of a reliable supply source.**
>
> . . . Although the Court could solve Steves' supply problem by ordering JELD-WEN to supply Steves' requirements for a long term, **that alternate remedy would not restore competition in the industry as a whole. And, the record proves that the lessened competition has adversely affected the Independents**

**[non-vertically integrated door manufacturers] other than Steves**. So simply securing a long-term supply for Steves **would not aid those manufacturers.**

*Id.* at *38 (emphasis added).

## II.        Conspiracy to Fix Prices of Interior Molded Doors

90.        According to RBC Capital, "[a] series of recent acquisitions has turned the [Interior Molded Door Market] into a duopoly, with Masonite and JELD-WEN each controlling about 40% of the residential [door] market [as a whole]."[17] This duopoly power has allowed Defendants to consistently raise prices in the Interior Molded Door Market without a decrease in demand. In fact, Masonite raised prices four times between 2013 and 2015, according to FBR Capital.[18]

91.        Additionally, as depicted in the graphs below, both Defendants have experienced significant increases in profitability throughout the duration of the Class Period. Masonite (referred to below as its ticker, "DOOR") has experienced significant rising profits since 2012.[19]

---

[17] Avi Salzman, *Masonite Is A Cheap Housing Play*, Barron's, (Aug. 1, 2015),
https://www.barrons.com/articles/masonite-is-a-cheap-housing-play-1438410748.
[18] *Id.*
[19] David Trainer, *Underappreciated Operational Efficiency Could Boost Masonite Sales*, Forbes,
(May 10, 2018, 9:50 AM),
https://www.forbes.com/sites/greatspeculations/2018/05/10/underappreciated-operational-efficiency-could-boost-masonite-shares/#1c76c1765eb1.



Similarly, JELD-WEN has experienced consistent rising EBITDA margins throughout the duration of the conspiracy.[20]



92.    Unsurprisingly, Defendant JELD-WEN reported profit margins in excess of 20% in 2016 and 2017.[21] A recent JP Morgan Analyst Report found that due to market structure

---

[20] *Q4 and Full Year 2017 Results Presentation*, JELD-WEN Windows and Doors, (Feb. 21, 2018), *available at* http://investors.jeld-wen.com/~/media/Files/J/Jeld-Wen-IR/reports-and-presentations/jeld-q4-2017-earnings-presentation.pdf (last accessed Feb. 1, 2019).

factors, JELD-WEN has been able to achieve "solid pricing power over the last several years."[22]
JP Morgan notes that company-wide, JELD-WEN's gross margin expansion over the period of
2013–16 was driven by improved pricing compared to the period of 2011–13 and the company's
success in implementing price increases.[23] In fact, company-wide, prices had increased at an
average rate of 5% per year in North America, significantly outstripping its price increases in
Europe or Australasia.[24]

93.     As it discussed in its annual reports, during this time JELD-WEN shifted from its
old strategy that focused on increasing market share which "often led to competing on price" to a
new strategy JELD-WEN characterized as "pricing optimization."[25] When sales forces have
incentives to pursue increases in market share, such incentives can run counter to cartel activity.
For this reason, a shift away from a pricing policy focused on increasing market share can be
suggestive of a conspiracy.

94.     Starting at least as early as 2012, Defendants engaged in a conspiracy to raise, fix,
maintain and or stabilize the prices of Interior Molded Doors. Specifically, since JELD-WEN's

---

[21] *See* JELD-WEN, *2017 Annual Report*, http://investors.jeld-wen.com/~/media/Files/J/JELD-
WEN-IR/documents/annual-reports-and-proxies/2017-annual-report.pdf (last accessed Feb. 1,
2019).
[22] J.P. Morgan JELD-WEN Report, Feb. 1, 2017, at p. 3.
[23] *Id.*
[24] *Id.*, at p. 16 Table 4.
[25] Amendment No. 6 to FORM S-1 Registration Statement Under the Securities Act of 1933:
JELD-WEN Holding, Inc., SECURITIES AND EXCHANGE COMMISSION, (Jan. 17, 2017),
*available at*
https://www.sec.gov/Archives/edgar/data/1674335/000119312517010414/d305299ds1a.htm;
*JELD WEN: Management's Discussion and Analysis of Financial Condition and Results of
Operations (Form 10-K)*, MarketScreener (Mar. 6, 2018, 4:43 PM),
https://www.marketscreener.com/JELD-WEN-HOLDING-INC-33385197/news/JELD-WEN-
Management-s-Discussion-and-Analysis-of-Financial-Condition-and-Results-of-Operations-fo-
26117569/.

2012 acquisition of CMI, JELD-WEN and Masonite have adopted numerous uniform price increases on Interior Molded Doors.

95.    These price increases were larger and in a different form than prior price increases. Historically, price increases would be in amounts such as 25 cents or $1 per door. Beginning around 2012, each Defendant began increasing prices by percentages.

| Company | Notice Date | Effective Date | Increase |
| --- | --- | --- | --- |
| JELD-WEN | 11/15/2012 | 02/04/2013 | 3%-5% |
| Masonite | 12/06/2012 | 03/18/2013 | 3%-6% |
| JELD-WEN | 08/06/2013 | 10/07/2013 | 4% |
| Masonite | 08/13/2013 | 09/30/2013 | 5% |
| Masonite | 10/31/2013 | 02/03/2014 | 5% |
| JELD-WEN | 11/18/2013 | 01/27/2014 | 5% |
| JELD-WEN | 06/09/2014 | 08/11/2014 | 9.5% |
| Masonite | 06/17/2014 | 08/18/2014 | 8% |
| Masonite | 12/01/2014 | 03/02/2015 | 5% |
| JELD-WEN | 12/03/2014 | 03/02/2015 | 5% |
| Masonite | 10/26/2015 | 02/01/2016 | 3%-5% |
| JELD-WEN | 10/28/2015 | 02/01/2016 | 3%-5% |
| Masonite | 10/4/2016 | 01/01/2017 | 5-7% |
| JELD-WEN | 10/18/2016 | 01/03/2017 | 5% |
| JELD-WEN | 03/06/2018 | 05/07/2018 | 6% |
| Masonite | 03/2018 | 06/01/2018 | 6% |
| JELD-WEN | 10/8/2018 | 12/07/2018 | 7% |
| Masonite | 10/8/2018 | 12/15/2018 | 7-9% |

96.    By comparison, inflation (as measured by the Consumer Price Index) ranged between a high of 2.1% in 2012 and a low of 0.1% in 2015 for this same time period. Graphically, this would be:



97.   Defendants' steady, lock-step price increases are not the result of competitive market forces, such as cost or demand factors, as is supported by data reflected in the graph below.  Rather, these increases are attributable to an explicit or tacit agreement to fix prices.



98.   The *Steves and Sons* court found JELD-WEN's Doorskins manufacturing costs actually declined as a result of improvement in the manufacturing process and found that the costs of the improvements were more than offset by associated savings in manufacturing costs.

Since Doorskins are the primary cost/input in Interior Molded Door manufacturing, the cost of manufacturing Interior Molded Doors also likely declined during the same period that Defendants were instituting anticompetitive price increases.

99.     In 2014, JELD-WEN's management team began to strategically change its pricing strategy that had previously "often led to competing on price" to a new strategy emphasizing "pricing optimization." A shift in pricing policy from increasing market share to increasing unit profits is consistent with conspiratorial pricing behavior.

100.    Defendants' price increases alleged herein cannot rationally be explained by normal market forces, such as key input costs or supply and demand factors. The largest input cost of Interior Molded Doors are Doorskins. Since Defendants are vertically-integrated, they control those costs and their price increases have outpaced any increase in their raw material and other costs.

101.    During the Class Period, Masonite never undercut JELD-WEN's pricing for Interior Molded Doors, even if Masonite's profit margin could have allowed for a lower sales price in an effort to take more market share. In the absence of collusion, a competitor would have used this opportunity to try to increase its market share.

102.    Defendants' ability to raise prices has been facilitated by their refusal to provide Doorskins to independent Interior Molded Door manufacturers as evidenced by the fact that Defendants imposed the largest of these increases after Masonite abruptly stopped selling Doorskins to third-party independent Interior Molded Door manufacturers in 2014.

103.    Prior to JELD-WEN's acquisition of CMI in 2012, Masonite, CMI, and JELD-WEN each aggressively competed in the sale of Doorskins to smaller, independent, non-

integrated door manufacturers, such as Steves, Lynden Door Inc., Haley Bros., Unidoor Corporation, Excel Interior Door, and ABS.

104.    In seeking regulatory approval of the CMI acquisition, JELD-WEN tried to assuage concerns held by these independent Interior Molded Door manufacturers and the DOJ that the acquisition would hurt competition in the Doorskins Market. It did so by entering into long-term supply agreements with several of these independent Interior Molded Door manufacturers. As a result of these supply agreements and JELD-WEN's representations concerning the continued supply of Doorskins, the DOJ did not challenge JELD-WEN's acquisition of CMI.

105.    Defendants gained additional leverage to effectuate their unlawful price-fixing conspiracy in 2014 when, pursuant to Defendants' agreement, and in furtherance of their conspiracy to fix prices of Interior Molded Doors, Masonite announced during an investor presentation on June 25, 2014 that it would no longer supply Doorskins to third-parties:

> Only Masonite and JELD-WEN service the entire North American market. And other door assembly companies are smaller and much more regionally focused. And importantly, the other smaller . . . door assembly manufacturers have to get their facing [i.e., doorskins] from somebody else. They're not vertically integrated in their facings. And we, at Masonite, have determined that we will not sell our facings into—to competition. ***So, that only leaves one other outlet for them to get their facings from in North America.***
> (emphasis added).

106.    Masonite offered no explanation for why it was exiting the Doorskins Market. But Masonite's statement, explicitly acknowledging that its exit would leave JELD-WEN as the only option for competing Interior Molded Door manufacturers to purchase Doorskins from, leaves little room for interpretation. It is clear that Masonite intended to cede its entire share in the Doorskins Market to JELD-WEN as part of Defendants' anticompetitive agreement.

107.    Masonite's ongoing refusal to sell Doorskins to other Interior Molded Door manufacturers is against Masonite's economic self-interest absent a conspiracy with JELD-WEN to fix prices of Interior Molded Doors. Because Doorskins are the primary component of Interior Molded Doors, a manufacturer's ability to control the Doorskins Market directly impacts the market for Interior Molded Doors. Masonite has excess capacity in its Doorskin production facilities and, due to the significant upfront and fixed costs of Doorskin manufacturing plants, would be incentivized to increase sales in order to maximize production of and revenue from Doorskins. It is also telling that Masonite exited the Doorskins Market at a time when JELD-WEN, its only real competitor, was experiencing pronounced and protracted quality control issues with its Doorskins. It is implausible that, absent an anti-competitive agreement with JELD-WEN, Masonite would exit a market in which it would have been poised to increase market share given its largest competitor's quality control issues.

108.    By exiting the Doorskins Market, Masonite gave JELD-WEN monopoly power in the Doorskins Market. JELD-WEN was then able to use its power in the Doorskins Market to raise prices in the Interior Molded Door Market. In effect, without competition from Masonite, JELD-WEN has the ability to price its Doorskins at a supracompetitive levels, regardless of the quality of the Doorskins, in order to limit competition from third-party Interior Molded Door manufacturers.

109.    JELD-WEN has, in fact, utilized its dominant position in the Doorskins Market, facilitated by its acquisition of CMI and its agreement with Masonite, to harm independent Interior Molded Door manufacturers. Contrary to its representations to the DOJ as to the competitive significance of its long-term supply relationships with independent Interior Molded Door manufacturers, JELD-WEN's relationship with those independent manufacturers has been

extremely contentious, particularly since Masonite's departure from the Doorskins Market. Faced with these difficulties in sourcing Doorskins, Steves, a smaller Interior Molded Door manufacturer that purchased Doorskins from JELD-WEN, filed a complaint against JELD-WEN in 2016. The complaint alleged that JELD-WEN's 2012 acquisition of CMI undermined its ability to compete in the Interior Molded Door Market and harmed competition, in violation of Section 7 of the Clayton Act. Steves and JELD-WEN had a long-term supply agreement, but JELD-WEN sent a notice of termination in September 2014, effective September 2021.

110.   When threatened with the loss of its supply of Doorskins from JELD-WEN, Steves sought alternative sources to obtain this crucial product. Steves approached Masonite, but Masonite refused to enter into a long-term supply agreement and would only sell to Steves on a spot basis at prices 37% higher than what JELD-WEN charged under its supply agreement with Steves. Before Masonite's exit from the Doorskins Market in 2014, Steves was able to purchase millions of Doorskins from Masonite. In 2012, Masonite also had offered to enter into a long-term supply relationship with Steves before Steves had entered into such a relationship with JELD-WEN.

111.   Steves also explored sourcing its Doorskins from foreign suppliers, but was unable to fulfill its Doorskin requirements from those suppliers. Doorskins manufactured outside of the United States are only used to a limited extent in the United States, as the foreign suppliers only offer a much more limited selection of designs and sizes, and the Doorskins are of questionable quality.[26] Third party purchasers of Doorskins are not able to readily and cost-effectively switch to foreign suppliers, and in fact, the foreign Doorskins plants "produce mostly

---

[26] In addition, Defendants together control approximately 75% of the global manufacturing capacity for Doorskins, in addition to their total control of the Doorskins market within the United States.

traditional, lower margin six panel doors that have been losing share in the industry for over the last five years."[27] In 2018, a jury found in favor of Steves and judgement was entered in favor of Steves in an amount in excess of $170 million.

112.   In sum, JELD-WEN and Masonite's unlawful conduct has undermined the ability of independent Interior Molded Door manufacturers to compete with Defendants in the sale of Interior Molded Doors, enabling Defendants to impose numerous matching anticompetitive price increases on the members of the Classes.

### III.   The Structure and Other Characteristics of the Interior Molded Door Market Support the Existence of a Conspiracy.

113.   The structure and other characteristics of the Interior Molded Door Market make it conducive to anticompetitive conduct among Defendants and make collusion particularly attractive. Specifically, the Interior Molded Door Market (1) is a highly concentrated oligopoly; (2) has significant barriers to entry; (3) concerns a product for which there are no economic substitutes; (4) concerns standardized products with a high degree of interchangeability, and (5) is comprised of participants who had ample opportunities to conspire.

#### a.   The Interior Molded Door Market is Conducive to Collusion Because of the Existence of High Barriers to Entry.

114.   A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market. Specifically, with regard to Interior Molded Door sales in the United States, high barriers to entry, especially those artificially erected by Defendants, have prevented entrants into the market. Thus, barriers to entry help facilitate the formation and maintenance of cartels.

---

[27] J.P. Morgan Jeld-Wen Analyst Report, February 21, 2017, at p. 13.

115.   According to Masonite, the "manufacturing process of a [D]oor is complex and it requires a high level of capital, significant process know-how, and a distributed strategic plant network to provide . . . customers with the high-quality products and industry-leading service levels that they've come to expect and demand."[28]

116.   Analysts estimate that it takes four years and more than $200 million to set up a factory to produce Interior Molded Doors on a large scale.[29] Specifically, according to a leading financial website, a new entrant would have five times the cost of existing players with a minimum of a $100 million investment per plant, and multiple plants are needed.[30]

117.   Additionally, since Doorskins are a necessary input for Interior Molded Doors, entry into the Interior Molded Door Market requires access to Doorskins. There are at least three barriers to entry in the Doorskins Market: (1) prohibitive startup costs to open manufacturing facilities that can provide an ample variety of Interior Molded Door styles; (2) significant IP and trademarks, which can result in costly litigation; and (3) a national distribution network. The Masonite presentation below estimates that to enter the Doorskins Market requires an investment of approximately $160 million to $204 million and each step of production "[p]oses [u]nique [c]hallenges."

---

[28] *Investor Day: Masonite*, BLOOMBERG TRANSCRIPT (Mar. 2, 2018).
[29] Avi Salzman, *Masonite Is A Cheap Housing Play*, BARON'S ONLINE (Aug. 1, 2015).
[30] *The Long Case For Masonite International*, SEEKING ALPHA, (Jun. 11, 2017, 4:00 PM ET), *available at* https://seekingalpha.com/article/4080385-long-case-masonite-international.



118.    The cost to start a Doorskins facility is estimated to be approximately $100–$150 million for the facility, plus an investment of $75 million in die plates to make the different types of Doorskins. Moreover, there are significant time costs that a company would need to incur: Masonite estimates that it would take about four years to get a facility up and running, including (1) 12 months for site selection, planning, and permitting; (2) 24 months for construction; and (3) 12 months for startup and qualification.

119.    The only recently-opened Doorskin manufacturing facility was opened by JELD-WEN in 2012. The facility was originally announced in 2006 and was expected to cost $85

million and be running in two years.[31] After facing a number of setbacks, the plant was finally completed in late 2012 at a cost of over $120 million.[32]

120.    Moreover, even if a new entrant had adequate resources to commit to the development of a Doorskins business, they might be then subject to potentially ruinous patent litigation brought by Defendants. In a filing with the United States Securities and Exchange Commission, JELD-WEN represented that it "rel[ies] primarily on patent, trademark, copyright, and trade secret laws and contractual commitments to protect [its] intellectual property and other proprietary rights."[33] Similarly, in a 2016 Securities and Exchange Commission filing, Masonite represented:

> We protect the intellectual property that we develop through, among other things, filing for patents in the United States and various foreign countries. In the United States, we currently have 213 design patents and design patent applications and 172 utility patents and patent applications. We currently have 197 foreign design patents and patent applications and 283 foreign utility patents and patent applications.[34]

121.    According to the American Intellectual Property Law Association's 2015 Report of the Economic Survey, the median cost of litigating a patent infringement suit through trial in which more than $25 million is at risk is $5 million.

---

[31] Tom Kelley, JELD-WEN Plant Announced for Dodson Location, The Piney Woods Journal, (http://www.thepineywoods.com/JELDWENJan07.htm (last accessed on Feb. 1, 2019).
[32] *Winn Parish picked for $120 million plant*, Nola.com (Jan. 14, 2012), https://www.nola.com/business/index.ssf/2012/01/winn_parish_picked_for_120_mil.html.
[33] JELD-WEN Holding, Inc., *Final Prospectus*, SECURITIES AND EXCHANGE COMMISSION, https://www.sec.gov/Archives/edgar/data/1674335/000119312517345857/d459059d424b4.htm.
[34] Masonite International Corporation, *Form 10-K*, SECURITIES AND EXCHANGE COMMISSION, https://www.sec.gov/Archives/edgar/data/893691/000089369116000072/a2015form10-k.htm.

122.    There is no reason to believe that either Defendant would be willing to voluntarily license their intellectual property to a new entrant at price that would otherwise be available in a fair and competitive market.

123.    The high barriers to entry in both the Interior Molded Door and Doorskins Markets helped facilitate Defendants' price-fixing and conspiracy, as they ensured that no new competitors would be able to enter the Interior Molded Door Market to undermine their collusive prices and pricing terms.

124.    It has been estimated that the construction of a new Doorskin manufacturing facility, with necessary molds and other capital equipment, could involve capital investments substantially in excess of $100 million, take over four years, and be subject to substantial uncertainties.

125.    According to Steves, a new entrant could not successfully enter with a single style of Doorskins; rather, an entrant would have to offer the full range of styles currently demanded by consumers, each of which requires substantial capital investment in a mold. This is because home improvement centers and other Doors customers demand a range of products, so they can in turn offer their own customers a range of choices.

126.    Moreover, supply contracts for Doorskins are sole-source contracts, meaning Interior Molded Door manufacturers cannot buy certain Doorskins models from one manufacturer and other models from a second manufacturer. Thus, no Interior Molded Door manufacturer will enter into a supply agreement with a new manufacturer unless that company can supply the full range of Doorskins models the Interior Molded Door manufacturer requires. Any hypothetical entrant would need to capture essentially all the business of the non-vertically

integrated Door manufacturers to achieve efficient, competitive scale and to make a reasonable return on its investment.

127.    In fact, no new entrant has entered the market since the 2012 Merger, and future entry is unlikely to be timely or sufficient to deter further coordination between Defendants.

### b. Price Inelasticity for Interior Molded Doors Makes the Market Susceptible to Collusion.

128.    The price elasticity of demand shows the responsiveness of the quantity demanded of a good relative to a change in its price. When a seller of goods or services can increase selling price without suffering a substantial reduction in demand, pricing is considered inelastic. Collusion is often associated with inelastic demands, allowing producers to raise their prices collectively without triggering customer substitution and lost sales revenue.[35]

129.    Pricing for Interior Molded Doors is highly inelastic, in large part because no close substitutes exist for Interior Molded Doors. Interior Molded Doors are a necessity for residential buildings for new construction markets, and if an Interior Molded Door is broken, it must be replaced. Solid wood doors are not close substitutes for Interior Molded Doors because they are significantly more expensive and are typically used only in the most expensive homes. Flush doors with hardboard or veneered doorskins are not close substitutes for Interior Molded Doors because they are of poorer quality and lack the aesthetically-pleasing designs of Interior Molded Doors and are therefore less attractive to consumers and are typically used only in entry-level homes or in utility rooms and garages.

130.    A hypothetical small but significant increase in the price of Interior Molded Doors by a cartel would not cause a significant number of purchasers to utilize other doors in lieu of

---

[35] Susan Athey, *et. al.*, *Collusion and Price Rigidity* (last revised Mar. 2000), http://web.mit.edu/athey/www/absrev1f.pdf.

Interior Molded Doors, nor would such a hypothetical price increase cause enough customer turnover to render the increase unprofitable. Historically, changes in the price of Interior Molded Doors have not had a significant impact on the demand for hardboard or veneered flush doors.

131. Because the price for Interior Molded Doors is highly inelastic, Defendants were able to and did collectively raise prices to supracompetitive levels without losing revenue.

### c. Interior Molded Doors Are Standardized Products with a High Degree of Interchangeability.

132. Both Masonite and JELD-WEN make very similar models of Interior Molded Doors. These Interior Molded Doors do not differ significantly in quality, appearance, or use. As a result, those Interior Molded Door models are functionally interchangeable.

133. When products are interchangeable, the primary way to compete is on the basis of price. The avoidance of price-based competition is the primary motivation for forming a cartel. Thus, cartels are more likely when the participants sell interchangeable products.

134. Where a product like an Interior Molded Door is interchangeable, economics suggests that cartel behavior is facilitated because, *inter alia*, cartel members can more easily monitor and detect defections from a price-fixing agreement.

### d. Defendants Had Opportunities to Conspire with Each Other.

135. Defendants had numerous opportunities to meet and conspire under the guise of legitimate business contracts and to perform acts necessary for the operation and furtherance of the conspiracy. At least throughout the Class Period, the Interior Molded Door industry provided ample opportunities for Defendants and/or their parent companies to collude and fix the prices of Doors, through trade association meetings and analyst phone calls.

136.    Masonite International, Masonite's parent company,[36] and JELD-WEN[37] are members of the Window & Door Manufacturers Association ("WDMA"), a trade association that has been in existence since 1927, originally known as the National Door Manufacturers Association. Senior executives from both JELD-WEN and Masonite currently serve on the Board of Directors of the WDMA.[38] The WDMA holds a number of annual meetings where Defendants had the opportunity to meet and discuss pricing, including the Spring Meeting & Legislative Conference jointly sponsored by the National Lumber & Building Material Dealers Association, the Executive Management Conference, the National Architectural Door Conference, and the Technical & Manufacturing Conference.[39]

137.    Masonite International and JELD-WEN are both members of the National Fenestration Ratings Council.[40] Defendants or their parent companies are members of and/or attended meetings organized by the World Millwork Alliance[41] and the Northeastern Retail Lumber Association.[42] Masonite International[43] and JELD-WEN[44] are also both product partners

---

[36] *Member Directory*, WDMA, https://www.wdma.com/members/?id=20179760 (last accessed Feb. 1, 2019).

[37] *Member Directory*, WDMA, https://www.wdma.com/members/?id=20180371 (last accessed Feb. 1, 2019).

[38] *Board of Directors*, WDMA, https://www.wdma.com/page/BoardofDirectors (last accessed Feb. 1, 2019).

[39] *Community Calendar*, WDMA, https://www.wdma.com/events/event_list.asp?show=past&group=&start=&end=&view= (last accessed Feb. 1, 2019).

[40] *NFRC Member Community*, NATIONAL FENESTRATION RATINGS COUNCIL, https://www.nfrccommunity.org/page/MemberList? (last accessed Feb. 1, 2019).

[41] *Masonite Explains its New Online Venture*, WORLD MILLWORK ALLIANCE, (July 25, 2017), https://worldmillworkalliance.com/masonite-explains-new-online-venture/; *Jeld-Wen Announces New CFO*, WORLD MILLWORK ALLIANCE, (Oct. 24, 2017), https://worldmillworkalliance.com/jeld-wen-announces-new-cfo/.

[42] LBM Expo 2018, NORTHEASTERN RETAIL LUMBER ASSOCIATION, https://www.nrla.org/NRLA/LBM_Expo/Exhibitor_and_Sponsor_Listing.aspx (last accessed Feb. 1, 2019).

with Energy star and representatives from both companies have attended at least one conference together.[45] Defendants or their parent companies also attended other trade shows and conventions, such as The International Builders' Show, organized by the National Association of Home Builders, which takes place in January or February each year in Orlando or Las Vegas.[46]

138. Both Masonite and JELD-WEN (or their parent companies) held IPOs in 2013 and 2017, respectively. Masonite and JELD-WEN and their parent companies are covered by several of the same financial analysts and executives. Representatives from each Defendant often attend and present at the same annual investor conferences, such as the J.P. Morgan Homebuilding & Building Products Conference,[47] the Baird Global Industrial Conference,[48] and the Deutsche Bank Global Industrials and Materials Summit.[49]

---

[43] *ENERGY STAR Partner List Results*, ENERGY STAR,
https://www.energystar.gov/index.cfm?fuseaction=estar_partner_list.showPartnerResults&comp
any_name=masonite&s_code=ALL&partner_type_id=ALL&cntry_code=ALL&award_search=
N (last accessed Feb. 1, 2019).
[44] *ENERGY STAR Partner List Results*, ENERGY STAR,
https://www.energystar.gov/index.cfm?fuseaction=estar_partner_list.showPartnerResults&comp
any_name=jeld-
wen&s_code=ALL&partner_type_id=ALL&cntry_code=ALL&award_search=N (last accessed
Feb. 1, 2019).
[45] *ENERGY STAR Attendee List*, ENERGY STAR
https://www.energystar.gov/ia/partners/prod_development/archives/downloads/windows_doors/
Attendee_List.xls?8fd5-1967 (last accessed Feb. 1, 2019).
[46] *NAHB International Builders' Show*, NAHB, https://web.nahb.org/Search/ExhibitorList.aspx
(last accessed Feb. 1, 2019).
[47] *Masonite International Corporation to Present at the J.P. Morgan Homebuilding and Building
Products Conference*, Masonite (May 8, 2018), https://investor.masonite.com/Investors/press-
releases/press-release-details/2018/Masonite-International-Corporation-to-Present-at-the-JP-
Morgan-Homebuilding-and-Building-Products-Conference/default.aspx; *JELD-WEN Holding,
Inc. to Participate in J.P. Morgan 2018 Homebuilding and Building Products Conference*,
BusinessWire, (May 8, 2018, 8:00 AM),
https://www.businesswire.com/news/home/20180510005327/en/JELD-WEN-Holding-
Participate-J.P.-Morgan-2018-Homebuilding.
[48] *Masonite International Corporation to Present at Baird's 2018 Global Industrial Conference*,
Barron's (Oct. 25, 2018, 7:19 PM), https://www.barrons.com/articles/PR-CO-20181025-921582;
*JELD-WEN Holding, Inc. to Participate in Baird 2017 Global Industrial Conference*,

139.    The opportunities for collusion are significantly enhanced because the Interior Molded Door industry is a network comprised of the same players who have been working together since the 1980s. Specifically, a number of senior executives have worked for both Masonite and JELD-WEN and hold close professional relationships with their former colleagues. For example, Philip Orsino, who served as Chief Executive Officer and President of JELD-WEN from August 2011 to March 2014, previously served as the chief executive at Masonite and its predecessor entities from 1984 to 2005.[50] After Orsino became chief executive at JELD-WEN, he brought other former Masonite employees to work at JELD-WEN. A Sales Manager at Masonite under Orsino's leadership from 2002 to 2010 left Masonite and now works as the Vice President of Sales at JELD-WEN.[51] The current Vice President and General Manager of JELD-WEN in North Carolina has been there since October 2012, but previously served as a Managing Director for Masonite International in South Korea from 1996 to 2003.[52]

---

BusinessWire, (Oct. 26, 2017, 4:30 PM), https://www.businesswire.com/news/home/20171026006509/en/JELD-WEN-Holding-Participate-Baird-2017-Global-Industrial.

[49] *Masonite International Corporation to Present at the Annual Deutsche Bank Industrials & Materials Summit*, Masonite, (May 30, 2018), https://investor.masonite.com/Investors/press-releases/press-release-details/2018/Masonite-International-Corporation-to-Present-at-the-9th-Annual-Deutsche-Bank-Industrials--Materials-Summit/default.aspx; *JELD-WEN Holding, Inc. to Participate in the Annual Deutsche Bank Global Industrials & Materials Summit*, BusinessWire, (May 31, 2017, 4:01 PM), https://www.businesswire.com/news/home/20170531006234/en/JELD-WEN-Holding-Participate-Deutsche-Bank-Global-Industrials.

[50] *Onex Completes Investment in JELD-WEN*, Yahoo, (Oct. 3, 2011), https://www.yahoo.com/news/Onex-Completes-Investment-marketwire-3423242147.html.

[51] *Christopher Mercier*, LinkedIn, https://www.linkedin.com/in/christopher-mercier-a33208aa/?trk=seokp-title-professional-name (last accessed Feb. 1, 2019).

[52] *Stephen Fancher*, LinkedIn https://www.linkedin.com/in/stephen-fancher-72525a169/?trk=seokp-title-professional-cta (last accessed Feb. 1, 2019)

140.     During the conspiracy alleged herein, Bob Merrill, served as Executive Vice President of Sales & Marketing at JELD-WEN, was previously CEO of CMI when it was acquired by JELD-WEN, and was formerly a Masonite executive for 19 years.[53]

141.     Other former JELD-WEN employees are now employed at Masonite. For example, an individual who was a Regional Sales Manager at JELD-WEN from 2004 to March 2009 and a Regional Manager at CMI from August 2009 to September 2012, when it was acquired by JELD-WEN, is now a Product Sales Manager at Masonite.[54] Additionally, a Vice President of Sales and Marketing at Masonite from 1988 to 2007 served as Vice President of Sales and Marketing at JELD-WEN from 2011 to 2016.[55]

### e. Defendants are Recidivist Violators of Antitrust Laws.

142.     The residential door industry for years has been highly concentrated, and there is a history of antitrust violations by Interior Molded Door manufacturers. In the 1990s, the DOJ investigated collusion in the residential door industry and several manufacturers, including Defendants' predecessors and subsidiaries, pleaded guilty to conspiring to fix the prices of residential doors and paid substantial fines. In connection with this investigation, roughly $9 million in criminal antitrust fines were assessed.[56]

---

[53] *Bob Merrill*, LinkedIn, https://www.linkedin.com/in/bob-merrill-5b8b24/ (last accessed Feb. 1, 2019).
[54] *Daryl Breymeyer*, LinkedIn, https://www.linkedin.com/in/darylbreymeyer/ (last accessed Feb. 1, 2019).
[55] *Joe Wathey*, LinkedIn, https://www.linkedin.com/in/joe-wathey-4832716/ (last accessed Feb. 1, 2019).
[56] *Michigan Door Manufacturer Agrees to Plead Guilty and Pay $1.55 Million Fine For Price Fixing*, DEPARTMENT OF JUSTICE, (Aug. 29, 1996), https://www.justice.gov/archive/atr/public/press_releases/1996/0859.htm.

143.    In 1994, Premdor, the predecessor to Masonite, pleaded guilty and paid a $6 million fine.[57]

144.    In 1994, Illinois Flush Door, Inc., which was subsequently acquired by CMI and in turn acquired by JELD-WEN, pleaded guilty and agreed to pay a $160,000 criminal fine.[58]

145.    In 1994, Ledco, Inc., which was subsequently acquired by Masonite, pleaded guilty and agreed to pay a $250,000 criminal fine.[59]

146.    In 1996, Michigan Birch Door Manufacturers, Inc., a subsidiary of JELD-WEN, pleaded guilty and agreed to pay a $1.55 million criminal fine.[60]

147.    In sum, Defendants' unlawful agreement to fix prices of Interior Molded Doors is supported by, among other things: (i) Defendants' sudden and dramatic parallel price increases, which absent a conspiracy to fix prices, ran contrary to their economic interests; (ii) the high level of market concentration in both the Interior Molded Door and Doorskins Markets; (iii) significant barriers to entry in both the Interior Molded Doors and Doorskins Markets, (iv) lack of economic substitutes for Interior Molded Doors, (v) standardization of Interior Molded Doors with a high degree of interchangeability; and (vi) the myriad opportunities that employees of Defendants had to conspire with one another to fix prices of Interior Molded Doors, coupled with their motivation to achieve such an unlawful end.

---

[57] Sharon Walsh, *Door Manufacturer to Pay $6 Million Fine for Fixing Prices*, Washington Post, (June 15, 1994), https://www.washingtonpost.com/archive/business/1994/06/15/door-manufacturer-to-pay-6-million-fine-for-fixing-prices/dc1d4cba-6402-4d59-b5e3-28be0f9bba2b/?noredirect=on&utm_term=.067bb78a2fcd.

[58] *Annual Report on Developments in Competition in the United States (October 1, 1994 through September 30, 1995)*, ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT, at p. 12 (April 17, 1996), https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international-competition-fora/1996--Annual%20Report%20on%20Developments%20in.pdf.

[59] *Id.*

[60] *Business Briefly*, The Hartford Courant, (Aug. 30, 1996), http://www.courant.com/news/connecticut/hc-xpm-1996-08-30-9608300213-story.html.

## CLASS ACTION ALLEGATIONS

148.    Plaintiffs bring this action on behalf of themselves, and as a class action under the

Federal Rules of Civil Procedure, Rule 23(a) and (b)(2) seeking equitable and injunctive relief on

behalf of the following class (the "Nationwide Class"):

> **Nationwide Class**: All persons and entities in The United States
> who, during the Class Period, indirectly purchased Interior Molded
> Doors for their own use and not for resale that were manufactured
> or sold by Defendants or Defendants' co-conspirators.

149.    Plaintiffs bring this action on behalf of themselves and as a class action under

Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to

antitrust, unfair competition, consumer protection, and unjust enrichment laws, on behalf of the

following class (the "Damages Class"):

> **Damages Class:** All persons and entities who, during the Class
> Period, indirectly purchased Interior Molded Doors in the Indirect
> Purchaser States[61] for their own use and not for resale that were
> manufactured or sold by Defendants or Defendants' co-
> conspirators.

150.    The Nationwide Class and Damages Class are referred to collectively as the

"Classes" unless otherwise indicated. Specifically excluded from the Classes are the following:

    a.   Purchasers of Interior Molded Doors directly from Defendants;

    b.   Purchasers of Interior Molded Doors for resale;

    c.   Defendants;

    d.   The officers, directors or employees of any Defendant;

    e.   Any entity in which any Defendant has a controlling interest; and any affiliate,

         legal representative, heir or assign of any Defendant;

---

[61] The "Indirect Purchaser States" are the states listed in the Second, Third, and Fourth claims for
relief.

44

f.  Any federal, state governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff;

g.  Any juror assigned to this action; and

h.  Any co-conspirator identified in this action.

151.    **Numerosity**. Because such information is in the exclusive control of Defendants, Plaintiffs do not know the exact number of the members of the Classes. Due to the nature of the trade and commerce involved, Plaintiffs believe that there are thousands, if not tens of thousands, of members in each Class and that they are sufficiently numerous and geographically-dispersed throughout the United States so that joinder of all class members would be impracticable. Class treatment is the superior method for fairly and efficiently adjudicating this controversy.

152.    **Class Identity**. The above-defined Classes are readily identifiable and are ones for which records should exist.

153.    **Typicality**. Plaintiffs' claims are typical of other class members' claims because they were injured through Defendants' uniform misconduct and paid supracompetitive prices for Interior Molded Doors.  Accordingly, by proving their own claims, Plaintiffs will necessarily prove the other class members' claims.

154.    **Common Questions Predominate**. Common legal and factual questions exist as to all members of the Classes. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was generally applicable to the Classes as a whole. These questions include but are not limited to the following:

a.  Whether Defendants engaged in a combination or conspiracy amongst themselves to fix, raise, maintain, and/or stabilize the prices of Interior Molded Doors in the United States;

b.  The identity of additional participants of the alleged combinations and conspiracy, if any;

c.  The duration of the alleged combination or conspiracy and nature and character of the acts carried out by Defendants in furtherance of the combination or conspiracy.

d.  Whether the alleged combination or conspiracy violated Section 1 of the Sherman Act, as alleged in the First Claim for Relief;

e.  Whether the combination or conspiracy had the effect of artificially inflating the price of Interior Molded Doors sold in the United States during the Class Period;

f.  Whether the alleged conspiracy violated state antitrust, unfair competition, and/or consumer protection laws as alleged in the Second and Third Claims for Relief;

g.  Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiffs and members of the Damages Class, thereby entitling Plaintiffs and members of the Damages Class to disgorgement of all benefits derived by Defendants as alleged in the Fourth Claim for Relief;

h.  Whether Defendants' conduct caused injury to the members of the Classes;

i.  Whether Defendants took actions to conceal their unlawful conspiracy;

j.  The appropriate injunctive and related equitable relief for the Nationwide Class; and

k.  The appropriate measure and amount of damages to which Plaintiffs and other Damages Class members are entitled.

155.  **Adequacy**. Plaintiffs can and will fairly and adequately represent and protect the class members' interests and have no interests that conflict with or are antagonistic to those of

the class.  Moreover, Plaintiffs' attorneys are experienced and competent in antitrust and class action litigation

156.    **Superiority**. Class action treatment is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted because: among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

157.    The prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

158.    Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief appropriate with respect to the Classes as a whole.

## ANTITRUST INJURY

159.    Defendants' anticompetitive conduct had the following effects, among others:

a.  Price competition has been restrained or eliminated with respect to Interior Molded Doors;

b.  The prices of Interior Molded Doors have been fixed, raised, stabilized, or maintained at artificially inflated levels;

c.  Indirect purchasers of Interior Molded Doors have been deprived of free and open competition; and

47

      d.   Indirect purchasers of Interior Molded Doors, including Plaintiffs, paid artificially inflated prices.

160.    During and throughout the Class Period, Plaintiffs and members of Classes indirectly purchased Interior Molded Doors in the United States for their own use and not for resale that were manufactured or sold by Defendants.

161.    The purpose of the conspiratorial and unlawful conduct of Defendants was to fix, raise, stabilize, and/or maintain the price of Interior Molded Doors.

162.    As a direct and proximate result of the alleged violations of the antitrust laws, Plaintiffs and members of the Classes have sustained injury to their businesses or property, having paid higher prices for Interior Molded Doors than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

163.    It is well recognized that in a multi-level chain of distribution, such as exists here, an overcharge is felt throughout the chain of distribution. As noted, antitrust scholar Professor Herbert Hovenkamp stated in his treatise, Federal Antitrust Policy, The Law of Competition and Its Practice 564 (1994):

> A monopoly overcharge at the top of a distribution chain generally results in higher prices at every level below. For example, if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum. In most cases they will absorb part of these increased costs themselves and pass part along to cookware wholesalers. The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers. Every person at every stage in the chain likely will be poorer as a result of the monopoly price at the top.

> Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level.

Similarly, Professor Jeffrey K. MacKie-Mason[62] has stated, it is "well known in economic theory and practice, (that) at least some of the overcharge will be passed on by distributors and end consumers."[63]

164.   Consequently, while the direct purchasers were the first to pay supracompetitive prices, some or all of the overcharge was passed along the distribution chain and absorbed by Plaintiffs and Class Members when they purchased Interior Molded Doors from stores or distributors, especially in the Interior Molded Doors market, which has no comparable substitutes.

165.   Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charges passed through the chain of distribution. Thus, the economic harm to Plaintiffs and the Class members can be quantified.

166.   The purpose of the conspiratorial conduct of Defendants was to raise, fix or maintain the prices of Interior Molded Doors and, as a direct and foreseeable result, Plaintiffs and the Classes paid supracompetitive prices for Interior Molded Doors during the Class Period.

167.   By reason of the alleged violations of the antitrust laws, Plaintiffs and the Classes have sustained injury to their business or property, having paid higher prices for Interior Molded Doors than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result have suffered damages.

168.   This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

---

[62] Professor MacKie-Mason is a professor in the Department of Economics at the University of California, Berkeley and the former Arthur W. Burks Professor of Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan.
[63] Order re: Class Certification, at 13-14, *Coordination Proceedings Special Title (Rule 1550(b)) Microsoft I-V Cases,* J.C.C.P. No. 4106 (San Francisco Super. Ct. Aug. 29, 2000).

## THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

169.    Plaintiffs and members of the Classes had neither actual nor constructive knowledge of the facts constituting their claims for relief. Plaintiffs and members of the Classes did not discover, nor could have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint. Defendants engaged in secret conspiracies that did not reveal facts that would put Plaintiffs or the Classes on inquiry notice that there was a conspiracy to fix prices of Interior Molded Doors.

170.    Plaintiffs and Class members had neither actual nor constructive knowledge of the facts constituting their claims for relief. Plaintiffs and Class members were unaware of Defendants' conspiracy, or of facts sufficient to place them on notice of the conspiracy or the claims set forth herein.

171.    In fact, Defendants have publicly stated that they have policies in place to ensure compliance with federal and state laws.

172.    Masonite's publicly available antitrust compliance policy provides:

Fair trade and competition laws – often referred to as "antitrust laws" – vary from country to country and, in some cases, even within a single country depending on the jurisdiction.

As a general rule, these laws:

- Prohibit agreements or understandings between competitors that undermine competition;
- Regulate the behavior of dominant companies; and
- Require prior review and in some instances clearance for mergers, acquisitions and certain other transactions, in order to prevent transactions that would substantially reduce competition.

Every country where Masonite does business has some form of fair trade, competition, or antitrust law. Thus, you should be fully familiar with Masonite's Antitrust Policy as it applies to where you do business. If you have any doubt

about whether a practice is legal or permitted under Masonite's policies, you should contact the Legal Department immediately.

## II. OUR POLICY

- Never enter into an agreement or an understanding with a competitor, or a group of competitors, about any aspect of Masonite's business without the approval of the Legal Department. Many, if not most, agreements with a competitor are criminal offenses that can result in large fines and prison terms.

- Do not ever agree with a competitor about: (1) Masonite's prices or terms and conditions of sale; (2) which customers Masonite will or will not sell to, or in what geographic areas it will sell or not sell; or (3) the price that Masonite will bid or offer to a customer or class of customers. These agreements are always illegal, and will result in your immediate dismissal. . .[64]

173.    Similarly, JELD-WEN's publicly available antitrust compliance policy states:

Business activities must be conducted in accordance with applicable antitrust and competition laws. Some of the most serious antitrust offenses are agreements between competitors that limit independent judgment and restrain trade, such as agreements to fix pricing, or to divide a market for customers, territories, products or purchases. Any communication with a competitor's representative, no matter how innocent it may seem at the time, may later be subject to legal scrutiny and form the basis for accusations of improper or illegal conduct. Directors, officers and employees should avoid situations from which an unlawful agreement could be inferred. By bringing competitors together, trade associations can raise antitrust concerns, even though such groups serve many legitimate goals. The exchange of sensitive information with competitors regarding topics such as pricing or billing practices can potentially violate antitrust and competition laws and should be avoided.[65]

## I.      Active Concealment of the Conspiracy

174.    Defendants engaged in an illegal scheme to fix prices of Interior Molded Doors in

---

[64] The Masonite Values Operating Guide, at p.15, https://www.masonite.com/wp-content/uploads/2017/12/masonite-values-guide.pdf (last visited Jan. 30, 2019).
[65] JELD-WEN Code of Business Conduct and Ethics (2018), http://investors.jeld-wen.com/~/media/Files/J/Jeld-Wen-IR/documents/governance-documents/code-of-business-conduct-and-ethics-june-2018.pdf (last visited Jan. 30, 2019).

violation of the federal and state antitrust laws and consumer protection statutes. Criminal and civil penalties for engaging in such conduct are severe. Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

175.    Defendants provided their customers for Interior Molded Doors with pretextual justifications for price increases in the letters they sent announcing those price increases. For example, Defendants attributed the need for price increases on rising input costs when in fact the cost of raw materials and energy was decreasing. Plaintiffs and the Classes had no knowledge that these justifications were pretextual.

176.    Through their misleading, deceptive, false and fraudulent statements and material omissions, Defendants effectively concealed their conspiracy from Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends, rather than the consequences of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for Interior Molded Doors.

177.    These false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of Interior Molded Doors to artificially inflated levels.

**II.    Plaintiffs Exercised Reasonable Diligence.**

178.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Plaintiffs and members of the Classes received pricing information from one or both of Defendants, and Plaintiffs reasonably considered the market for Interior Molded Doors to be competitive, rather than a result of an illegal price-fixing conspiracy between Defendants.

179.    Furthermore, Plaintiffs and the Classes had no reason to suspect that Defendants' price increases on Interior Molded Doors were a consequence of Defendants' conspiracy. Even after the filing of the Steves complaint on June 29, 2016, Plaintiffs and the Classes had little to no reason to investigate and no way to know that these prices were higher than they should have been due to the unlawful conspiracy between Defendants. Moreover, even after the filing of the Steves' complaint, and to this day, Defendants have publicly denied any wrongdoing.

180.    Because of Defendants' concealment of their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

181.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct. Despite the exercise of reasonable diligence, Plaintiffs and the other members of the Classes were unaware of Defendants' unlawful conduct and did not know they were paying supracompetitive prices for Interior Molded Doors throughout the United States during the Class Period.

### FIRST CLAIM FOR RELIEF
**Violation of the Sherman Act, Section 1, 15 U.S.C. § 1**
**(On Behalf of the Nationwide Class for Injunctive and Equitable Relief)**

182.    Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

183.    Defendants are direct competitors in the Interior Molded Doors market throughout the United States.

184.    Beginning in at least 2012, and continuing thereafter to the present, Defendants, by and through their officers, directors, employees, agents, or other representatives, have

explicitly or implicitly colluded to raise prices in the Interior Molded Doors Market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

185.    Plaintiffs and the other members of the Nationwide Class have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement. Plaintiffs and members of the Nationwide Class have paid more for Interior Molded Doors than they otherwise would have paid in the absence of Defendants' collusive conduct. This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

186.    In formulating and effectuating this conspiracy, Defendants did those things that they combined and conspired to do, including:

a)  Participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise take actions to fix, increase, maintain, or stabilize prices of Interior Molded Doors in the United States;

b)  Agreeing to implement lock-step price increases in the presence of excess supply; and

c)  Participating in meetings and conversations among themselves to implement, adhere, and police the agreements they reached.

187.    The combination and conspiracy alleged herein has had the following effects, among others:

a)  Price competition in the sale of Interior Molded Doors has been restrained, suppressed, and/or eliminated in the United States;

   b) Prices for Interior Molded Doors sold by Defendants and all of their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

   c) Those who purchased Interior Molded Doors indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

188. Defendants' lock-step price increases on Interior Molded Doors, made at a time where supply and production capacity were in excess, are evidence of price fixing. In an industry with large fixed costs, such as this one, had the market been competitive, Defendants would have attempted to raise sales in order to be close to capacity because high sales would have allowed them to spread their fixed costs over a larger quantity, and thus reduce per-unit cost. However, instead of lowering prices to reduce excess production capacity, Defendants increased their prices in nearly identical, lock-step fashion.

189. Interior Molded Doors are a commodity-like product, which makes the market more susceptible to price fixing, as products are nearly uniform with the primary competition being based upon price. This commodity-like nature of their product allows Defendants to more easily monitor and detect defections from their price-fixing agreement.

190. There are many buyers in the market, which reduces the probability that either Defendant would cheat on their price-fixing agreement since each potential sale is small while the risk of disrupting their collusive pricing agreement would carry a large penalty.

191. Defendants' large profit margins are consistent with that which one would expect to find in a price-fixed/cartelized market.

192.     Plaintiffs and members of the Classes have been injured and will continue to be injured by paying more for Interior Molded Doors manufactured or sold by Defendants than they would have paid and will pay in the absence of the combination and conspiracy as alleged herein.

193.     Plaintiffs and members of the Classes are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF
### Violation of the State Antitrust Statutes
### (On Behalf of the Plaintiffs and the Damages Class)

194.     Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

195.     During the Class Period, Defendants engaged in a continuing contract, combination, or conspiracy with respect to the sale of Interior Molded Doors in unreasonable restraint of trade in commerce, in violation of the various state antitrust and consumer protection statutes set forth below.

196.     Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for Interior Molded Doors.

197.     As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated Indirect Purchasers in the Damages Class who purchased Interior Molded Doors have been harmed by being forced to pay artificially-inflated, supracompetitive prices for Interior Molded Doors.

198.     By engaging in the foregoing conduct, Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws pleaded below.

199.     **Arizona.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Ariz. Rev. Stat. §§ 44-1402,** *et seq.* with respect to purchases of Interior Molded Doors in Arizona by Class members and/or purchases by Arizona residents.

a. Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Interior Molded Door prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Molded Doors.

b. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1402, *et seq.*

200. **California.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Cal. Bus. and Prof. Code, §§ 16720,** *et seq.* with respect to purchases of Interior Molded Doors in California by Class members and/or purchases by California residents.

a. During the Class Period, Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of Interior Molded Doors at supracompetitive levels.

b. The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action

among the Defendants, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of Interior Molded Doors.

c.  For the purpose of forming and effectuating the unlawful trust, the Defendants have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the following: (1) fixing, raising, stabilizing, and pegging the price of Interior Molded Doors.

d.  The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition in the sale of Interior Molded Doors has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for Interior Molded Doors sold by Defendants have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased Interior Molded Doors directly or indirectly from Defendants have been deprived of the benefit of free and open competition.

e.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property in that they paid more for Interior Molded Doors than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

201.  **District of Columbia.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **D.C. Code Ann. §§ 28-4502, *et seq.*** with respect to purchases of Interior Molded Doors in the District of Columbia by Class members and/or purchases by District of Columbia residents.

a. Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Interior Molded Door prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Molded Doors.

b. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4502, *et seq.* Accordingly, members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4502, *et seq.*

202. **Hawaii.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Haw. Rev. Stat. § 480-1, *et seq.*** with respect to purchases of Interior Molded Doors in Hawaii by Class members and/or purchases by Hawaii residents.

a. Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Molded Doors.

59

    b.   During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Haw. Code § 480-1, *et seq.* Accordingly, members of the Damages Class seek all forms of relief available under Haw. Code § 480-1, *et seq.*

203.    **Iowa.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Iowa Code §§ 553.4 *et seq.*** with respect to purchases of Interior Molded Doors in Iowa by Class members and/or purchases by Iowa residents.

    a.   Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Molded Doors.

    b.   During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.4, *et seq.* Accordingly, members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.4, *et seq.*

204.    **Kansas.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Kan. Stat. Ann. §§ 50-101,** *et seq.* with respect to purchases of Interior Molded Doors in Kansas by Class members and/or purchases by Kansas residents.

      a.  Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Molded Doors.

      b.  During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

      c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

      d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

205.    **Maine.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Me. Rev. Stat. Ann. 10 §§ 1101,** *et seq.* with respect to purchases of Interior Molded Doors in Maine by Class members and/or purchases by Maine residents.

      a.  Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Maine; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) members of the Damages Class were

deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Molded Doors.

b. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, members of the Damages Class seek all relief available under Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*

206. **Michigan.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Mich. Comp. Laws Ann. §§ 445.772, *et seq.*** with respect to purchases of Interior Molded Doors in Michigan by Class members and/or purchases by Michigan residents.

a. Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Interior Molded Door prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Molded Doors.

b. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

    c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.772, *et seq.* Accordingly, members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.772, *et seq.*

207.   **Minnesota.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Minn. Stat. §§ 325D.51, *et seq.*** with respect to purchases of Interior Molded Doors in Minnesota by Class members and/or purchases by Minnesota residents.

    a.  Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Interior Molded Door prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Molded Doors.

    b.  During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

    c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.51, *et seq.* Accordingly, members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.51, *et seq.*

208.    **Mississippi.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Miss. Code Ann. §§ 75-21-3,** *et seq.* with respect to purchases of Interior Molded Doors in Mississippi by Class members and/or purchases by Mississippi residents.

   a.   Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Interior Molded Door prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Molded Doors.

   b.   During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

   c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

   d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-3, *et seq.* Accordingly, members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-3, *et seq.*

209.    **Nebraska.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Neb. Code Ann. §§ 59-801,** *et seq.* with respect to purchases of Interior Molded Doors in Nebraska by Class members and/or purchases by Nebraska residents.

   a.   Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Interior Molded Door prices were raised, fixed, maintained and

stabilized at artificially high levels throughout Nebraska; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Molded Doors.

b. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly, members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

210.    **Nevada.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Nev. Rev. Stat. Ann. §§ 598A.060,** *et seq.* with respect to purchases of Interior Molded Doors in Nevada by Class members and/or purchases by Nevada residents.

a. Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Interior Molded Door prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Molded Doors.

b. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.060, *et seq.* Accordingly, members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.060, *et seq.*

211.    **New Hampshire.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.H. Rev. Stat. Ann. §§ 356:2, *et seq.*,** with respect to purchases of Interior Molded Doors in New Hampshire by Class members and/or purchases by New Hampshire residents.

a. Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Interior Molded Door prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Molded Doors.

b. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:2, *et seq.* Accordingly,

66

members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:2, *et seq.*

212.    **New Mexico.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.M. Stat. Ann. §§ 57-1-1, *et seq.*** with respect to purchases of Interior Molded Doors in New Mexico by Class members and/or purchases by New Mexico residents.

    a.   Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Interior Molded Door prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Molded Doors.

    b.   During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

213.    **New York.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.Y. Gen. Bus. L. §§ 340, *et seq.*** with respect to purchases of Interior Molded Doors in New York by Class members and/or purchases by New York residents.

    a.   Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout New

York; (2) Interior Molded Door prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors, or purchased products that were otherwise of lower quality than they would have been absent the conspirators illegal acts, or were unable to purchase products that they otherwise would have purchased absent the illegal conduct.

b. During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

214.    **North Carolina.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.C. Gen. Stat. §§ 75-1, *et seq.*** with respect to purchases of Interior Molded Doors in North Carolina by Class members and/or purchases by North Carolina residents.

a. Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Interior Molded Door prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the

68

Damages Class paid supracompetitive, artificially inflated prices for Interior Molded Doors.

b.   During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

c.   As a direct and proximate result of the Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq.*

215.   **North Dakota.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.D. Cent. Code §§ 51-08.1-01, *et seq.*** with respect to purchases of Interior Molded Doors in North Dakota by Class members and/or purchases by North Dakota residents.

a.   Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Interior Molded Door prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Molded Doors.

b.   During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

69

    d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.* Accordingly, members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

216.    **Oregon.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Or. Rev. Stat. §§ 646.705, *et seq.*,** with respect to purchases of Interior Molded Doors in Oregon by Class members and/or purchases by Oregon residents.

    a.   Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Interior Molded Door prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Molded Doors.

    b.   During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

217.    **Rhode Island.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **R.I. Gen. Laws §§ 6-36-4, *et seq.*** with respect to purchases of Interior Molded Doors in Rhode Island by Class members and/or purchases by Rhode Island residents.

a. Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Molded Doors.

b. During the Class Period, Defendants' illegal conduct substantially affected Rhode Island commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of R.I. Gen. Laws §§ 6-36-4, *et seq.* Accordingly, members of the Damages Class seek all forms of relief available under R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

218. **South Dakota.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **S.D. Codified Laws Ann. §§ 37-1, *et seq.*** with respect to purchases of Interior Molded Doors in South Dakota by Class members and/or purchases by South Dakota residents.

a. Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Interior Molded Door prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Molded Doors.

    b.   During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.* Accordingly, members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

219.    **Tennessee.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Tenn. Code Ann. §§ 47-25-101, *et seq.*** with respect to purchases of Interior Molded Doors in Tennessee by Class members and/or purchases by Tennessee residents.

    a.   Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Molded Doors.

    b.   During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

    c.   As a direct and proximate result of the Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.* Accordingly, members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

220.    **Utah.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Utah Code Ann. §§ 76-10-3101, *et seq.*** with respect to purchases of Interior Molded Doors in Utah by Class members and/or purchases by Utah residents.

    a.  Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Utah; (2) Interior Molded Door prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Molded Doors.

    b.  During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

    c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq.* Accordingly, members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq.*

221.    **Vermont.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Vt. Stat. Ann. 9 §§ 2453, *et seq.*** with respect to purchases of Interior Molded Doors in Vermont by Class members and/or purchases by Vermont residents.

a.  Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Interior Molded Door prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Molded Doors.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.* Accordingly, members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

222.  **West Virginia.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **W.Va. Code §§ 47-18-4,** *et seq.* with respect to purchases of Interior Molded Doors in West Virginia by Class members and/or purchases by West Virginia residents.

a.  Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Interior Molded Door prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Interior Molded Doors.

74

    b.   During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*. Accordingly, members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

223.    **Wisconsin.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Wis. Stat. §§ 133.01 *et seq*.** with respect to purchases of Interior Molded Doors in Wisconsin by Class members and/or purchases by Wisconsin residents.

    a.   Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Interior Molded Door prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Door.

    b.   During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.* Accordingly, members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

## THIRD CLAIM FOR RELIEF
### Violation of State Consumer Protection Statutes
### (On Behalf of Plaintiffs and the Damages Class)

224.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

225.    Defendants engaged in unfair competition, or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

226.    **Arizona.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Ariz. Code §§ 44-1521, *et seq.***, with respect to purchases of Interior Molded Doors in Arizona by Class members and/or purchases by Arizona residents.

a.  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Interior Molded Doors were sold, distributed, or obtained in Arizona and took efforts to conceal their agreements from members of the Damages Class.

b.  The aforementioned conduct on the part of the Defendants constituted deceptive or unfair acts or practices in violation of Ariz. Code §§ 44-1522(A).

c.  Defendants' unlawful conduct had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Arizona; (2)

Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

d.  During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce and consumers.

e.  As a direct and proximate result of the unlawful conduct of Defendants, members of the Damages Class have been injured in their business and property and are threatened with further injury.

f.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Code § 44-1522, and, accordingly, members of the Damages Class seek all relief available under that statute.

227.  **Arkansas.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Ark. Code §§ 4-88-101,** *et seq.*, with respect to purchases of Interior Molded Doors in Arkansas by Class members and/or purchases by Arkansas residents.

a.  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Interior Molded Doors were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from members of the Damages Class.

b.  The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

c. Defendants' unlawful conduct had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

d. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

e. As a direct and proximate result of the unlawful conduct of Defendants, members of the Damages Class have been injured in their business and property and are threatened with further injury.

f. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, members of the Damages Class seek all relief available under that statute.

228. **California.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Cal. Bus. & Prof Code §§ 17200, _et seq_**, with respect to purchases of Interior Molded Doors in California by Class members and/or purchases by California residents.

a. During the Class Period, Defendants marketed, sold, or distributed Interior Molded Doors in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, _et seq._ of the California Business and Professions Code, by engaging in the acts and practices specified above.

b. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts,

as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

c.  Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above.

d.  Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, are otherwise unfair, unconscionable, unlawful or fraudulent, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts.

e.  Defendants' acts or practices are unfair to consumers of Interior Molded Doors in the State of California within the meaning of Section 17200, California Business and Professions Code.

f.  Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

g.  Members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

h.  The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

i.  The unlawful and unfair business practices of Defendants, each of them, have caused and continue to cause the members of the Damages Class to pay supracompetitive and artificially-inflated prices for Interior Molded Doors. Members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

j.  The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

k.  As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

229.    **District of Columbia.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **D.C. Code §§ 28-3901,** *et seq.* with respect to purchases of Interior Molded Doors in D.C. by Class members and/or purchases by D.C. residents.

a.  Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Interior Molded Doors were sold, distributed or obtained in the District of Columbia.

b.  The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and

illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Interior Molded Doors. Defendants had the sole power to set that price and members of the Damages Class had no power to negotiate a lower price. Moreover, members of the Damages Class lacked any meaningful choice in purchasing Interior Molded Doors because they were unaware of the unlawful overcharge and there was no alternative source of supply through which members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of Doors, including their illegal conspiracy to secretly fix the price of Interior Molded Doors at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of members of the Damages Class. Defendants took grossly unfair advantage of members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Doors.

c. Defendants' unlawful conduct had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

d. As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in

violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, members of the Damages Class seek all relief available under that statute.

230.    **Florida.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Fla. Stat. §§ 501.201, *et seq***, with respect to purchases of Interior Molded Doors in Florida by Class members and/or purchases by Florida residents.

    a.    Defendants' unlawful conduct had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Florida; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

    b.    During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

    c.    As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured and are threatened with further injury.

    d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, members of the Damages Class seek all relief available under that statute.

231.    **Hawaii.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Haw. Rev. Stat. §§ 480, *et seq.*** with respect to purchases of Interior Molded Doors in Hawaii by Class members and/or purchases by Hawaii residents.

    a.    Defendants' unlawful conduct had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Hawaii; (2)

Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Doors.

b.  During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured and are threatened with further injury.

d.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and, accordingly, members of the Damages Class seek all relief available under that statute.

232.   **Illinois.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **815 ILCS §§ 505/1, *et seq*.** with respect to purchases of Interior Molded Doors in Illinois by Class members and/or purchases by Illinois residents.

a.  Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on Illinois commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS §§ 505/1, *et seq.,* and, accordingly, members of the Damages Class seek all relief available under that statute.

233.     **Kansas.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Kan. Stat. §§ 50-623, *et seq.*,** with respect to purchases of Interior Molded Doors in Kansas by Class members and/or purchases by Kansas residents.

    a.   Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

    b.   During the Class Period, Defendants' illegal conduct had a substantial effect on Kansas commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. §§ 50-623, *et seq.* and, accordingly, members of the Damages Class seek all relief available under that statute.

234.   **Maine.** have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **5 Me. Rev. Stat. §§ 207,** *et seq*. with respect to purchases of Interior Molded Doors in Maine by Class members and/or purchases by Maine residents.

    a.   Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Maine; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

    b.   During the Class Period, Defendants' illegal conduct had a substantial effect on Maine commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. §§ 207, *et seq*., and, accordingly, members of the Damages Class seek all relief available under that statute.

235.   **Massachusetts.** have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Mass. Gen. Laws, ch. 93A, § 2** with respect to purchases of Interior Molded Doors in Massachusetts by Class members and/or purchases by Massachusetts residents.

    a.   Defendants were engaged in trade or commerce as defined by Mass. Gen. Laws ch. 93A.

    b.   Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling, and/or

85

maintaining at artificial and non-competitive levels, the prices at which Interior Molded Doors were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from members of the Damages Class.

c.  Defendants' unlawful conduct had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

d.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class were injured and are threatened with further injury.

e.  Defendants have or will be served with a demand letter in accordance with Mass. Gen. Laws ch. 93A, § 9, or, upon information and belief, such service of a demand letter was unnecessary due to the defendant not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth.

f.  By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of G.L. c. 93A, §2. Defendants' violations of Chapter 93A were knowing or willful, entitling members of the Damages Class to multiple damages.

236.  **Michigan.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Mich. Stat. §§ 445.901, *et seq.*** with respect to purchases of Interior Molded Doors in Michigan by Class members and/or purchases by Michigan residents.

a. Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. §§ 445.901, *et seq.*,. and, accordingly, members of the Damages Class seek all relief available under that statute.

237.    **Minnesota.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Minn. Stat. §§ 325F.68,** *et seq.*, and **Minn. Stat. §§ 8.31,** *et seq.* with respect to purchases of Interior Molded Doors in Minnesota by Class members and/or purchases by Minnesota residents.

a. Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on Minnesota commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. §§ 325F.68, *et seq.*, and Minn. Stat. §§ 8.31, *et seq.* and, accordingly, members of the Damages Class seek all relief available under that statute.

238. **Missouri.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Mo. Stat. §§ 407.010, *et seq.***, with respect to purchases of Interior Molded Doors in Missouri by Class members and/or purchases by Missouri residents.

a. Plaintiffs and the Damages Class purchased Interior Molded Doors for personal, family, or household purposes.

b. Defendants engaged in the conduct described herein in connection with the sale of Interior Molded Door in trade or commerce in a market that includes Missouri.

c. Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Interior Molded Doors were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to members of the Damages Class.

d. Defendants concealed, suppressed, and omitted to disclose material facts to members of the Damages Class concerning Defendants' unlawful activities and artificially

inflated prices for Interior Molded Doors. The concealed, suppressed, and omitted facts would have been important to members of the Damages Class as they related to the cost of Interior Molded Doors they purchased.

e.  Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Interior Molded Door by making public statements that were not in accord with the facts.

f.  Defendants' statements and conduct concerning the price of Interior Molded Doors were deceptive as they had the tendency or capacity to mislead members of the Damages Class to believe that they were purchasing Interior Molded Doors at prices established by a free and fair market.

g.  Defendants' unlawful conduct had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

h.  The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

i.  As a direct and proximate result of the above-described unlawful practices, members of the Damages Class suffered ascertainable loss of money or property.

j.  Accordingly, members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or

advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

239.    **Montana.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Mont. Code §§ 30-14-101, *et seq.*** with respect to purchases of Interior Molded Doors in Montana by Class members and/or purchases by Montana residents.

   a.   Defendants' unlawful conduct had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Montana; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

   b.   During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

   c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured and are threatened with further injury.

   d.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-101, *et seq.*, and, accordingly, members of the Damages Class seek all relief available under that statute.

240.    **Nebraska.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Neb. Rev. Stat. §§ 59-1601, *et seq***, with respect to purchases of Interior Molded Doors in Nebraska by Class members and/or purchases by Nebraska residents.

   a.   Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

   b.   During the Class Period, Defendants' illegal conduct had a substantial effect on Nebraska commerce.

   c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

   d.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §§ 59-1601, *et seq.* and, accordingly, members of the Damages Class seek all relief available under that statute.

241.   **Nevada.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Nev. Rev. Stat. §§ 598.0903,** *et seq.* with respect to purchases of Interior Molded Doors in Nevada by Class members and/or purchases by Nevada residents.

   a.   Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

    b.   During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. §§ 598.0903, *et seq.* and, accordingly, members of the Damages Class seek all relief available under that statute.

242.    **New Hampshire.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **N.H. Rev. Stat. §§ 358-A:1, *et seq.*** with respect to purchases of Interior Molded Doors in New Hampshire by Class members and/or purchases by New Hampshire residents.

    a.   Defendants willingly and knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Interior Molded Doors were sold, distributed or obtained in New Hampshire and took efforts to conceal their agreements from members of the Damages Class.

    b.   The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.H. Rev. Stat. §§ 358-A, 1, *et seq.*, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by members of the Damages Class and the prices paid by them for Interior Molded Doors as set forth in N.H. Rev. Stat. §§ 358-A, 1, *et seq.*. Members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by

Defendants for Interior Molded Doors. Defendants had the sole power to set that price and members of the Damages Class had no power to negotiate a lower price. Moreover, members of the Damages Class lacked any meaningful choice in purchasing Interior Molded Doors because they were unaware of the unlawful overcharge and there was no alternative source of supply through which members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of Doors, including their illegal conspiracy to secretly fix the price of Interior Molded Doors at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of members of the Damages Class. Defendants took grossly unfair advantage of members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Doors.

c.   Defendants' unlawful conduct had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

d.   During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce and consumers.

e.   As a direct and proximate result of the unlawful conduct of Defendants, members of the Damages Class have been injured and are threatened with further injury.

    f.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. §§ 358-A, 1, *et seq.*, and, accordingly, members of the Damages Class seek all relief available under that statute.

243. **New Mexico.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **N.M. Stat. §§ 57-12-1, *et seq.*** with respect to purchases of Interior Molded Doors in New Mexico by Class members and/or purchases by New Mexico residents.

    a.   Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Interior Molded Doors were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from members of the Damages Class.

    b.   The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by members of the Damages Class and the prices paid by them for Interior Molded Doors as set forth in N.M.S.A., § 57-12-2E. Members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Interior Molded Doors. Defendants had the sole power to set that price and members of the Damages Class had no power to negotiate a lower price. Moreover, members of the Damages Class lacked any meaningful choice in purchasing Interior Molded Doors because they were unaware of the unlawful overcharge and there was no alternative source of supply through which members of the Damages Class could avoid the

overcharges. Defendants' conduct with regard to sales of Doors, including their illegal conspiracy to secretly fix the price of Interior Molded Doors at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of members of the Damages Class. Defendants took grossly unfair advantage of members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Doors.

c.  Defendants' unlawful conduct had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

d.  During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

e.  As a direct and proximate result of the unlawful conduct of Defendants, members of the Damages Class have been injured and are threatened with further injury.

f.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, members of the Damages Class seek all relief available under that statute.

244.  **New York.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **N.Y. Gen. Bus. L. §§ 349,** *et*

*seq.* with respect to purchases of Interior Molded Doors in New York by Class members and/or purchases by New York residents.

   a.   Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Interior Molded Doors were sold, distributed or obtained in New York and took efforts to conceal their agreements from members of the Damages Class.

   b.   Defendants made public statements about the prices of Interior Molded Doors that Defendants knew would be seen by New York consumers; such statements either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for Doors; and Defendants alone possessed material information that was relevant to consumers but failed to provide the information.

   c.   Because of Defendants' unlawful trade practices in the State of New York, New York consumer class members who indirectly purchased Interior Molded Doors were misled to believe that they were paying a fair price for Interior Molded Doors or the price increases for Interior Molded Doors were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conspiracy.

   d.   Defendants knew that their unlawful trade practices with respect to pricing Interior Molded Doors would have an impact on New York consumers and not just the Defendants' direct customers.

   e.   Defendants knew that their unlawful trade practices with respect to pricing Interior Molded Doors would have a broad impact, causing consumer class members who indirectly purchased Interior Molded Doors to be injured by paying more for Interior

Molded Doors than they would have paid in the absence of Defendants' unlawful trade acts and practices.

f.  The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

g.  Defendants' unlawful conduct had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout New York; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

h.  During the Class Period, Defendants' marketed, sold, or distributed Interior Molded Doors in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers.

i.  During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Interior Molded Doors in New York.

j.  Members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

245.  **North Carolina.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **N.C. Gen. Stat. §§ 75-1.1,** *et seq.* with respect to purchases of Interior Molded Doors in North Carolina by Class members and/or purchases by North Carolina residents.

97

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Interior Molded Doors were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from members of the Damages Class.

b. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which members of the Damages Class could not possibly have been aware. Defendants publicly provided pre-textual and false justifications regarding their price increases. Defendants' public statements concerning the price of Interior Molded Doors created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders, conducting meetings and conversations in secret, and avoiding the creation of documents which would reveal the antitrust violations.

c. The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

d. Defendants' unlawful conduct had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout North

Carolina; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

e.  During the Class Period, Defendants' marketed, sold, or distributed Interior Molded Doors in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

f.  During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Interior Molded Doors in North Carolina.

g.  Members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, members of the Damages Class seek all relief available under that statute.

246.  **Oregon.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Or. Rev. Stat. §§ 646.605, *et seq.*** with respect to purchases of Interior Molded Doors in Oregon by Class members and/or purchases by Oregon residents.

a.  Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. §§ 646.605, *et seq.*, and, accordingly, members of the Damages Class seek all relief available under that statute.

247.  **Rhode Island.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **R.I. Gen. Laws §§ 6-13.1-1,** ***et seq.*** with respect to purchases of Interior Molded Doors in Rhode Island by Class members and/or purchases by Rhode Island residents.

a.  Members of this Damages Class purchased Interior Molded Doors for personal, family, or household purposes.

b.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Interior Molded Doors were sold, distributed, or obtained in Rhode Island.

c.  Defendants deliberately failed to disclose material facts to members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Interior Molded Doors. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, Defendants breached that duty by their silence. Defendants misrepresented to all consumers during the Class Period that Defendants' Interior Molded Door prices were competitive and fair.

100

    d.  Defendants' unlawful conduct had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

    e.  As a direct and proximate result of the Defendants' violations of law, members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

    f.  Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Doors, likely misled all consumers acting reasonably under the circumstances to believe that they were purchasing Interior Molded Doors at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to members of the Damages Class as they related to the cost of Interior Molded Doors they purchased.

    g.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, members of the Damages Class seek all relief available under that statute.

248.  **South Carolina.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **S.C. Code §§ 39-5-10,** *et seq.* with respect to purchases of Interior Molded Doors in South Carolina by Class members and/or purchases by South Carolina residents.

a. Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and, accordingly, members of the Damages Class seek all relief available under that statute.

249. **South Dakota.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **S.D. Codified Laws § 37-24-6** with respect to purchases of Interior Molded Doors in South Dakota by Class members and/or purchases by South Dakota residents.

a. Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

    b.   During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-6, and, accordingly, members of the Damages Class seek all relief available under that statute.

250.    **Tennessee.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Tenn. Code §§ 47-18-101,** *et seq.* with respect to purchases of Interior Molded Doors in Tennessee by Class members and/or purchases by Tennessee residents.

    a.   Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

    b.   During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code §§ 47-18-101, *et seq*, and, accordingly, members of the Damages Class seek all relief available under that statute.

251.   **Utah.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Utah Code §§ 13-11-1, *et seq.*** with respect to purchases of Interior Molded Doors in Utah by Class members and/or purchases by Utah residents.

    a. Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Utah; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

    b. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

    c. As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code §§ 13-11-1, *et seq.*, and, accordingly, members of the Damages Class seek all relief available under that statute.

252.   **Virginia.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Va. Code §§ 59.1-196, *et seq.*** with respect to purchases of Interior Molded Doors in Virginia by Class members and/or purchases by Virginia residents.

    a.  Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Virginia; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Virginia; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

    b.  During the Class Period, Defendants' illegal conduct had a substantial effect on Virginia commerce.

    c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code §§ 59.1-196, *et seq*, and, accordingly, members of the Damages Class seek all relief available under that statute.

253.    **Vermont.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Vt. Stat. 9, §§ 2453, *et seq.*** with respect to purchases of Interior Molded Doors in Vermont by Class members and/or purchases by Vermont residents.

    a.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Interior Molded Doors were sold, distributed, or obtained in Vermont.

    b.  Defendants deliberately failed to disclose material facts to members of the Damages Class concerning their unlawful activities and artificially inflated prices for Interior Molded Doors. Defendants owed a duty to disclose such facts, and considering the

relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that their Interior Molded Door prices were competitive and fair.

c.  Defendants' unlawful conduct had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

d.  As a direct and proximate result of Defendants' violations of law, members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by the Defendants' willful and deceptive conduct, as described herein.

e.  Defendants' deception, including their omissions concerning the price of Doors, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Interior Molded Doors at prices born by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, members of the Damages Class seek all relief available under that statute.

254.  **West Virginia.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **W. Va. Code §§ 46A-6-101,**

*et seq.* with respect to purchases of Interior Molded Doors in West Virginia by Class members and/or purchases by West Virginia residents.

    a.  Defendants' combination or conspiracy had the following effects: (1) Interior Molded Door price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Interior Molded Door prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for Doors.

    b.  During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

    c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code §§ 46A-6-101, *et seq.* and, accordingly, members of the Damages Class seek all relief available under that statute.

255.    Plaintiffs and members of the Damages Class have been injured in their business and property by reason of Defendants' anticompetitive, unfair, unconscionable, and/or deceptive conduct. Their injury consists of paying higher prices for Interior Molded Doors than they would have paid in the absence of these violations. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

256.    On behalf of themselves and the Damages Class, Plaintiffs seek all appropriate relief provided for under the foregoing statutes.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Damages Class)**

107

257.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

258.   As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Interior Molded Doors.

259.   Defendants have benefited from their unlawful acts and it would be inequitable, under unjust enrichment principles under the laws of each state in the United States as well as the District of Columbia, except for Delaware, Georgia, Indiana, Kentucky, Louisiana, New Jersey, Ohio, Oklahoma, Pennsylvania, Texas, Virginia, Washington, and Wyoming for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Class for Interior Molded Doors.

260.   Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

261.   As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits from Defendants' sales of Doors.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Classes of all others so similarly situated, respectfully requests judgment against Defendants as follows:

1. That the Court determines that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Classes, once certified;

2. That the unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed:

    a. An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

    b. A *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

    c. An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

    d. Acts of unjust enrichment by Defendants as set forth herein.

3. That Plaintiffs and the Damages Class recover damages, to the maximum extent allowed under the applicable state laws, and that a joint and several judgments in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

4. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or

effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

5.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits identification of company's information;

6.      Plaintiffs and the members of the Damages Class be awarded pre-and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint;

7.      Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

8.      Plaintiffs and the members of the Classes have such other and further relief as the case may require and the Court deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, on all issues so triable.

Dated:  Feb 1, 2019                          Respectfully submitted,

                                             /s/_____
                                             Conrad M. Shumadine
                                             (VSB #4325)
                                             *Interim Liaison Counsel for Plaintiffs and the*
                                             *Proposed Indirect Purchaser Classes*
                                             **WILLCOX & SAVAGE, P.C.**
                                             440 Monticello Avenue, Suite 2200
                                             Norfolk, Virginia 23510
                                             Telephone: (757) 628-5500
                                             Facsimile: (757) 628-5566
                                             cshumadine@wilsav.com

                                             Daniel E. Gustafson
                                             Daniel C. Hedlund
                                             Michelle J. Looby
                                             Kaitlyn L. Dennis
                                             **GUSTAFSON GLUEK PLLC**
                                             120 South 6th Street, Suite 2600
                                             Minneapolis, MN 55402
                                             Tel: (612) 333-8844
                                             Fax: (612) 339-6622
                                             dgustafson@gustafsongluek.com
                                             dhedlund@gustafsongluek.com
                                             mlooby@gustafsongluek.com
                                             kdennis@gustafsongluek.com

                                             Joseph R. Saveri
                                             Steve Williams
                                             Kyla J. Gibboney
                                             **JOSEPH SAVERI LAW FIRM**
                                             601 California Street, Suite 1000
                                             San Francisco, CA 94108
                                             Tel: (415) 500-6800
                                             Fax: (415) 395-9940
                                             jsaveri@saverilawfirm.com
                                             swilliams@saverilawfirm.com
                                             kgibboney@saverilawfirm.com

                                             Hollis Salzman
                                             William V. Reiss
                                             Nahid A. Shaikh
                                             Noelle Feigenbaum
                                             **ROBINS KAPLAN LLP**
                                             399 Park Avenue, Suite 3600
                                             New York, NY 10022

111

Tel: 212-980-7400
Fax: 212-980-7499
HSalzman@RobinsKaplan.com
WReiss@RobinsKaplan.com
NShaikh@RobinsKaplan.com
NFeigenbaum@RobinsKaplan.com

*Interim Co-Lead Counsel for Plaintiffs and the
Proposed Indirect Proposed Classes*

Kristi Cahoon Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
**KELLY & CRANDALL, PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Tel.: 703-424-7570
Fax: 703-591-0167
kkelly@kellyandcrandall.com
aguzzo@kellyandcrandall.com
casey@kellyandcrandall.com

Marc H. Edelson
**EDELSON & ASSOCIATES, LLC**
3 Terry Drive, Suite 205
Newtown, PA 18940
Tel: (215) 867-2399
Medelson@edelson-law.com

Brian Douglas Penny
**GOLDMAN SCARLATO & PENNY, P.C.**
Eight Tower Bridge, Suite 1025
161 Washington Street
Conshohocken, PA 19428
Tel.: (484) 342-0700
Fax: (484) 580-8747
penny@lawgsp.com

Joshua H. Grabar, Esq.
**GRABAR LAW OFFICE**
1735 Market Street
Suite 3750
Philadelphia, PA 19103
Tel: (267) 507-6085
Fax: (267) 507-6048
jgrabar@grabarlaw.com

112

Daniel K. Bryson
**WHITFIELD BRYSON & MASON LLP**
900 W. Morgan Street
Raleigh, North Carolina 27603
Tel: (919) 600-5000
Fax: (919) 600-5035
dan@wbmllp.com

Greg F. Colelman
**GREG COLEMAN LAW**
First Tennessee Plaza
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
greg@gregcolemanlaw.com

Daniel R. Karon
**KARON LLC**
700 W. St. Clair Ave., Suite 200
Cleveland, OH 44113
Tel: (216) 622-1851
Fax: (216) 241-8175
dkaron@karonllc.com

Christopher D. Jennings
**JOHNSON FIRM**
610 President Clinton Avenue, Suite 300
Little Rock, AR 72201
Tel: (501) 372-1300
Fax: (888) 505-0909
chris@yourattorney.com

M. Stephen Dampier
**THE DAMPIER LAW FIRM P.C.**
55 N. Section Street
P.O. Box 161 (36533)
Fairhope, AL  36532
Tel: (251) 929-0900
Fax: (251) 929-0800
stevedampier@dampierlaw.com

Robert A. Blake, Jr.
James F. Wyatt III
**WYATT & BLAKE LLP**
435 E. Morehead St.
Charlotte, NC 28202

113

Tel: (704) 331 0767
Fax: (704) 331-0773
rblake@wyattlaw.net
jwyatt@wyattlaw.net

Jason S. Hartley
**HARTLEY LLP**
550 West C St., Ste. 1750
San Diego, CA 92101
Tel: (619) 400-5822
Fax: (619) 400-5832
hartley@hartleyllp.com

*Additional Counsel for Plaintiffs and the Proposed
Indirect Proposed Classes*