**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| IN RE: INTERIOR MOLDED DOORS INDIRECT PURCHASER ANTITRUST LITIGATION | Lead Civil Action No. 3:18-cv-00850-JAG |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**<u>REDACTED VERSION</u>**

## **TABLE OF CONTENTS**

I.   THE PROPOSED CLASS IS ASCERTAINABLE UNDER RULE 23 ..................................1

  A.  The Proposed Class Is Defined by Objective Criteria .........................................................1

  B.  Class Members Can be Readily Identified Through Objective Criteria .............................2

II.  IPPS ESTABLISH PREDOMINANCE UNDER RULE 23(b)(3)...........................................6

  A.  IPPs Can Prove Impact Using a Method Common to the Class ..........................................6

    i.   IPPs Can Demonstrate by Common Evidence That All or Virtually All Direct
         Purchasers Paid an Overcharge.....................................................................................6

    ii.  IPPs Can Demonstrate by Common Evidence that Overcharges were Passed-On to
         All or Virtually All Class Members............................................................................10

    iii. Pass-On by IPPs is Not a Permitted Defense in this Case and Does Not Defeat Class
         Certification ................................................................................................................15

  B.  IPPs Apply a Reliable Methodology for Proving Damages on a Class-Wide Basis ........17

  C.  Any Minor Variations In State Law Are Manageable ......................................................19

III. CONCLUSION....................................................................................................................20

## **TABLE OF AUTHORITIES**

<u>Cases</u>                                                                                                                          Page(s)

*Bell v. WestRock CP, LLC*,
   No. 3:17-CV-829, 2019 WL 1874694 (E.D. Va. Apr. 26, 2019) ............................................... 5

*Broussard v. Meineke Disc. Muffler Shops, Inc*
   155 F.3d 331 (4th Cir. 1998).................................................................................................. 18

*Bussey v. Macon County Greyhound Park, Inc.*
   562 F. App'x 782 (11th Cir. 2014) .......................................................................................... 4

*Clayworth v. Pfizer, Inc.*,
   49 Cal. 4th 758 (2010)........................................................................................................... 17

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ................................................................................................................ 17

*DeLoach v. Philip Morris Cos., Inc.*,
   206 F.R.D. 551 (M.D.N.C. 2002) ......................................................................................... 18

*Gordon v. Microsoft*,
   No. MC 00-5994, 2003 WL 23105550 (D. Minn. Dec. 15, 2003)........................................... 14

*Gunnells v. Healthplan Servs., Inc.*,
   348 F.3d 417 (4th Cir. 2003).................................................................................................. 19

*Henderson v. Corelogic Nat'l Background Data, LLC*, 3:12-cv-97,
   2016 WL 4611571 (E.D. Va. Sept. 2, 2016) ............................................................................ 2

*Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cty., Tenn. v. Momenta Pharm., Inc.*,
   333 F.R.D. 390 (M.D. Tenn. 2019).............................................................................. 7, 16, 17

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   No. 1917, 2013 WL 5429718 (N.D. Cal. Jun. 20, 2013) ......................................................... 4

*In Re Compact Disc Minimum Advertised Price Antitrust Litig.*,
   216 F.R.D. 197 (D. Me. Jun. 13, 2003).................................................................................... 5

*In re Disposable Contact Lens Antitrust*,
   329 F.R.D. 336 (M.D. Fla. 2018)........................................................................................... 14

*In re Fla. Cement & Concrete Antitrust Litig.*
   2012 WL 27668 (S.D. Fla. Jan. 3, 2012) ............................................................................... 18

*In re Flonase Antitrust Litig.*,
  284 F.R.D. 207 (E.D. Pa. 2012) ............................................................... 6

*In re Graphics Processing Units Antitrust Litig.*,
  253 F.R.D. 478 (N.D. Cal. 2008) .............................................................. 7

*In re Korean Ramen Antitrust Litig.*,
  No. 13-CV-04115-WHO, 2017 WL 235052 (N.D. Cal. Jan. 19, 2017) ................................. 19

*In re Lamictal Direct Purchaser Antitrust Litig.*,
  957 F.3d 184 (3d Cir. 2020) .................................................................. 7

*In re Marine Hose Antitrust Litig.*,
  No. 08-MDL-1888, 2009 WL 10685187 (S.D. Fla. Aug. 11, 2009) ............................. 5

*In re Nexium (Esomeprazole) Antitrust Litig.*,
  297 F.R.D. 168 (D. Mass. 2013) ............................................................. 19

*In re Nexium Antitrust Litig.*,
  777 F.3d 9 (1st Cir. 2015) .............................................................. 16, 17

*In re Optical Disk Drive Antitrust Litig.*,
  303 F.R.D. 311 (N.D. Cal. 2014) ............................................................ 14

*In re OSB Antitrust Litig.*,
  No. 06-826, 2007 WL 2253418 (E.D. Pa. Aug. 3, 2007) ........................................ 1

*In re Packaged Seafood Prods. Antitrust Litig.*,
  332 F.R.D. 308 (S.D. Cal. 2019) ............................................... 12, 17, 19, 20

*In re Pharm. Indus. Average Wholesale Price Litig.*,
  582 F.3d 156 (1st Cir. 2009) ............................................................... 17

*In re Polyester Staple Antitrust Litig.*,
  MDL No. 3:03CV1516, 2007 WL 2111380 (W.D.N.C. July 19, 2007) ................................. 9

*In re Polyurethane Foam Antitrust Litig.*,
  No. 1:10 MD 2196, 2015 WL 4459636 (N.D. Ohio Jul. 21, 2015) .............................. 4

*In re Processed Egg Prods. Antitrust Litig.*,
  312 F.R.D. 124 (E.D. Pa. 2015) ............................................................. 14

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
  No. 18-MD-2819, 2020 WL 2555556 (E.D.N.Y. May 5, 2020) ...................................... *passim*

*In re Scrap Metal Antitrust Litig.*,
  527 F.3d 517 (6th Cir. 2008) ........................................................................... 18

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  264 F.R.D. 603 (N.D. Cal. 2009) ................................................................ 11, 14

*In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*,
  421 F. Supp. 3d 12 (E.D. Pa. 2019) ........................................................ 7, 9, 10

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 583 (N.D. Cal. 2010) ........................................................ 4, 7, 11, 14

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 09-4997 SI,
  2012 WL 6709621 (N.D. Cal. Dec. 26, 2012) ................................................. 17

*In re Titanium Dioxide Antitrust Litig.*,
  284 F.R.D. 328 (D. Md. 2012), amended, 962 F. Supp. 2d 840 (D. Md. 2013) ...... 19

*In re Zetia (Ezetimibe) Antitrust Litig.*,
  No. 2:18-MD-2836, 2020 WL 3446895 (E.D. Va. June 18, 2020) ..................... 18

*Johnson v. Kansas City Southern*,
  224 F.R.D. 382 (S.D. Miss. 2004) ..................................................................... 5

*Johnson v. Time Warner Entertainment-Advance/Newhouse P'ship.*,
  No. 3:15-cv-01727-CMC, 2017 WL 3765551 (D.S.C. Aug. 31, 2017) ............... 5

*Karhu v. Vital Pharm., Inc.*,
  621 F. App'x 945 (11th Cir. 2015) ..................................................................... 5

*Krakauer v. Dish Network, LLC*,
  925 F.3d 643 (4th Cir. 2019) ......................................................................... 4, 6

*Krakauer v. Dish Network, LLC*,
  No. 1:14-CV-333, 2017 WL 3206324 (M.D.N.C. July 27, 2017) ....................... 1

*Langan v. Johnson & Johnson Consumer Cos., Inc.*,
  897 F.3d 88 (2d Cir. 2018) .............................................................................. 20

*Mullins v. Direct Digital, LLC*,
  795 F.3d 654 (7th Cir. 2015) ............................................................................. 6

*P.J.'s Concrete Pumping Serv., Inc. v. Nextel W. Corp.*,
  345 Ill. App. 3d 992, 803 N.E.2d 1020 (2004) ............................................... 8, 9

*Peraton, Inc. v. Raytheon, Co.*,
   No. 1:17-cv-979, 2018 WL 10436093 (E.D. Va. Jan. 24, 2018) ............................................ 16

*Polyurethane Foam Antitrust Litig.* ("*Poly Foam*"),
   314 F.R.D. 226 (N.D. Ohio 2014) .......................................................................................... 11

*Rodgers v. Abbster Enters.*, LLC,
   No. 3:16-CV-106, 2017 WL 402055 (N.D. W.Va. Jan. 30, 2017) ............................................ 8

*Roofer's Pension Fund v. Papa*,
   333 F.R.D. 66 (D.N.J. 2019) .................................................................................................... 8

*Sidibe v. Sutter Health*,
   333 F.R.D. 463 (N.D. Cal. 2019) ........................................................................................... 15

*Simon v. KeySpan Corp.*,
   694 F.3d 196 (2d Cir. 2012) ................................................................................................... 17

*Soutter v. Equifax Info Servs.*, LLC,
   307 F.R.D. 183 (E.D. Va. 2015) .............................................................................................. 5

*Sullivan v. DB Invs.*, *Inc.*,
   667 F.3d 273 (3d Cir. 2011) ................................................................................................... 20

*Tidewater Fin. Co. v. Fiserv Sols.*, *Inc.*,
   192 F.R.D. 516 (E.D. Va. 2000) ............................................................................................ 15

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016) ..................................................................................................... 14, 18

*Ward v. Dixie Nat'l Life Ins. Co.*,
   257 F. App'x 620 (4th Cir. 2007) .......................................................................................... 20

*Windham v. American Brands, Inc.*,
   565 F.2d 59 (4th Cir. 1977) ................................................................................................... 18

## Rules

Fed. R. Civ. P. 8(c)(1) ............................................................................................................. 15

Fed. R. Civ. P. 23 ..................................................................................................................... 1

Fed. R. Civ. P. 23(c)(1)(C) ....................................................................................................... 2

Indirect Purchaser Plaintiffs ("IPPs") demonstrate in their opening brief that the proposed Class meets the criteria of Federal Rule of Civil Procedure 23, and Defendants fail to present law or facts establishing otherwise. IPPs' Motion for Class Certification should therefore be granted.

## I.   THE PROPOSED CLASS IS ASCERTAINABLE UNDER RULE 23.

### A.  The Proposed Class Is Defined by Objective Criteria.

Defendants do not dispute that IPPs' Class definition, which excludes those who "purchased for resale," is defined by objective criteria. Defendants in fact concede that this Class definition is a "standard definition of indirect purchasers." Expert Report of James A. Levinsohn ("Levinsohn Rep."), Ph.D., ECF No. 200-2, ¶ 17. Defendants instead argue that the inclusion of contractors, which the Court recognized "buy IMDs to install in someone else's home for a fee or as part of a larger construction project",[1] renders the Class definition "unascertainable." Defs.' Opp'n. to IPPs' Mot. for Class Certification ("Opp.") ECF No. 200, at 5. This argument is a red herring. Whether contractors meet the Class definition is entirely separate from whether the Class is defined by objective criteria. The former question has no bearing on whether the Class is ascertainable and is appropriately reserved in the claims administration process. *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253418, at *9 (E.D. Pa. Aug. 3, 2007) (the class must be "ascertainable by some objective criteria, not *actually* ascertained" such that "challenges to individual claims based on class membership may be resolved at the claims phase of the litigation."); *Krakauer v. Dish Network, LLC*, No. 1:14-CV-333, 2017 WL 3206324, at *10 (M.D.N.C. July 27, 2017).

Based on IPPs' clear definition, contractors are included in the Class. Defendants' sole

---

[1] Opinion, *In re Interior Molded Doors Indirect Purchaser Antitrust Litig.*, No. 3:18-cv-00850 (Sept. 18, 2019), ECF No. 106 at 18 n. 10 (hereinafter, "Opinion").

argument to the contrary is that contractors "resell" IMDs.[2] The Court has already acknowledged that the sale of a product incorporating an IMD is distinct from the sale of a "standalone" IMD and that purchasers of products incorporating IMDs are not part of the Class. Opinion at 19 ("Whatever larger good a component indirect purchaser might have bought, that good is not reasonably interchangeable with an IMD."). The Court further observed that "[D]efendants [] distinguish between two groups of standalone indirect purchasers: those who bought IMDs for their own use (such as a homeowner) and those who bought IMDs to install for someone else's use (such as a contractor) . . . ***The defendants' distinction is one without much difference***." *Id.* at 18 n.10 (emphasis added). Thus, a contractor who did not resell a standalone IMD did not purchase the IMD for resale and is included in the Class.[3]

In an abundance of caution and to avoid any possible ambiguity, IPPs respectfully seek to amend their Class definition as set forth in Exhibit 1.[4]

## B.  Class Members Can be Readily Identified Through Objective Criteria.

The thrust of Defendants' argument is that Class members cannot be identified because

---

[2] Defendants criticize as "unworkable" Dr. Mangum's instruction from IPP counsel that "IMD purchases 'made on behalf of another [that] were fully and separately reimbursed'" should be excluded from the class for purposes of his analysis. Opp. at 5. But this instruction did not impact Dr. Mangum's analysis. *See* Ex. 2, Reply Declaration of Russell W. Mangum III, Ph.D. ("Mangum Reply") at 4 n.10; Ex. 3, Deposition of James A. Levinsohn, Ph.D. ("Levinsohn Tr.") 94:11–95:4 (testifying he did not recall anything in Dr. Mangum's report indicating Dr. Mangum excluded purchases that were separately and fully reimbursed). As Defendants concede, no such "limitation . . . appear[s] in the class definition." Opp. at 5. Dr. Levinsohn testified it is not unusual for an individual to purchase a consumer product on behalf of another and to subsequently be reimbursed for such purchase. Levinsohn Tr. 98:3–99:25; 101:18–102:18. The existence of such a common occurrence does not defeat ascertainability.

[3] The argument that adequacy or typicality is defeated because contractor IPPs "resell" IMDs also fails. Opp. at 5. Contractors indisputably purchase stand-alone IMDs and have no "conflict" with their customers because the latter purchasers of contracting services are not in the Class.

[4] In addition, as set forth in Exhibit 1, IPPs seek to amend their class definition to exclude purchases of IMDs from Menards. *See* Fed. R. Civ. P. 23(c)(1)(C); *Henderson v. Corelogic Nat'l Background Data, LLC,* 3:12-cv-97, 2016 WL 4611571, at *4 (E.D. Va. Sept. 2, 2016) (a court may alter or amend a certification order at any time before final judgment).

retailers and wholesalers sometimes "multisource" their purchases of IMDs from different manufacturers and in some instances these purchases cannot be traced to the original manufacturer. Opp. at 10–11. This argument rings hollow.

With respect to the retail channel, IPPs can determine whether a Class member purchased a Defendant-manufactured IMD in nearly every instance. Virtually all IMDs sold by ▉▉▉ were manufactured by Defendants. Mangum Reply ¶¶ 145–46, 154. While ▉▉▉▉▉▉ supplies ▉▉▉▉▉ with IMDs in several states, Mississippi is the only Class State in which ▉▉▉▉▉ sources IMDs from ▉▉▉. *Id.* ¶¶ 147, 154. Of the Mississippi ▉▉▉▉ stores, ▉▉ is virtually the exclusive supplier for twelve stores and Defendants are virtually the exclusive suppliers for two stores. *Id.* ¶ 147. IPPs can exclude Mississippi consumers who purchased ▉▉ IMDs simply by requiring potential Class members to identify the store where they purchased their IMD(s).

Defendants also exaggerate the impact of multisourcing within the wholesale channel. Based on data produced by third parties in this case, Class members purchasing IMDs through the wholesale channel account for less than ▉▉ of the Class. *Id.* ¶ 155. And within the wholesale channel, Defendants supplied the vast majority—approximately ▉▉—of IMDs. *See* Ex. 4, MAS-0000025015. Unlike consumers in the retail channel, customers purchasing from wholesalers often purchase a substantial number of IMDs. Mangum Reply ¶¶ 153, 167. Because of this, most of these entities purchased at least one IMD manufactured by Defendants and fall within the Class definition. The small number of customers that may have purchased IMDs in the wholesale channel exclusively from non-defendants (i.e., customers falling outside the class definition) comprise a negligible percentage of end-purchasers of stand-alone IMDs. Even if

IPPs were not able to weed out these entities,[5] ascertainability does not require that IPPs

"identify in every instance whether a Defendant manufactured" an IMD purchased by an IPP. *In*

*re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2015 WL 4459636, at *6–7 (N.D.

Ohio Jul. 21, 2015) (rejecting decertification motion and defendants' argument that plaintiffs

could not determine from sales receipts, product manuals, and products themselves whether the

relevant product was manufactured by a defendant); *Krakauer v. Dish Network, LLC*, 925 F.3d

643, 658 (4th Cir. 2019) (class is ascertainable where members can be identified "on a large

scale basis.)" [6]

Defendants also argue that IPPs cannot identify purchasers of Defendants' IMDs because

IPPs do not possess every shred of transactional data from each possible retailer and wholesaler

that sold to Class members.[7] Opp. at 9–10. But a detailed review of transactional data will not be

required in most instances because, as explained *supra*, most IPPs bought a Defendant-

manufactured IMD. To the extent necessary, IPPs may rely on sources, including purchase

---

[5] Defendants fail to cite an example of a wholesale customer that purchased IMDs exclusively manufactured by non-Defendants and cite only two examples of wholesalers that purportedly multi-sourced, ████ and ████. Levinsohn Rep. ¶ 63. But Dr. Mangum concluded that it is a "virtual certainty" that customers of ████ and ████ purchased an IMD made by Defendants. Mangum Reply ¶¶ 150, 155 (establishing that Defendants supplied over ████ purchases and that Jeld-Wen supplied ████ of IMDs to ████ during the Class Period).

[6] *See also In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 1917, 2013 WL 5429718, at *8 (N.D. Cal. Jun. 20, 2013), *report and recommendation adopted*, No. C-07-5944-SC, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013) (concluding "even if some individuals join the class and it is then determined that their units did not contain Defendants' CRTs, this does not preclude class certification."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 592 (N.D. Cal. 2010) ("*TFT-LCD*") (same).

[7] Although Dr. Mangum does not have all retailer and wholesaler data, he analyzed ████ ██████████████████████████████ Mangum Reply ¶ 25. Defendants cite no authority holding that IPPs must obtain all existing data that could identify class members at the class certification stage. *Bussey v. Macon County Greyhound Park, Inc.*, is inapposite as the plaintiffs had not "provided *any* indication that they ha[d], or even that they c[ould] obtain, data" relating to a subset of class members. 562 F. App'x 782, 788 (11th Cir. 2014) (emphasis added). Here, additional data is unnecessary in many instances for the reasons set forth above.

records[8] and transactional data to identify Class members.[9] The fact that some Class members may not possess every purchase record does not defeat ascertainability as Defendants suggest (Opp. at 11–12). *See, e.g.*, *In re Marine Hose Antitrust Litig.*, No. 08-MDL-1888, 2009 WL 10685187, at *3 (S.D. Fla. Aug. 11, 2009) ("class members should not be penalized for lack of documents" because Defendants successfully implemented a long-running conspiracy); *In Re Compact Disc Minimum Advertised Price Antitrust Litig.,* 216 F.R.D. 197, 213 (D. Me. Jun. 13, 2003) (rejecting requirement that class members provide proof of purchase given likelihood that

---

[8] Defendants argue that some purchase records do not identify the IMD manufacturer and that matching a SKU number to the manufacturer is a "laborious process." Opp. at 11. But this "complexity" is easily simplified by requiring claimants to identify the retailer/wholesaler and store location where the IMD was purchased. And, this Court has made clear that "[t]he number of 'steps' in the process and the time and effort required have no bearing on whether the individuals are or are not objectively ascertainable." *Soutter v. Equifax Info Servs., LLC*, 307 F.R.D. 183, 197, 199 (E.D. Va. 2015) (certifying class and explaining that "holding otherwise would mean that defendants could defeat class certification when their conduct affects a large number of individuals and the class-action device can be most useful."); *see also Bell v. WestRock CP, LLC*, No. 3:17-CV-829, 2019 WL 1874694, at *6 (E.D. Va. Apr. 26, 2019) (Gibney, Jr., J.) ("[t]he fact that applying the criteria could take significant time and effort . . . does not factor into the Court's ascertainability determination.") (citing *Soutter,* 307 F.R.D., at 199). In *Bell*, the Court distinguished cases that required "individualized review of thousands of … documents." *Id.* Unlike here, those cases required "scouring property records," identifying land tracts and ownership exclusions, reviewing title documents and conveyance language, and making legal determinations regarding the parties' intent and the effect of conveyance instruments. *Id.* (citing *Johnson v. Time Warner Entertainment-Advance/Newhouse P'ship.,* No. 3:15-cv-01727-CMC, 2017 WL 3765551, at *1 (D.S.C. Aug. 31, 2017); *Johnson v. Kansas City Southern*, 224 F.R.D. 382, 383 (S.D. Miss. 2004)).

[9] IPPs do not merely point to "hypothetical data or records" (Opp. at 12) to identify class members, but have produced purchase records that reflect the date of purchase and item numbers that can be used to identify the manufacturer of an IMD. In other instances, claimants need only identify which store they purchased IMDs from in order to determine whether they purchased a Defendant-manufactured IMD. *See* p.3, *supra*. Unlike the class plaintiffs in *Karhu v. Vital Pharm., Inc.*, (Opp. at 12), IPPs are not "simply [] asserting that class members can be identified using the defendant's records." *Karhu v. Vital Pharm., Inc*., 621 F. App'x 945, 948 (11th Cir. 2015). To the extent additional data is needed to identify class members, it is common for class plaintiffs to obtain additional data after certification for claims administration purposes. *See, e.g.*, *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.,* No. 18-MD-2819, 2020 WL 2555556, at *19 (E.D.N.Y. May 5, 2020) (approving proposed claims administration process involving obtaining third-party data after close of fact discovery).

records would be kept years after the purchase); *see also Mullins v. Direct Digital, LLC*, 795 F.3d 654, 669 (7th Cir. 2015) ("Given the significant harm caused by immunizing corporate misconduct . . . a district judge has discretion to allow class members to identify themselves with their own testimony"). For the reasons set forth above, the Class is defined by objective criteria and IPPs identify a method for identifying Class members "on a large-scale basis." *Krakauer*, 925 F.3d at 658.

## II.   IPPS ESTABLISH PREDOMINANCE UNDER RULE 23(b)(3).

### A.   IPPs Can Prove Impact Using a Method Common to the Class.

At the class certification stage, IPPs must present a methodology capable of showing that all or virtually all class members suffered impact. *See Restasis*, 2020 WL 2555556, at *12 (collecting cases). IPPs have done so through a methodology that shows all or virtually all direct purchasers would be impacted by the alleged conspiracy and that all or virtually all direct purchasers and other resellers passed-on that overcharge to contractors and consumers.[10] Defendants' arguments to the contrary hold no water.

### i.   IPPs Can Demonstrate by Common Evidence That All or Virtually All Direct Purchasers Paid an Overcharge.

<u>First</u>, Dr. Mangum's quantitative and qualitative analyses—including his correlation analysis, effective price increase analysis, and his overcharge regression model—demonstrate that all or nearly all direct purchasers would be impacted (Mangum Decl. ¶¶ 109–70). Courts routinely "accept[] multiple regression analyses as means of proving antitrust injury and

---

[10] Defendants' contention that IPPs may not incorporate the fact section from Direct Purchaser Plaintiffs' class certification briefing to the extent it relies on Dr. Lamb's report (Opp. at 2–3) is irrelevant. Regardless, liability in a price fixing case is easily demonstrated through common evidence. *See In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 219 (E.D. Pa. 2012) (predominance satisfied where plaintiffs would "utilize the same operative evidence" to prove defendants' liability for state antitrust, consumer protection and unjust enrichment claims).

damages on a class-wide basis." *TFT-LCD*, 267 F.R.D. at 606. Defendants also argue that Dr.

Mangum's multiple regression analysis "assumes away significant variations . . . in IMD product

types, regional market forces, and customer-specific factors affecting IMD pricing." Opp. at 17,

19–23. But Dr. Mangum's analysis assesses a host of factors, including price structures and

product features in order to isolate the effect of Defendants' conspiracy. Mangum Reply ¶ 42.[11]

Second, IPPs allege that Defendants engaged in conspiratorial conduct beginning March

1, 2014 (Mem. of Law in Support of IPPs' Mot. for Class Certification ("Supp. Mem.") ECF No.

178, at 7) and Dr. Mangum's overcharge calculation includes this period. Mangum Reply

¶ 177.[12]  Defendants claim that Dr. Mangum improperly "assumes injury for purchases that pre-

date price increases." Opp. at 18–19. But purchasers can be injured absent formal price increase

announcements. *See, e.g.*, *In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust*

*Litig.*, 421 F. Supp. 3d 12, 60–61 (E.D. Pa. 2019); *Hosp. Auth. of Metro. Gov't of Nashville &*

*Davidson Cty., Tenn. v. Momenta Pharm., Inc.*, 333 F.R.D. 390, 408, 410 (M.D. Tenn. 2019)

(products sold at supracompetitive prices despite no formal price increase or announcement).

Moreover, to the extent Defendants dispute the scope and sufficiency of IPPs' liability evidence,

---

[11] Defendants' reliance on *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478
(N.D. Cal. 2008), is misplaced. There, the products varied by ultimate application (desktop chips
and cards, notebook chips, handheld chips) and by performance level; the "overwhelming
majority" of wholesale purchases were individually negotiated and highly customized; the
products were not fungible; and the expert failed to account for variables that impacted prices.
*Id.* at 480–81; 491. Here, IMDs are fungible commodities that do not vary widely by attribute or
application and Dr. Mangum's analysis controlled for attributes that contribute to price
differences across products. Mangum Reply ¶¶ 18–26. Defendants' reliance on *In re Lamictal
Direct Purchaser Antitrust Litig.*, 957 F.3d 184 (3d Cir. 2020) is also unavailing. That court did
not conclude that the expert "impermissibly relied[] on averages" (Opp. at 18). Instead, it held
that the district court failed to undertake a rigorous analysis in resolving factual disputes unique
to the case. *Lamictal*, 957 F.3d at 194.

[12] Dr. Magnum did not testify that his calculation of a single overcharge during the entire class
period was incorrect (Opp. at 18 n.15); he stated that he tested his model by breaking it into four
parts. Ex. 5, Deposition of Russell W. Mangum III, Ph.D., ("Mangum Tr.") 233:23–234:13.

these are merits questions not appropriate for resolution at class certification. *See Rodgers v. Abbster Enters.*, LLC, No. 3:16-CV-106, 2017 WL 402055, at *2 (N.D. W.Va. Jan. 30, 2017) (liability for conduct taking place during specific period was factual dispute inappropriate for consideration at class certification); *Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 89 (D.N.J. 2019) ("Should Defendants wish to challenge the Class Period after uncovering evidence that contradicts that date, they may do so either on a motion for summary judgment or at trial.").[13]

    Third, Dr. Mangum's model accounts for the minor variations in Defendants' IMD product. Virtually all differentiation between IMDs is limited to size and design combinations, which do not fundamentally change the product or affect the performance function of the IMD. Mangum Decl. ¶¶ 40, 99–101; Mangum Reply ¶¶ 19–22. While a trivial number of IMDs are sold under designs that are "unique" to one Defendant (Mangum Decl., Table 3), nearly all Class members (approximately ███ or more) bought IMDs from ████████ and ████, which offer a highly limited subset of IMD designs. Mangum Decl. Table 8; Mangum Reply ¶ 22. Defendants made no showing that IMDs are meaningfully different beyond size, design, and pre-finishing, all of which are universally offered by both Defendants. Non-Defendant suppliers are an irrelevant source of additional product variation. Defendants are the only two sources of Door Skins and thus the only two sources of design. Defendants themselves refer to their products as interchangeable commodities. Mangum Decl. ¶¶ 99–101. Regardless, Dr. Mangum's analysis, including his overcharge and pass-through estimation, fully accounts for all the different attributes and types of IMD products.

---

[13] Defendants speculate that IMDs purchased during the beginning of the class period may not have been subject to an overcharge "depending on how long each direct purchaser kept IMDs in inventory." Opp. at 18. But "a hypothetical problem [] is not a sufficient basis to deny certification of an otherwise proper class action." *P.J.'s Concrete Pumping Serv., Inc. v. Nextel W. Corp.*, 345 Ill. App. 3d 992, 1003-04, 803 N.E.2d 1020, 1030 (2004).

Fourth, Defendants overstate the effects of regional market forces. Defendants fail to define what these "regions" are or explain how their limited testing is consistent with their theory. Regardless, Defendants' flawed testing shows limited regional variation while failing to suggest lack of impact. *See* Expert Report of Dr. John H. Johnson, IV ("Johnson") Ex. K1–K3; Mangum Reply ¶ 76, n.88. In the wholesale market, all customers received the same price increase letters and for retail, price increases rolled out nationally. Both facts demonstrate a lack of concern about regional effects. In fact, Dr. Johnson's theory of regional patterns (Johnson ¶¶ 26–30) is undermined by the correlation analysis performed by Dr. Mangum across states, which showed exceptionally strong relationships across regions. Mangum Decl. ¶ 138 & Table 6. There are no pockets in the country where Defendants, the only nationwide suppliers, lack significant market share. *See* MAS-0000025015; Mangum Decl. ¶ 58.  Even in regions where competitors arguably have more than a nominal market share: (1) Defendants still have significant market share; and (2) Defendants are the exclusive suppliers of Door Skins (the primary input cost for IMDs) such that non-defendant IMD suppliers have no ability to constrain Defendants' IMD pricing. *See id.*; Mangum Decl. ¶ 112. Dr. Levinsohn's attempt to show regional overcharge by slicing the data into small pieces is inappropriate and the "negative" overcharges he finds do not make sense from a "regional competition" perspective. Mangum Reply ¶¶ 190–92.

Fifth, the fact that direct purchasers negotiated prices does not defeat certification. *See, e.g.*, *In re Polyester Staple Antitrust Litig.*, MDL No. 3:03CV1516, 2007 WL 2111380, at *22–24 (W.D.N.C. July 19, 2007) (extensively discussing case law and holding that variation in prices related to the customer's bargaining power did not preclude plaintiffs from demonstrating common impact, where plaintiffs could establish an inflated base price); *In re Suboxone*

*(Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 60–61 (E.D. Pa. 2019) (collecting cases holding that differing purchase methods, varying prices paid, and price negotiations by class members did not preclude class certification). Variation in pricing existed across customers before the alleged conspiracy and was therefore controlled for in the benchmark period. *See* Mangum Reply, ¶ 50, n 54. Additionally, Dr. Johnson overstates the impact of individual pricing negotiations.[14] In any case, Dr. Mangum's analysis reflects concessions negotiated between Defendants and their customers, as it incorporates the actual prices paid by Defendants' customers. Defendants fail to provide a single example of a Class member that was unaffected by the alleged conspiracy. Mangum Reply ¶ 87.[15]

Finally, Dr. Mangum's analysis explicitly accounts for the difference between the wholesale and retail channels. He includes separate discussions of evidence related to competition, pricing mechanisms, and products, and separate quantitative analyses for each customer type. *See* Mangum Decl. ¶ 180, Table 14 (estimating overcharges separately for wholesalers, Home Depot, and Lowe's), ¶¶ 134–43, 159–70. Contrary to Defendants' assertions (Opp. at 22), Dr. Mangum clearly explained "why" █████████ and ██████ would not escape impact. Mangum Decl. ¶¶ 150–57 (██████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████ .



### ii.  IPPs Can Demonstrate by Common Evidence that Overcharges were

---

[14] Dr. Johnson's report indicates that ████████████████████████████████ ████████████████████████████████████████████████████ . *See* Johnson Rep., Ex. 23, 24 & M1–M6.

[15] ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ . *Id.* Defendants' arguments regarding respective bargaining power (Opp. at 21) are illogical, as smaller customers are less able to engage in meaningful negotiations as compared to customers with the most bargaining power, such as ██████████ and ██████ , which still paid overcharges.

**Passed-On to All or Virtually All Class Members.**

Dr. Mangum established pass-through on a class-wide basis with a combination of three well-accepted categories of common evidence: (1) economic theory as applied to the IMD market; (2) documentary evidence from Defendants and downstream market participants; and (3) extensive econometric analyses of entities in the distribution chain.[16] *See* Supp. Mem. at 25–27; Mangum Decl. ¶¶ 30, 209–314. This is all that is required. *Poly. Foam*, 314 F.R.D. at 286 (an instance in the short term where a direct purchaser failed to pass-on the overcharge "cannot defeat an otherwise proper offer of generalized evidence of overcharge passthrough").

Defendants challenge only Dr. Mangum's opinions on category (3). *See* Opp. at 23–26. Dr. Mangum conducted empirical pass-through studies of eight entities (excluding ▮▮▮▮) in the wholesale and retail distribution channels, including 1-step distributors, a purchasing cooperative used by 1-step distributors, 2-step distributors, regional retailers, and nationwide home centers. Mangum Decl. ¶ 314. The data in Dr. Mangum's analysis covered the entire Class Period; included data from sales made in all states in the proposed Class; and included over 8.5M observations, 40M unit sales and $2B in sales of slab, value-add and pre-hung IMDs. *Id.*; *see also id.* Tables 15–20, 22–23; App. F.1–F.9. Dr. Mangum estimated pass-through rates of over ▮▮▮▮▮▮▮▮ (*id.* Table 23) and opined that Defendants' "▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮." *Id.* ¶ 314. Defendants' challenges to Dr. Mangum's empirical analyses of pass-through are without merit.

---

[16] *See In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 613 (N.D. Cal. 2009) (economist's application of economic theory to SRAM product and market characteristics supports (b)(3) predominance on pass-through); *TFT-LCD*, 267 F.R.D. at 602–04 (recognizing feasibility of plaintiffs' empirical pass-through estimations); *In re Polyurethane Foam Antitrust Litig.* ("*Poly Foam*"), 314 F.R.D. 226, 276, 279, 285–86 (N.D. Ohio 2014) (relying on qualitative, documentary evidence of pass-through in certifying class).

Defendants' claim that Dr. Mangum's "estimated pass-through rate is based on a tiny, non-representative sample of IMD sales" is specious. The third party data analyzed by Dr. Mangum is hardly "tiny" or "non-representative." *See In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. 308, 344 (S.D. Cal. 2019) (nine studies based on retailer and distributor data were "robust"). To portray the percentage of sales into the channels covered by Dr. Mangum's studies as "tiny," Dr. Levinsohn misleadingly shrinks the percentages of sales covered in each channel by incorrectly using Defendants' sales *through all channels* as the denominator—not sales through the individual channel at issue. *See* Mangum Reply ¶¶ 205–09; Levinsohn Tr. at 253–57 (confirming same). With the proper divisor and using total sales of the reseller entity in question, Dr. Mangum's data—excluding █████—represent ████████ and ███ of Defendants' sales into the retail, 1-step distributor, and 2-step distributor channels, respectively. Mangum Reply ¶ 209, Table 6. And Dr. Levinsohn has no opinion on what percentage of any category of sales would have been a sufficient sample size. Levinsohn Tr. at 258–59.

Defendants' challenge to Dr. Mangum's data sample for 1-step distributors (Opp. at 25) also ignores the fact that the ████████ and ████ studies covered nearly ██████ ███████████████████████████████████████████████████████████. *See* Mangum Decl. Tables 19, 20, 23; Apps. F.5, F.6.[17] Defendants' claim that Dr. Mangum's one-stepper data "omits information for most sales of pre-hung doors and lacks reliable data from a number of the class states" (Opp. at 25) is also without merit. Virtually all of Defendants' pre-hung IMDs are sold to retailers, not distributors, and the distributors included in Dr. Mangum's

---

[17] Dr. Levinsohn also wrongly disregards Dr. Mangum's analysis of direct purchaser buying cooperative ████—which is akin to a one-step distributor—that indisputably shows ████████ ████ of Defendants' price increases ███████████ throughout the U.S., ██████████████████████. *See* Mangum Decl. ¶¶ 238–46; *see also id.* ¶ 230 (showing 1-step distributor ████████ use of markups and pass-through).

analyses sold IMDs into 46 out of 50 states, and in 19 out of 21 Class States. *See* Mangum Reply ¶¶ 200–04, n. 240. Defendants do not show that pre-hung IMDs are sold in large quantities to distributors, or that distributors who pass-through overcharges in 19 Class States would not do so in the remaining two.

Defendants argue IPPs must show that "any overcharge to direct purchasers was at least partially passed through the entire distribution chain" (Opp. at 25) and claim that distributor ██ ████████████ testified "████████████████████████████████████████." But the █████ witness testified that they ████████████████████████ █████ and that with respect to ████████████████████████████ ████████████████ Ex. 6, Deposition of ████████ 40:24–41:5.[18]

Defendants claim that █████ or █████ may have used a small number of pricing tiers that would shield some customers from the pass-through of overcharges and that Dr. Mangum improperly used averages in his analyses. Opp. at 23–24. Neither argument has merit. Dr. Levinsohn's analysis focuses on █████ and █████ pricing practices, speculating that other retailers might price their products similarly. Levinsohn Rep. ¶ 83. But purchases from █████ are not part of the IPP Class,[19] and Dr. Levinsohn's effort to group █████ pricing with █████ and ████████ pricing is unsupported. *See* Mangum Reply ¶¶ 157–66. First, as Dr. Mangum explains, "Levinsohn Figure 9 shows meaningful sales volumes at numerous different visible prices for █████, but hides the prices of the largest share of IMDs in an

---

[18] Defendants' further claim that Dr. Mangum "admit[ed] he did not 'investigate whether [less-than-100% pass-through] existed in the IMD market" (Opp. at 25–26), is untrue. Dr. Mangum broadly investigated whether pass-through occurred in the market. Mangum Decl. ¶¶ 211–314.
[19] Even if they were, Dr. Levinsohn failed to articulate any reason that a "dizzying dive into Menards' pricing and the mind of the customer" (Opp. at 24) would be necessary. Mangum Reply ¶¶ 159–60 (Dr. Levinsohn does not show that Menards' reduced sale frequency was caused by Defendants' price increases).

unexplained 'Other' price category." *Id*. ¶ 162. Second, Dr. Mangum reviewed  and █████████ pricing data and showed that █████████████████████████████ ██████████████████████, which fully supports pass-through. *Id*. ¶¶ 163–65, App. E, F.[20]

Dr. Levinsohn's further criticism of Dr. Mangum's use of averaging is unsupported in academia, the law, and by Dr. Levinsohn's own methods. It is well-accepted in peer-reviewed academic publications that multiple regression analysis, which requires the use of averaging, may be used to measure pass-through. *See* Mangum Reply ¶¶ 34–35, 166. Neither Defendants nor Dr. Levinsohn cite peer-reviewed, academic support for the claim that estimating an average pass-through rate is improper. Indeed, numerous courts have rejected defendants' criticism of the use of averaged price data to measure pass-through. *See TFT-LCD*, 267 F.R.D. at 605 ("a number of courts have held that averaged and aggregated data may be used to demonstrate pass-through").[21] Unlike the experts in those cases, Dr. Mangum did not rely on average price data but instead used transactional data, Defendants still criticize Dr. Mangum for failing to perform a regression analysis on a transaction-by-transaction basis. Opp. at 24–25. Defendants cite no authority for such a proposition and as Dr. Mangum explains, doing so would lead to absurd results. Mangum Reply ¶ 166.

---

[20] Because Defendants' ██████-related price point arguments do not apply to ██████ and ████████████ Defendants' reliance on *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311 (N.D. Cal. 2014) is misplaced. Also, the denial of class certification in *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 158 (E.D. Pa. 2015) hinged on the expert's analysis of a single nationwide pass-through rate for one retailer, not the eight robust studies performed here.
[21] *Id*. (*quoting Gordon v. Microsoft*, No. MC 00-5994, 2003 WL 23105550, at *3 (D. Minn. Dec. 15, 2003) ("average pass through rates appear reasonable and even necessary to prove damages here")); *SRAM*, 264 F.R.D. at 614 (rejecting the defendants' criticism that the indirect-purchaser plaintiffs' use of average and aggregated data in their structural model could yield "false-positive pass-through"); *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 389 (M.D. Fla. 2018) ("use of averages to prove common impact to a putative class is accepted.") (citing *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1047–49 (2016)).

Finally, Dr. Levinsohn repeatedly uses averaging in his own analyses when it suits his purposes. *See* Levinsohn Rep. Figure 2 (comparing average slab and prehung sales prices) and Levinsohn Tr. at 153:23–154:10 (re Fig. 2: "███████████████████████████ ██████████████████████."). *See also* Levinsohn Rep. Figure 16 (plotting "average residuals"); *id.* ¶ 207 (use of averages to estimate "lag" times). Defendants' challenges to Dr. Mangum's estimates of average pass-through rates should be rejected.[22]

### iii.   Pass-On by IPPs is Not a Permitted Defense in this Case and Does Not Defeat Class Certification.

The untimely argument that IPPs cannot demonstrate common impact and typicality because some contractors may have passed on the cartel overcharge to customers should be rejected both on procedural grounds and on the merits. As a threshold matter, Defendants failed to raise pass-on as an affirmative defense in their answers to IPPs' complaint, and such defense is therefore waived. *See* Fed. R. Civ. Proc. 8(c)(1) ("in responding to a pleading, a party must affirmatively state any avoidance or affirmative defense"); *Tidewater Fin. Co. v. Fiserv Sols., Inc.*, 192 F.R.D. 516, 523 (E.D. Va. 2000) (affirmative defense waived where not pleaded in answer to counterclaim). Moreover, Defendants' present position directly contradicts not only the Court's prior holdings,[23] but also their own prior position that homeowners engaging

---

[22] Defendants' reliance on *Sidibe v. Sutter Health*, 333 F.R.D. 463, 497–98 (N.D. Cal. 2019) is also misplaced. Opp. at 26. In *Sidibe*, the expert's pass-through methodology suffered from myriad deficiencies, including a "100-percent-passthrough assumption" that was based in part on a defendant's PowerPoint presentation, and on an "overly simplistic" regression model that used a single explanatory variable, and was contradicted by the expert's own reply report analyses. Dr. Mangum's work has none of these infirmities.

[23] The Court already explicitly considered the composition of the class, holding that contractors are indirect purchasers with antitrust standing, while further downstream indirect purchasers who purchased a component containing IMDs are not. Opinion at 18–19. The Court noted that the product market is determined by reasonable interchangeability, and in the analogous situation of homebuyers: "[a] house, of course, is not a substitute good for an interior door." *Id.* at 19. *A fortiori*, neither is a contracting service. Contractors and DIYers "both suffered the same antitrust injury and are consumers in the relevant market" because they purchased standalone IMDs from

contractors were in a separate product market, and that apportioning damages as between the two would be "impossibl[e]." Defs.' Mem. in Supp. of Mot. to Dismiss, ECF No. 69, at 14–18 (arguing "[a] homeowner who pays for a remodeling project… participates in the general-contractor market, not the door market, even if the job calls for the installation of one or more doors."). Having prevailed in their argument, Defendants now reverse course and argue that homeowners, not contractors, are the injured parties here. Opp. at 14. Defendants are barred from making this argument. *See Peraton, Inc. v. Raytheon, Co.*, No. 1:17-cv-979, 2018 WL 10436093, at *2 (E.D. Va. Jan. 24, 2018) (litigants are "prohibit[ed] … from taking one position, gaining advantage by doing so, and then attempting to take an inconsistent position in the same litigation").

Defendants' assertion of a pass-on defense similarly fails on the merits. Even if Defendants were permitted such a defense—they are not—it does not defeat class certification. This is because "antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset." *Restasis*, 2020 WL 2555556, at *24 (quoting *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015)); *Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cty., Tenn. v. Momenta Pharm., Inc.*, 333 F.R.D. 390, 409 (M.D. Tenn. 2019) (same).

Further, Defendants' sweeping generalization that all Class States permit a pass-on defense is wrong. Most Class States do not allow a pass-on defense under *any* circumstances.[24] Even in the Class States that allow a pass-on defense in certain limited circumstances, it may only be used as an affirmative defense to preclude duplicative recovery of the same overcharge, which is not a possibility here due to: (1) the Court's ruling that purchasers of product containing

---

distributors. *Id.* at 18 n.10. The Court rejected Defendants' contention that damages would need to be apportioned between contractors and their homeowner customers because "plaintiffs do not seek to recover twice for the sale of the same door." *Id.* at 28 n.16.

[24] *See* IPPs' Appendix A (State Authority on Defensive Pass-On Chart).

IMDs as a component cannot recover (Opinion at 19), and (2) IPPs "do not seek to recover twice for the sale of the same door." *Id.* at 18 n. 16; *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 787 (2010) (except in cases involving "cost-plus"[25] contracts or where "multiple levels of purchasers have sued, or where a risk remains they may sue," a pass-on defense is precluded). Defendants, accordingly, have failed to meet their burden of establishing the applicability of the pass-on defense in any Class State.[26]

### B. IPPs Apply a Reliable Methodology for Proving Damages on a Class-Wide Basis.

Although class-wide damages must be both "capable of measurement on a classwide basis" and "susceptible of measurement across the entire class," they "need not be exact." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34-35 (2013). "The use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism." *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 197 (1st Cir. 2009) (citing 3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 10.5, at

---

[25] The narrow "cost-plus" exception is inapplicable here, where contracts were not pre-determined fixed-quantity contracts. *See, e.g.*, *Simon v. KeySpan Corp.*, 694 F.3d 196, 202 (2d Cir. 2012) (cost-plus exception "is only appropriate when the contract has removed all doubts about who bore the antitrust injury. For the exception to apply, the contract quantity must be determined prior to the overcharge[.]").

[26] *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 09-4997 SI, 2012 WL 6709621 (N.D. Cal. Dec. 26, 2012), *aff'd*, 637 F. App'x 981 (9th Cir. 2016) ("*LCD*") does not change the analysis here, but rather confirms that, to the extent recognized by a particular state, the pass-on defense is permitted only to preclude duplicative recovery. *Id.* at *2–7. *LCD* is also not a class certification decision. Notably, Defendants have not cited a single case where a pass-on defense defeated class certification, and in fact, courts routinely certify classes of indirect purchasers despite pass-on of overcharges. *See, e.g., Packaged Seafood*, 332 F.R.D. at 346 (certifying indirect purchaser commercial food preparer class where class members resold the product); *In Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cty., Tenn. v. Momenta Pharm., Inc.*, 333 F.R.D. 390 (M.D. Tenn. 2019) (certifying indirect purchaser class including retail and non-retail channels where some hospitals passed costs on to patients and insurance companies); *see e.g.*, Ex. 7, Auto Dealers' Mot. for Final Approval, *In re Auto. Parts Antitrust Litig.*, No. 2:12-cv-00202 (E.D. Mich. Dec. 6, 2019), ECF No. 229 at 6 (summarizing court's rulings certifying settlement classes consisting of dealers that re-sold automobiles containing allegedly price-fixed products and granting final or preliminary approval of over $300M in settlements).

483–86 (4th ed. 2002)).[27] The unique facts of *Windham v. American Brands, Inc.*, 565 F.2d 59

(4th Cir. 1977), relied upon by Defendants (Opp. at 26–27), distinguish it from this case. *See*

*DeLoach v. Philip Morris Cos., Inc.* 206 F.R.D. 551, 558–66 (M.D.N.C. 2002) (noting that in

*Windham* there were no available economic formulas; classwide impact was not supported by the

factual allegations; plaintiffs were represented by a sole practitioner, the relevant product was

non-fungible; and the market was highly competitive).

The few other cases that Defendants rely on are equally inapplicable. First, *Broussard v.*

*Meineke Disc. Muffler Shops, Inc*, is not an antitrust case, and cites to *Windham* once for the

proposition that "the need for individual proof of damages bars class certification ***in some***

antitrust cases." 155 F.3d 331, 342–43 (4th Cir. 1998) (emphasis added) (citing *Windham*, 565

F.2d at 66). Second, Dr. Mangum's prior criticism of aggregate damages came in the context of a

false advertising case where reliance was an element and there was no way to tell whether the

allegedly false label was on the product that the Class members purchased. *See* Ex. 8, *McCrary*

*v. The Elations Co.*, No. 5:13-cv-00242-JGB (C.D. Cal. Oct. 20, 2014) (Defs.' Opp'n to Mot. to

Exclude). Third, in *In re Fla. Cement & Concrete Antitrust Litig.*, the court found that the

products at issue were heterogeneous and that many direct purchasers paid the same or lower

prices during the alleged conspiracy. No. 09-23187-CIV, 2012 WL 27668, at *11 (S.D. Fla. Jan.

3, 2012). Here, IPPs show that IMDs are homogenous (Mangum Decl. ¶¶ 97–101; Mangum

Reply ¶¶ 18–26, 125–28) and virtually all direct purchasers received price increases. Mangum

Decl. ¶¶ 131–33. Finally, Defendants' argument that Dr. Mangum's model has many "false

positives" is unpersuasive. Opp. at 28–29. Dr. Mangum effectively rebuts this argument

---

[27] *See also Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1044, 1048 (2016)*; In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 534 (6th Cir. 2008)*;  In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18-MD-2836, 2020 WL 3446895 (E.D. Va. June 18, 2020), at *32; *Restasis*, 2020 WL 2555556, at *26–27.

(Mangum Reply ¶¶ 80–81) and courts have disregarded similar arguments. *See, e.g. In re Korean Ramen Antitrust Litig.*, No. 13-CV-04115-WHO, 2017 WL 235052 (N.D. Cal. Jan. 19, 2017), at *17 (noting "'false positives'…occur with any significance *only* when [Defendants' expert's] preferred cost index and price measures are used").

Ultimately "Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 427–28 (4th Cir. 2003) (noting that "if common questions predominate over individual questions as to liability, courts generally find the predominance standard of Rule 23(b)(3) to be satisfied"). The Court has a variety of methods at its disposal to structure the case to utilize the advantages of a class action while addressing manageability concerns. *See* ECF No. 178 at 28 (citing *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328 (D. Md. 2012), *amended*, 962 F. Supp. 2d 840 (D. Md. 2013) at 349). Here, IPPs rely on established econometric methods to accurately estimate class-wide damages. Mangum Decl. ¶¶ 109–319; Mangum Reply ¶¶ 27–112; 134–239. Using a conservative pass-through rate of 100%, Dr. Mangum multiplied the direct overcharge by the applicable commerce amount less non-eligible sales[28] to determine the aggregate damages. Mangum Decl. ¶¶ 315–19. "This methodology…satisfies Rule 23(b) for damages." *Packaged Seafood*, 332 F.R.D. at 336; *see also CRT*, at *16–23.

### C. Any Minor Variations In State Law Are Manageable.

The minor variations among the Class States' antitrust, consumer protection and unjust enrichment laws are insufficient to defeat class certification.[29] In circumstances like these, where

---

[28] Contrary to Defendants' claims (Opp. at 28), Dr. Mangum did not overstate the relevant volume of commerce. Mangum Reply ¶¶ 223–39 (rebutting Defendants' experts' arguments regarding volume of commerce).

[29] Defendants largely "echo[] objections in their motion to dismiss." *In re Nexium*

IPPs provided a detailed analysis of each state law under which they bring claims and a proposed additional verdict form separating purported variations into groups,[30] courts routinely certify indirect purchaser plaintiff classes. *See, e.g., Restasis*, 2020 WL 2555556, at *28 (certifying class alleging claims under 31 state laws); *Packaged Seafood*, 332 F.R.D. at 346 (same under 32 state laws).[31] Defendants' argument that "the Fourth Circuit has not approved of class certification" where differences in state law fell into a limited number of predictable patterns (Opp. at 30) is misleading, as the Fourth Circuit has never addressed this issue. There is no reason to think the Fourth Circuit would rule differently than other circuits. *See e.g.*, *Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88, 97 (2d Cir. 2018); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 301 (3d Cir. 2011). Therefore, IPPs' claims under state law do not overwhelm common questions, and any purported variations (if they exist) are manageable.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, IPPs respectfully request that their motion for class certification be granted in its entirety.

---

*(Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168, 175 (D. Mass. 2013); *see also* Opp. at 29–30 & Appendix D (arguing reliance and intrastate conduct are necessary under certain state law claims, and that certain states consumer protection laws should not be interpreted using federal law). The Court ruled on many of these issues already. Opinion at 32–41 (determining issues regarding reliance, intrastate conduct, and FTC Act harmonization); *see also* ECF No. 195. Defendants attempt to resurrect these arguments, claiming that individualized issues predominate, but most of the issues raised—particularly those related to proving flagrant or unscrupulous conduct, damages, class action bans, and intrastate effects—are common for all class members.

[30] *See* Appendix B (State Law Variation Chart); Ex. 11 (Proposed Additional Verdict Form).

[31] In *Ward v. Dixie Nat'l Life Ins. Co.*, 257 F. App'x 620, 628 (4th Cir. 2007), cited by Defendants (Opp. at 20), the court denied class certification where the plaintiff "never identified what state law would apply to the claims of absent class members who are not residents of South Carolina and whose claims have no connection to that state." IPPs identify which state laws apply, analyze these laws, and include a special verdict form separating purported variations into groups. *See* Appendix B, (State Law Variation Chart); Ex. 11 (Proposed Additional Verdict Form).

Dated:  June 30, 2020                       Respectfully submitted,

                                            INDIRECT PURCHASER PLAINTIFFS

                                            /s/ _____
                                            Conrad M. Shumadine (VSB #4325)
                                            **WILLCOX & SAVAGE, P.C.**
                                            440 Monticello Avenue, Suite 2200
                                            Norfolk, Virginia 23510
                                            Tel: (757) 628-5500
                                            Fax: (757) 628-5566
                                            Email: cshumadine@wilsav.com

                                            *Interim Liaison Counsel for Plaintiffs and the*
                                            *Proposed Class*

Daniel E. Gustafson                         Joseph R. Saveri
Daniel C. Hedlund                           Steve N. Williams
Michelle J. Looby                           Kyle P. Quackenbush
Kaitlyn L. Dennis                           **JOSEPH SAVERI LAW FIRM**
**GUSTAFSON GLUEK PLLC**                    601 California Street, Suite 1000
120 South 6th Street, Suite 2600            San Francisco, CA 94108
Minneapolis, MN 55402                       Tel: (415) 500-6800
Tel: (612) 333-8844                         Fax: (415) 395-9940
Fax: (612) 339-6622                         Email:  jsaveri@saverilawfirm.com
Email: dgustafson@gustafsongluek.com                swilliams@saverilawfirm.com
        dhedlund@gustafsongluek.com                 kquackenbush@saverilawfirm.com
        mlooby@gustafsongluek.com
        kdennis@gustafsongluek.com

Hollis Salzman
William V. Reiss
Noelle Feigenbaum
**ROBINS KAPLAN LLP**
399 Park Avenue, Suite 3600
New York, NY 10022
Tel: (212) 980-7400
Fax: (212) 980-7499
Email: HSalzman@RobinsKaplan.com
        WReiss@RobinsKaplan.com
        NFeigenbaum@RobinsKaplan.com

*Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*
(admitted *pro hac vice*)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 30th day of June 2020, a copy of the foregoing document was filed electronically on the Court's Electronic Case Filing (ECF) system. A Notice of Electronic Filing (NEF) will be sent by operation of the Court's ECF system to the filing party, the assigned Judge, and any registered user in the case as indicated on the NEF.

To the best of my knowledge, there are no other attorneys or parties who require service by U.S. Mail.

/s/
Conrad M. Shumadine
VSB #4325
**Willcox & Savage, P.C.**
440 Monticello Avenue, Suite 2200
Norfolk, VA 23510
Telephone: (757) 628-5500
Facsimile: (757) 628-5566
cshumadine@wilsav.com

*Interim Liaison Counsel for Plaintiffs and the
Proposed Indirect Purchaser Class*