IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN RE: INTERIOR MOLDED DOORS ANTITRUST LITIGATION | Lead Civil Action No. 3:18cv718 |
| IN RE: INTERIOR MOLDED DOORS INDIRECT PURCHASER ANTITRUST LITIGATION | Lead Civil Action No. 3:18cv850 |

## OPINION

In these two class actions, the "Direct Purchaser Plaintiffs" ("DPPs") and "Indirect Purchaser Plaintiffs" ("IPPs")[1] sue the defendants, Jeld-Wen, Inc. ("Jeld-Wen"), and Masonite Corporation ("Masonite"), for price fixing. Although the parties have requested tentative approval of the settlements of the cases, they have asked the Court to keep evidence of the allegedly fixed prices under seal. In support of their request, the defendants argue that disclosure of historic pricing information will harm them competitively because people will learn how the defendants treated their customers and how much profit they made. In other words, the defendants want to maintain a competitive advantage by hiding evidence of price fixing.

The case now comes before the Court to decide three issues. The first issue deals with a potential indicative ruling on issues currently on appeal. The defendants have appealed the Court's decision not to seal historic pricing information. They now suggest, however, that the Court can and should render an indicative ruling on their motion to reconsider the decision they have appealed.

---

[1] The Court refers to the DPPs and IPPs collectively as the plaintiffs.

The second issue involves potential intervention. A group of potential intervenors asks the Court to allow them to appear in the case to join the defendants' argument that the Court should hold those same documents under seal because the papers contain information about prices paid and charged by the intervenors.

Third, the parties have asked the Court to preliminarily approve the settlements, certify these cases as class actions, and allow the parties to notify the class of proposed settlements.

## I. BACKGROUND

In these cases, the plaintiffs assert two related antitrust claims. The defendants—Jeld-Wen and Masonite—sell most of the interior molded doors ("IMDs") in the United States. IMDs primarily consist of hollow frames over which the manufacturer hangs a molded doorskin, which looks like real wood. Builders, home repair specialists, and do-it-yourself homeowners buy millions of IMDs annually.

Two sets of plaintiffs have brought these class actions. The first set, a group of DPPs, consists primarily of home improvement suppliers, such as The Home Depot and Lowe's, that bought doors directly from Jeld-Wen and Masonite. The second set of plaintiffs, a group of IPPs, consists of entities that bought doors from wholesalers or home improvement suppliers.

Both groups contend that Jeld-Wen's and Masonite's anti-competitive conduct drove up the prices they paid for IMDs. Specifically, the plaintiffs say that Jeld-Wen and Masonite teamed up to eliminate most of the competition in the field and then increased the prices of IMDs to maximize their profits. Among other things, the plaintiffs rely on the defendants' "lockstep" price increases to prove their claims.

On February 21, 2020, the plaintiffs in both cases moved to certify classes, under Federal Rule of Civil Procedure 23. (ECF No. 195, Lead Civil Action No. 3:18cv718; ECF No. 177, Lead

Civil Action No. 3:18cv850.) In support of the certification motions, the plaintiffs filed lengthy reports from expert witnesses. To the defendants' chagrin, the reports contained a great deal of information about the operation of the defendants' businesses, including historic pricing information. Pursuant to a protective order,[2] during discovery the parties had designated much of this information as "confidential." As required by the protective order, the parties moved the Court to seal the "confidential" parts of the class certification filings.

As the case progressed, the parties realized that additional "confidential" information would likely come out in court and that the defendants would likely want to seal that information. At the parties' request, therefore, the Court approved several omnibus stipulations which ultimately made October 16, 2020, the deadline for the parties to file omnibus motions to seal. (ECF No. 229, Lead Civil Action No. 3:18cv718; ECF No. 210, Lead Civil Action No. 3:18cv850.)

In the Court's view, however, the October 16, 2020 deadline did not control the February 21 motions to seal. Those motions became ripe in March 2020. On September 3, the Court largely denied the motions to seal,[3] and set deadlines for the parties to file unredacted versions of documents containing information designated as confidential.[4] (ECF No. 241, Lead Civil Action No. 3:18cv718; ECF No. 223, Lead Civil Action No. 3:18cv850.)

---

[2] The protective order governed production of information during discovery. It required the parties to keep information confidential among themselves. It did not, however, allow the parties to decide whether confidential information would remain sealed in the Court's records. The protective order made clear that, while the parties might provisionally file documents under seal, the ultimate decision on public access to information filed in these proceedings lies with the Court. (ECF No. 106, at 11, Lead Civil Action No. 3:18cv718; ECF No. 67, at 11, Lead Civil Action No. 3:18cv850.)

[3] The Court granted the motions to seal as to certain information, such as personnel records and telephone numbers.

[4] In retrospect, the Court recognizes that the stipulations may have led the parties to believe that the February motions to seal fell within the ambit of the omnibus sealing procedure.

The potential disclosure of the confidential information—particularly pricing information—rankled Jeld-Wen and Masonite.  The defendants did not want the public to know how they changed prices, what they charged, and how some customers got better deals than others. The defendants moved to reconsider the September 3 Order unsealing documents (the "Unsealing Order" or the "September 3 Order"), which the Court denied.  (ECF No. 249, Lead Civil Action No. 3:18cv718; ECF No. 230, Lead Civil Action No. 3:18cv850.)  The defendants then filed notices of appeal to the September 3 Order.  (ECF No. 252, Lead Civil Action No. 3:18cv718; ECF No. 223, Lead Civil Action No. 3:18cv850.)  After the defendants appealed, the court stayed enforcement of its September 3 Order.  (ECF No. 276, Lead Civil Action No. 3:18cv718; ECF No. 256, Lead Civil Action No. 3:18cv850.)  The defendants continue to request the Court to revisit its September 3 Order.  (ECF No. 290, Lead Civil Action No. 3:18cv718; ECF No. 273, Lead Civil Action No. 3:18cv850.)

After the defendants had filed notices of appeal, several IMD distributors moved to intervene.  (ECF Nos. 255, 264, 279, Lead Civil Action No. 3:18cv718; ECF Nos. 235, 244, 259, Lead Civil Action No. 3:18cv850.)  Like the defendants, they did not want their customers to know how much they paid the defendants for IMDs, how much they marked up their prices, and who got the best deals from them.   The Court has not ruled on those motions.

Despite their angst about confidential information, the defendants managed to agree to settle the case with the plaintiffs.  The parties have moved to conditionally certify settlement classes.  (ECF No. 242, Lead Civil Action No. 3:18cv718; ECF No. 224, Lead Civil Action No. 224.)  They have also asked the Court to approve notice to potential class members allowing them

---

Fortunately, the parties have subsequently fully briefed the issues arising from those motions, so the Court can rule on the request for an indicative ruling.

to review the settlements, and to join in, object to, or opt out of the proposed settlements.  (ECF No. 242, Lead Civil Action No. 3:18cv718; ECF Nos. 224, 296, Lead Civil Action No. 3:18cv850.) The Court held a hearing on the settlements and found that the parties had shown that the proposal might be fair and reasonable.  But the Court expressed concern about how deeply the parties had discounted the plaintiffs' claims, considering the damages predicted by the plaintiffs' experts.

## II. DISCUSSION

### A. *Jurisdiction*

The Court faces multiple pending motions.  First, the defendants filed motions to reconsider the September 3 Order unsealing the plaintiffs' expert reports and related information containing information about the defendants' pricing practices.[5]  (ECF No. 247, Lead Civil Action No. 3:18cv718; ECF No. 228, Lead Civil Action No. 3:18cv850.)  Second, would-be intervenors have filed motions to intervene to argue for keeping information about them sealed.  (ECF Nos. 255, 264, 279, Lead Civil Action No. 3:18cv718; ECF Nos. 235, 244, 259, Lead Civil Action No. 3:18cv850.)  Third, the parties have filed joint motions to tentatively certify settlement classes and to begin the process of approving the settlements.  (ECF No. 242, Lead Civil Action No. 3:18cv718; ECF No. 224, Lead Civil Action No. 3:18cv850.)

Ordinarily, a notice of appeal deprives a district court of jurisdiction over a case.  *Doe v. Pub. Citizen*, 749 F.3d 246, 258 (4th Cir. 2014).  A district court may, however, "take action that aids the appellate process."  *Id.*  Thus, in this case, the Court had jurisdiction, in aid of the appellate

---

[5] Initially, the defendants requested the Court to seal all kinds of information, including discussions about customers, plans to expand operations, and other general business decisions.  In their motions to reconsider the Court's decision, however, the defendants have limited their request to pricing information since 2015.  (ECF No. 248, at 6, Lead Civil Action No. 3:18cv718; ECF No. 229, at 6, Lead Civil Action No. 3:18cv850.)  The Court will treat their current motions as dealing with these limited categories of information.

process, to stay its order unsealing the records in question.  If the Court required the parties to disclose the sealed information on the original schedule, it would have rendered the appeal useless by giving the public access to the confidential information before the Fourth Circuit could address the merits of the appeal.

In contrast, the pending motion to reconsider the unsealing order does not fall under the exception for action that "aids the appellate process."  The "aids the appellate process" exception exists for "a "narrow class of actions that . . . facilitate the division of labor between trial and appellate courts."  *Id.*  The exception does not allow the trial court to make rulings that alter the status of the case or change the issues on appeal.  If the district court could change the appealed ruling, both the trial and appellate court would effectively exercise jurisdiction over the case simultaneously, which could make the proceedings in the appellate court moot.  Here, if the Court could reconsider the rulings on appeal, it could change the landscape of the appeal dramatically. Thus, this Court cannot rule upon the motions to reconsider.

Sometimes, however, a ruling in the district court can take care of a lot of headaches.  Thus, Federal Rule of Civil Procedure 62.1 provides for an "indicative ruling."  An indicative ruling allows the district court to offer a hypothetical ruling to address motions over which it lacks jurisdiction because of an appeal.  In this way, the trial court can indicate how it would solve the questions pending on appeal, or at least define the questions more precisely.  After an indicative ruling, the appellate court can remand the case to the trial court, restoring its jurisdiction to formally enter the decision.  It goes without saying that the appellate court has discretion to take or leave the district court's indicative ruling.

In this case, this Court will render an indicative ruling on the motions to reconsider the September 3 Unsealing Order. Its ruling may in some way limit the issues faced by the Fourth Circuit in this case.

A different result obtains as to the motions to intervene. Once the defendants filed their notices of appeal, the Court lost jurisdiction to grant motions to intervene. *Doe*, 749 F.3d at 258. The decision to allow a party to intervene lies in the district court's discretion. *McHenry v. Comm'r*, 677 F.3d 214, 216 (4th Cir. 2012) ("Civil Rule 24[, governing intervention,] confers broad discretion on a trial court . . . ."). If the Court made an indicative ruling on the motions to intervene, its decision would simply reflect its discretionary choice. This would add no clarity to the issues currently on appeal and, in fact, would inject the additional tangential question of how the Court exercised its discretion.

Finally, the Court has jurisdiction to approve the motions to certify settlement classes and to notify potential class members of the settlements. Tentative approval of a settlement involves different issues from the issues on appeal, so the Court retains jurisdiction to move ahead with the settlement. *Doe*, 749 F.3d at 258.

Ironically, however, settlement itself changes the balance of factors relevant to the issue of sealing records. The parties necessarily base their decision to settle, in part, on pricing information. And class members will presumably base their decision to participate in the settlements on how the defendants' prices affected them. Most significantly, the Court's decision to approve or deny the settlements rests on evidence in the record, including pricing information.

### B. Motions to Reconsider

Courts do their business in public. The litigants and the public enjoy a "presumptive right of access" to papers filed with the courts. *Id.* at 266. The defendants want to shut the door on a

7

big part of these proceedings to protect their "competitive" strength in the market—a strength that the evidence arguably shows came from the very misconduct they want to conceal. Both the original motions to seal as well as the motions to reconsider try to keep this door shut. The law demands otherwise. The Court, therefore, will make an indicative ruling to deny the motions to reconsider.

The right of public access to court records stems from both the common law and the Constitution. This right brooks few exceptions. Whether protected by the common law or the Constitution, the public's access right helps ensure the justice of court proceedings and, therefore, "may be abrogated only in unusual circumstances." *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 182 (4th Cir. 1988).

The common law right of public access "extends to all judicial documents and records." *Doe*, 749 F.3d at 266. A party seeking to keep court records secret must show that "countervailing interests heavily outweigh the public interest in access." *Rushford v. New Yorker Mag., Inc.,* 846 F.2d 249, 253 (4th Cir. 1988). "[T]he common law presumes a right to access *all* judicial records and documents. . . ." *In re Application of the U.S.*, 707 F.3d 283, 290 (4th Cir. 2013) (emphasis in original) (quoting *In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984)). To rebut the presumption of public access, a party must show that privacy interests "heavily outweigh" the public's interest in access. *Rushford*, 846 F.2d at 253.

A First Amendment right of access applies only to "*particular* judicial records and documents." *In re Application of the U.S.*, 707 F.3d at 290 (emphasis in original). Although the Fourth Circuit's cases refer to "judicial records" in different ways,[6] the cases make clear that a

---

[6] *Contrast Stone*, 855 F.2d at 181 (seemingly treating all court papers the same), *with In re Application of the United States*, 707 F.3d at 290 n.6 (treating "judicial records" differently from other documents in court files).

First Amendment right of access applies to documents that "play a role in the adjudicative process, or adjudicate substantive rights." *In re Application of the U.S.*, 707 F.3d at 290. To fall in the category of "judicial records," a document must "'be relevant to the performance of the judicial function and useful in the judicial process.'" *Id.* at 291 (quoting *United State v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995)). A party can overcome the First Amendment right of access only "if closure is 'necessitated by a compelling government interest' and the denial of access is 'narrowly tailored to serve that interest.'" *Doe*, 749 F.3d at 266 (quoting *In re Wash. Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986)).

The defendants incorrectly argue that only the common law right of access applies here. The plaintiffs filed their expert witness reports in support of motions to certify the class actions. When the parties tentatively settled the cases, the Court denied the motions to certify as moot. The defendants, therefore, argue that the reports did not figure in a judicial decision and, therefore, do not amount to judicial records. This argument was weak at the time the defendants made it, and it has grown weaker as the case has proceeded.

The parties have moved the Court to certify the case as a class action for settlement purposes. To obtain preliminary approval, the plaintiffs have asked to the Court to find "probable cause" that the proposal falls within the range of permissible settlements that meet the standards of fairness, reasonableness, and adequacy. (ECF No. 245, at 7, Lead Civil Action No. 3:18cv718; ECF No. 225, at 4, Lead Civil Action No. 3:18cv850.) As discussed below, the Court has made that finding, based in part on the expert witness reports that the plaintiffs filed in court.

In a hearing on the proposed settlements, the Court asked plaintiffs' counsel to explain how the damages described by the experts related to the amount of the proposed settlement. Counsel explained that, although the plaintiffs would have liked to recover more money, they believed they

secured the best settlements possible and reasonably discounted the damages identified by the expert witnesses. Balancing the expert witness reports with the proposed settlement, the Court has found probable cause that the settlements fall within the acceptable range of adequate, fair, and reasonable results in the case.

Going forward, the expert witness reports will continue to be "useful in the judicial process." *In re Application of the U.S.*, 707 F.3d at 291 (quoting *Amodeo*, 44 F.3d at 145.) Not only the Court, but also the prospective class members, will need to analyze the reports to decide how to move ahead. The expert witness reports highlight astounding parallel pricing decisions. For many years, the defendants raised their prices in lockstep, increasing the cost of IMDs to potential class members. Those class members must decide whether to participate in the settlements, and a good way they can evaluate their losses—and the adequacy of their prospective recovery—is to see how the price increases affected them. This evaluation necessarily entails a review of historic prices. In a public hearing, the Court asked the parties how prospective class members can decide whether to participate in the settlements. Counsel told the Court the key factor is transparency of information. (ECF No. 287, at 16, Lead Civil Action No. 3:18cv718 ("[A]ll we can do is be as transparent as possible.").) Yet, transparency is precisely what the defendants oppose.

Thus, the information the defendants want to keep secret will have continued usefulness in the judicial process, making the expert reports public records protected by the First Amendment.

Under either the common law or the First Amendment, the defendants do not offer reasons that outweigh the interest in public disclosure of court records. The defendants offer only a single reason to keep the information secret: self-interest. The defendants worry that customers and the public will learn embarrassing facts about Jeld-Wen and Masonite. They will find out how much

the defendants marked up their goods and the incommodious fact that the defendants did so simultaneously. They will learn that some customers got better deals than others. Competitors and customers will use the information to predict future price increases. And, the defendants add, resellers will also face the embarrassment of having their own customers learn that the resellers made a profit and that some of their customers paid more than others.

Commercial embarrassment does not go far in justifying secrecy in the courts. As much as litigants dislike it, courts routinely air personal and commercial information. Aside from the lockstep price increases, the information here is hardly mortifying. Everyone understands that companies have profit margins and that some customers negotiate better terms. "'[C]ommercial self-interest' does not qualify as a legitimate ground to keep documents under seal." *Doe*, 749 F.3d at 269-70 (quoting *Procter & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 225 (6th Cir. 1996)).

The countervailing interests weigh heavily in favor of disclosure. Equally as compelling as the defendants' commercial self-interest, the self-interest of the people who buy IMDs plays an important role in this case. The purchasers must decide whether to object to settlements that pay only a fraction of the amount of their losses, with a sizeable chunk of the payments going to lawyers. They must also decide whether to search through their records to determine the amount of their loss and whether to submit a claim. Yet, the defendants want to hide from them important information that will figure in their decision-making.

More importantly, the public has an interest in maintaining its "ability to oversee and monitor the workings of the Judicial Branch." *Id.* at 263. Other branches of government face periodic elections, but the judiciary operates without a public check on its actions. People deserve to have as much information as possible about how judges make decisions. Suppose, for instance,

11

that the Court ultimately approves the proposed settlements in this case. Economists, legal scholars, and just plain curious people may legitimately ask how the Court came to approve the settlements considering the evidence in the case. They may wonder whether wealthy businesses too heavily influenced the Court. Or they may want to see how private litigation solves a serious public problem. Access to all the facts helps them answer these questions. Public confidence in the judiciary mandates openness whenever possible.

The public interest goes beyond concerns about the judiciary. People could easily ask how the government's antitrust enforcers allowed this situation to arise. They might wonder why the Justice Department did not pursue the defendants for price fixing. Or, on the other hand, they might applaud the government for allowing the parties most interested in the case—sellers and buyers—to fight it out.

And finally, the public's curiosity plays a role. Our country's citizens have a right to know what is going on—in the courts, the executive branch, and in industry. To call this interest "curiosity" understates its importance and legitimacy. One of the things that separates our country from others is that our institutions—including our courts—operate in the public eye. In totalitarian nations, someone makes a decision, and everyone lives with it. Here, we see how the government makes decisions, and we hold people accountable for them. But the defendants want to obscure part of the decisional process.

The defendants have offered meager grounds to overcome the presumption of public access, whether it arises under the First Amendment or the common law. Their arguments do not "heavily outweigh" the common law right of public access and come nowhere close to serving as a compelling government interest in secrecy. The Court, therefore, makes an indicative ruling to deny the motions to reconsider its September 3 Order.

12

### *C.  Preliminary Approval of Settlements*

Finally, the Court turns to the issue of preliminary approval of the proposed settlement of the class actions.  As noted above, the Court's must decide whether the parties have presented "probable cause" to find that the proposed settlements fall within the range of adequate, fair, and reasonable resolutions of the cases.

The Court finds some terms of the settlements hard to stomach.  In the plaintiffs' expert reports, they have presented credible evidence of misconduct.  They have shown lockstep price hikes, multiple opportunities for collusion, and enormous damages—$243.7 million for the DPPs, (ECF No. 196-1, at 9, Lead Civil Action No. 3:18cv718), and $206.1 million for the IPPs, (ECF No. 178-1, at 10, Lead Civil Action No. 3:18cv850).  The settlements discount these damages drastically.

The simultaneous price increases are astounding.  But price increases do not tell the whole story, and the parties may know of evidence or legal arguments that undercut the strength of the plaintiffs' cases.  Although the proposed settlements reflect a dramatic reduction of the projected damages in these cases, it does not amount to a nominal payment.  For this reason, the Court will preliminarily approve the settlement, subject to both a searching examination of the evidence and law before final approval and disclosure of the expert reports filed with the motions for class certification.

The Court will approve in large part the plan of publication of the settlements and the means of getting class approval and objections.

In addition, as stated above, to allow class members to make an informed decision, and to allow the public to fully understand the settlement, the Court will require the parties to make the expert witness reports available as part of the notification.

The Court recognizes that this approval differs in some details from what the parties submitted. If any of the parties wish to back out of the settlement, they should notify the Court within fourteen days. The Court will then hold a hearing on whether to allow the parties to withdraw from the settlement. If the parties do not go forward with the settlement, the Court will re-docket the motions for class certification. The parties have already briefed that issue, so they need file no additional papers. If the parties call off the settlements, the Court will set those motions for a prompt hearing.

### III. CONCLUSION

For the reasons stated in this Opinion, the Court will:

(1) defer disposition of the pending motions to intervene for want of jurisdiction;

(2) issue an indicative ruling, pursuant to Federal Rule of Civil Procedure 62.1, stating that it would deny the motions to reconsider its September 3 Unsealing Order;

(3) defer disposition of the plaintiffs' motions for preliminary settlement approval, conditional class certification, and approval of proposed notice; and

(4) order the plaintiffs to resubmit proposed orders that preliminarily approve the settlement, conditionally certify settlement classes, and approve the proposed notice. The proposed orders shall accord with this ruling, most notably the requirement that parties make the expert reports publicly available as part of their settlement notices. The proposed orders shall also contain a schedule that includes the final approval hearing date, settlement objection deadlines, and the briefing schedules for final approval and subsequent motions regarding distribution and use of the settlement funds.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: ___10___ December 2020
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge