**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| **IN RE: INTERIOR MOLDED DOORS INDIRECT PURCHASER ANTITRUST LITIGATION** | Lead Civil Action No. 3:18-cv-00850-JAG |

**DEFENDANTS' JOINT RESPONSE TO INDIRECT PURCHASER PLAINTIFFS' BRIEF REGARDING WITHDRAWAL FROM SETTLEMENT WITH DEFENDANTS**

The Court should not permit the Indirect Purchaser Plaintiffs ("IPPs") to withdraw from the settlement. This Court has found "probable cause" to conclude that the IPPs' settlement with Defendants "fall[s] within the acceptable range of adequate, fair, and reasonable." ECF 298 at 10. Accordingly, the Court stated that it "will preliminarily approve the settlement, subject to both a searching examination of the evidence and law before final approval and disclosure of the expert reports filed with the motions for class certification." *Id.* at 13. However, IPPs now seek to withdraw from their agreement, not because the law or facts have changed since they executed the settlement agreement in September 2020, but instead because they now believe they can better guess how their case might fare than they could at the time they agreed to settle. The Court should decline IPPs' request to withdraw from the settlement.

Defendants acknowledge that the Court has an obligation to satisfy itself of the fairness of settlement before granting final approval. Defendants will come to the final approval hearing prepared to demonstrate to the Court that the settlement comports with Federal Rule of Civil Procedure 23(e) and is fair and reasonable for the class. There is no need to predetermine the outcome of that process. Rather than decide that issue now—on a partial record and based on assumptions about how class members, who have yet to receive notice of the settlement, may react—the better path is to proceed with the orderly settlement process contemplated by Rule 23.

Contrary to their current request, the IPPs agreed to support the settlement and work for its final approval. Settlement Agreement, ECF 226-1, at ¶ 23. In fact, IPP class counsel represented to the Court and to their class members that the settlement is "fair, reasonable, and adequate" and the "best possible settlement for [the] proposed class." Mot. for Prelim. Approval, ECF 225, at 8–9; Oct. 8, 2020, Prelim. Approval Hr'g Tr. at 10:1–7. IPPs entered into the settlement knowing they were giving up the chance to litigate class certification and the merits, in exchange for the certainty and speed of a recovery. The experienced antitrust counsel who represent the IPPs and settled this case on their behalf understood that class-certification decisions may be immediately appealable under Rule 23(f), that their class posed appellate risk, and that Defendants' formidable antitrust experts stand prepared to present the other side of this case to the Court and, if necessary, a jury.

IPPs are not entitled to avoid their settlement obligations now. It does not matter that IPPs have developed a changed view of their litigation risks. When IPPs entered into the settlement in the first place, they were well aware that the Defendants had yet to offer their case on summary judgment or at trial and that numerous risks to their ability to recover damages had not been fully brought to the Court's attention. Those risks will persist regardless of the Court's pre-trial rulings in the case. The IPPs settled this case to avoid those risks, and under Virginia law, no intervening change of circumstance authorizes them to avoid their contractual obligations.

In short, it is for the Court to decide, at the final approval hearing, whether the settlement is fair and reasonable. At that stage, the Court will conduct its "searching examination of the evidence and the law" to confirm that IPP counsel honored their duties to the class and the Court when agreeing to, and urging the Court to preliminarily approve, their settlement. Until then, the Court should hold the IPPs to their agreement.

I.    **The Settlement Remains Fair, Reasonable, and Adequate.**

The settlement to be presented to the IPP class is fair and reasonable.  As an initial matter, it appropriately reflects the uncertainty of the IPPs' case on the merits.  The parties settled before the Defendants briefed summary judgment, and the Court's recent Opinion acknowledged that there may be "evidence [and] legal arguments that undercut the strength of the plaintiffs' case[]" that the Court had not yet heard.  ECF 298 at 13.  That is exactly so.  In fact, it is precisely those legal arguments and evidentiary problems that led IPP counsel to settle when and for the amount they did.

Despite extensive discovery, IPPs have not adduced a single piece of direct evidence showing any conspiracy to fix prices.  And unlike other price-fixing class actions, IPPs can point to no guilty pleas to antitrust charges or any related investigations, interventions, or objections from regulators or law enforcement that might eventually produce such a plea.  Instead, IPPs rely heavily on supposedly parallel price increases by the Defendants and contacts between them—without any evidence that even a single communication between JELD-WEN and Masonite involved the price of interior molded doors ("IMDs").  But settled antitrust law precludes IPPs from arguing that mere opportunities for collusion, along with parallel pricing behavior in a concentrated market, create the inference of a price-fixing conspiracy.  *See, e.g.*, *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 398 (3d Cir. 2015).  That is because, in concentrated markets like the one for IMDs, rational sellers will follow each other's pricing actions even without collusion.  *See, e.g.*, *id.* at 412 (parallel increases, advance pricing knowledge, opportunities to collude, and criminal guilty pleas by defendants' Canadian counterparts were just "as consistent with [independent decision-making in a concentrated market] as with a conspiracy"); *see also Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 938, 942 (7th Cir. 2018); *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015).

Settling this case also eliminated the risk to IPPs that their damages expert's analysis would not withstand scrutiny. Although IPPs' expert created a large damages number, Defendants' experts identified a host of faults with his analysis and concluded that IPPs could not have been damaged at all. ECF 200-2 at 99–100, ¶¶ 222–27. Moreover, unlike direct purchasers suing under federal law, IPPs risk seeing their damages discounted by any overcharge they passed on to their own customers. *See, e.g.*, *In re Vitamins Antitrust Litig.*, 259 F. Supp. 2d 1, 8–9 (D.D.C. 2003) (explaining "under [Michigan law], the Court finds that defendants can challenge plaintiff's damage estimates with a pass through defense"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 09-4997 SI, 2012 WL 6709621, at *7 (N.D. Cal. Dec. 26, 2012) (limiting state-law antitrust damages to "actual damages sustained") (citation omitted). In fact, many of the named plaintiff contractors admitted during their depositions that they were reimbursed by their customers for the exact cost of the IMDs, passing on any price increase. ECF 200 at 18, n.4, 8.

Nor do the risks to IPPs stop at liability and damages. As indirect purchasers, the IPPs face an uphill battle on maintaining certification of their class, both in this Court and on appeal. Most problematically, IPPs fail to meet the ascertainability requirement under Rule 23. *See EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (explaining class proponents must define the class in such a way that "a court can readily identify the class members in reference to objective criteria"). IPPs have *no way at all* to identify which IMDs were manufactured by the Defendants rather than by third parties. And while they propose a class of those who indirectly purchased IMDs "not for resale," IPPs simultaneously insist that IMD *resellers* like contractors *are* in the class while excluding most actual end-users. *See* ECF 200 at 16–24. IPPs also cannot meet Rule 23(b)(3)'s predominance requirement because it is impossible to show, using class-wide rather than individual proof, that all or nearly all class members suffered an injury. *Id.* at 25–30; *see Bell*

*Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) (finding plaintiff unable to prove predominance "where fact of damage cannot be established for every class member through proof common to the class"); *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 625 (D.C. Cir. 2019). These issues present risks to the IPPs both in this Court and on an immediate appeal pursuant to Federal Rule of Civil Procedure 23(f).

IPP counsel, all sophisticated and experienced antitrust lawyers, accounted for all those vulnerabilities—along with the potential for *Daubert* challenges and intra-class conflicts—when they determined to settle this case for the amount in the settlement agreement. And importantly, the IPPs knew when they settled that if they did not, they would have to face those risks alone: They no longer have the benefit of a concurrent case by Direct Purchaser Plaintiffs, meaning IPPs would have to litigate without any direct-purchaser-level expert work or trial preparation.

In agreeing to the settlement that they signed, the IPPs acknowledged their litigation risks. As IPPs explained during the preliminary approval hearing:

> *[T]his is not your prototypical case where you have got [the] benefit of guilty pleas*. So *there [are] risks involved* there. And . . . all of the appeals that would follow even under the best case scenario likely would not have been resolved for years. So we weighed the benefits and risks of the case also with the time frame of getting recovery for our class. And with the uncertainties of the global pandemic and the financial situation and after hard-fought negotiation *[we] reached what we thought was the best possible settlement for our proposed class*.

Oct. 8, 2020, Prelim. Approval Hr'g Tr. at 9:21–10:7 (emphasis added); *see also* FED. R. CIV. P. 23(e)(2)(C)(i) (instructing courts to weigh a class settlement's adequacy in light of "the costs, risks, and delay of trial and appeal").

Despite the weakness of their case and the problems with their expert's calculations, the IPPs' counsel secured a valuable settlement for the class. The settlement guarantees each class

member a ***minimum*** $25 recovery, even for those who purchased a single IMD—when nearly 70% of Defendants' IMDs were sold for ***$30 or less***.  ECF 297-1 at 43; ECF 200-2 at 14, Figure 1.

Indeed, the settlement amount represents 9.5% of the damages that IPPs' expert estimates, which compares favorably to cases with far stronger evidence for antitrust claims—including guilty pleas, consent decrees, government investigations or enforcement, and cooperating co-conspirators:

- *In re New Jersey Tax Sales Certificates Antitrust Litig.*, No. 12-1893 (MAS)(TJB), 2016 WL 5844319, at *1, *9 (D.N.J. Oct. 3, 2016) (approximately ***2.5%*** of the "best possible recovery," where "several defendants" ***pled guilty***);

- *In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 1001 (N.D. Ohio 2016) (***7%*** of the highest damages estimate, where multiple defendants ***pled guilty***[1]);

- *In re Pool Prod. Distrib. Mkt. Antitrust Litig.*, No. MDL 2328, 2015 WL 4528880, at *2, *14 (E.D. La. July 27, 2015) (***8.5%*** of best-case damages, where the ***FTC entered into a consent decree*** with the defendants);

- *In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 498 (N.D. Miss. 1996) (less than ***9%*** of estimated damages, where defendants were identified as ***co-conspirators to a price-fixing scheme in a criminal case***[2]);

- *In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d 307, 315 (S.D.N.Y. 2020) (approximately ***10%*** of highest damages estimate, where the ***New York Attorney General obtained an injunction*** for the same anticompetitive conduct[3]);

- *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775 (JG)(VVP), 2009 WL 3077396, at *9 (E.D.N.Y. Sept. 25, 2009) (approximately ***10.5%*** of estimated

---

[1] *See* U.S. Dep't of Justice, *Three Foam Manufacturers Plead Guilty in Price Fixing Scheme*, June 27, 2014, https://www.justice.gov/opa/pr/three-foam-manufacturers-plead-guilty-price-fixing-scheme (last visited Jan. 19, 2021).

[2] *See In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1023 n.3 (N.D. Miss. 1993).

[3] *See* N.Y. State Office of the Attorney General, *A.G. Schneiderman Announces Resolution Of Lawsuit That Protected Alzheimer's Patients From Anticompetitive Tactic Aimed At Maintaining Higher Drug Prices*, Nov. 25, 2015, https://ag.ny.gov/press-release/2015/ag-schneiderman-announces-resolution-lawsuit-protected-alzheimers-patients (last visited Jan. 19, 2021).

damages, where multiple defendants *pled guilty* to a world-wide conspiracy to fix prices[4]);

- *Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1833, 2020 WL 1922902, at *3, *21, *30 (E.D. Pa. Apr. 21, 2020) (**11.5%** of best possible recovery, where **FTC settled with the defendant** for the same claims);

- *Nichols v. SmithKline Beecham Corp.*, No..00-6222, 2005 WL 950616, at *16 (E.D. Pa. Apr. 22, 2005) (**9–14%** of estimated damages, where **FTC investigated** antitrust violations[5]).

Any comparison to the raw amount of the DPP settlement also does not support withdrawal. Indirect purchaser classes often receive smaller settlements than their direct purchaser counterparts. *Compare In re Packaged Ice Antitrust Litig.*, No. 08-MD-01952, 2011 WL 717519, at *2 (E.D. Mich. Feb. 22, 2011), No. 08-MDL-01952, 2011 WL 6209188, at *3 (E.D. Mich. Dec. 13, 2011), No. 08-MDL-01952, 2012 WL 5493613, at *1 (E.D. Mich. Nov. 13, 2012) (direct purchasers $26.75 million) *with In re Packaged Ice Antitrust Litig.*, 322 F.R.D. 276, 280, 294 (E.D. Mich. 2017) (indirect purchasers $7.35 million, which is **27% of DPP settlement**); *see also In re First Databank Antitrust Litig.*, 205 F.R.D. 408, 411–12 (D.D.C. 2002) (direct purchasers $24 million; indirect purchasers $2.9 million, which is **12.1% of DPP settlement**); *In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 1001 (N.D. Ohio 2016) (direct purchasers $433.1 million;[6] indirect purchasers $151.25 million, which is **34.9% of DPP settlement**); *In re Domestic Drywall Antitrust Litig.*, No. 13-MD-2437, 2018 WL 999149, at *5 (E.D. Pa. Feb. 21, 2018) (direct

---

[4] *See In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 (JG)(VVP), 2014 WL 7882100, at *4 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted*, No. 06-MD-1775 (JG)(VVP), 2015 WL 5093503 (E.D.N.Y. July 10, 2015).

[5] *See* Melody Petersen, *U.S. Looking at SmithKline Effort to Block Generic Drug*, N.Y. TIMES, Dec. 7, 2000, https://www.nytimes.com/2000/12/07/business/us-looking-at-smithkline-effort-to-block-generic-drug.html (last visited Jan. 19, 2021).

[6] *See* In Re Polyurethane Foam Antitrust Litigation, Frequently Asked Questions, http://www.flexiblepolyurethanefoamsettlement.com/faq (last visited Jan. 19, 2021).

purchasers $190.67 million;[7] indirect purchasers $16.95 million, which is **8.9% of DPP settlement**). Here, IPPs' settlement amount of $19.5 million represents roughly 35% of the initial DPP settlement amount of $56 million. Given that IPPs face additional risks—*e.g.*, specific state-law defenses, difficulties in proving damages and establishing that they were not passed on, and challenges maintaining an ascertainable class—IPPs' settlement is a fair and reasonable amount that appropriately reflects the strength of their case.

In short, the settlement agreement IPPs negotiated and signed with Defendants remains fair, reasonable, and adequate. That is especially so in light of all risks to IPPs' ability to recover their alleged damages (or even a portion of them); IPP counsel's understanding of those risks before they finalized the settlement; and settlement agreements in comparable cases.

## II.     The Court Should Not Permit IPPs to Withdraw from the Settlement.

Defendants acknowledge the Court's responsibility to ensure that the final settlement is fair, reasonable, and adequate. FED. R. CIV. P. 23(e). For the reasons explained above, Defendants believe that—as the IPPs previously represented to the Court to obtain preliminary approval—the settlement meets that standard. Defendants will be prepared to demonstrate that at the final approval hearing. In the meantime, however, the Court should not pretermit the settlement process in advance of that hearing.

As an initial matter, although the Court itself has responsibility for ensuring the fairness of the final settlement, the IPPs themselves have no general right to unilaterally withdraw from their agreement. *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008) ("[T]he requirement that the district court approve a class action settlement does not affect the binding nature of the

---

[7] *See* In Re: Domestic Drywall Antitrust Litigation, Frequently Asked Questions, http://www.drywalldirectpurchaserlitigation.com/frequently-asked-questions.aspx (last visited Jan. 19, 2021).

parties' agreement."); *see also Haggart v. United States*, 131 Fed. Cl. 628, 639–40 (2017) (A "court's review and approval of a class action settlement agreement calling for an award of damages does not affect the legality or binding nature of that agreement."). As a matter of law, parties to a settlement are bound by its terms. "Under Virginia law, which governs the interpretation and construction of the Settlement Agreement, when the terms of a contract are clear and unambiguous, a court is required to construe the terms according to the plain meaning." *Heritage Disposal & Storage, L.L.C. v. VSE Corp.*, No. 1:15-cv-1484 (AJT/MSN), 2017 WL 361547, at *6 (E.D. Va. Jan. 24, 2017); Settlement Agreement, ECF 226-1, at ¶ 58 (selecting Virginia choice of law).

The settlement agreement here does not permit rescission under the present circumstances. Quite the opposite: It unequivocally requires IPPs to "make reasonable best efforts to take actions to effectuate this Settlement Agreement and . . . promptly seek and obtain the Court's preliminary and Final Approval." *Id.* ¶¶ 23, 27; *see also Bradley v. Am. Household Inc.*, 378 F.3d 373, 380 (4th Cir. 2004) ("Motions to enforce settlement agreements draw upon standard contract principles."). As the settlement's recitals demonstrate, IPPs exhaustively scrutinized this case through pre-suit investigation and extensive discovery and, with all of that information, "concluded that a settlement with Defendants according to the terms set forth below is fair, reasonable, adequate, and in the best interest of Plaintiffs and the Settlement Class Members." Settlement Agreement at 2.

Nothing that has happened since then justifies cancelling IPPs' contractual obligations. In its recent Opinion saying it would grant preliminary approval, the Court ordered the parties to publicly disclose the expert reports they filed in support of and opposition to the motion for class certification. ECF 298 at 13. Recognizing that public disclosure of the previously sealed expert

reports was a new requirement for approval, the Court asked the parties whether they wished to continue with the settlement approval as revised.[8] *Id.* The IPPs, however, do not claim that public disclosure of expert reports provides any basis to withdraw from the settlement. Instead, IPPs evidently wish to withdraw from the settlement because they have reassessed their litigation risk based on the Court's comments in its December Opinion, but not based on any new law or facts. IPPs assume that after careful consideration of the parties' submissions supporting their settlement, the Court will deny final settlement approval. IPPs further contend that mere *possibility* not only relieves them of their contractual duty to *seek* final approval—but also means that they should be allowed to revoke their preliminary approval motion, which the Court already said it would grant.

      IPPs' position has no basis in the law. IPPs' brief in support of withdrawal cites no authority justifying rescission, and their oblique allusions to future objections do not substitute for missing citations. The governing law is straightforward: A change in perceived litigation risk does not allow counsel to renege on their agreement. *See, e.g.*, *Swift v. Frontier Airlines, Inc.*, 636 F. App'x 153, 154–55 (4th Cir. 2016) ("Having second thoughts about the results of a valid settlement agreement does not justify setting aside an otherwise valid agreement."); *Sheng v. Starkey Labs., Inc.*, 117 F.3d 1081, 1084 (8th Cir. 1997) (party cannot avoid settlement agreement when it subsequently learned that judge already drafted ruling in its favor because the party "knew it had a dispositive motion pending, and yet chose the certainty of settlement rather than the gamble of a ruling on its motion"); *Anita Founds., Inc. v. ILGWU Nat'l Ret. Fund*, 902 F.2d 185, 189–90 (2d Cir. 1990) (settlement struck amid uncertainty "cannot be successfully attacked" based solely on

---

[8] With the exception of the disclosure of individuals' phone numbers and personnel records, Defendants have withdrawn all sealing requests and related appeals.

"subsequent resolution of the uncertainty"); *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595–96 (3d Cir. 2010) ("The choice to settle implicitly acknowledges calculated risks and . . . reflects the deliberate decision of both parties to opt for certainty in terminating their litigation. We will not relieve a party of that decision because hindsight reveals that its decision was . . . probably wrong."); *In re Syncor ERISA Litig.*, 516 F.3d at 1100–02 (district court improperly entered summary judgment for defendants after the parties reached a settlement but did not justify avoiding settlement on the parties' agreed-upon terms); *Schumacher v. SC Data Ctr., Inc.*, No. 2:16-cv-04078-NKL, 2016 WL 7007539, at *2 (W.D. Mo. Nov. 29, 2016) (declining to allow party to back out of settlement following a Supreme Court opinion relevant to plaintiff's standing in the case). This is especially true when the plaintiffs are represented by seasoned counsel who understood the risks to their case when they negotiated and entered into the settlement agreement and also understood that either party could receive favorable or unfavorable rulings had the case not settled. IPPs' counsel made an affirmative, informed decision to resolve this litigation rather than take those risks. They have no legal right to avoid their settlement obligations now.

That rule comports with the "strong presumption in favor of voluntary settlement agreements," which is "especially strong in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *See Ehrheart*, 609 F.3d at 594–95 (marks and citation omitted); *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 997 (2d Cir. 1983) ("[C]ourts favor the policy of encouraging voluntary settlement of disputes."). Indeed, if parties were allowed to rescind settlement based on a perceived change in circumstances, "the settlement process would become meaningless since either party to a class action settlement (or any other type of settlement that requires court approval) could back out of

an agreement at any time before court approval and avoid any legal repercussions for breaching the earlier offer and acceptance." *Ehrheart*, 609 F.3d at 594.

As a result, IPPs cannot avoid their binding contractual obligation to seek approval of the settlement. It does not matter that IPPs now believe the Court looks more favorably on their case than they guessed at the time of the settlement. Uncertainty about a decision-maker's ultimate thinking *always* informs a party's decision about whether and when to settle. Learning that the Court has formed tentative views of the case, based on the parties' submissions to date, does not constitute a changed circumstance. In any case, the premise of the IPPs' argument is wrong: The Court has made clear that it has not prejudged the matter of final settlement approval. To the contrary, the Court expressly acknowledged that "the parties may know of evidence or legal arguments that undercut the strength of the plaintiffs' case[]." ECF 298 at 13.

Although IPPs claim that the costs of sending notice for a settlement that might not be finally approved would be deducted from the class's recovery, ECF 326 at 2–3, that is not correct. The Settlement Agreement is clear that it is ***Defendants***, and ***not the class***, that bear the financial risk for notice dissemination in the event final approval is not granted. Settlement Agreement, ECF 226-1, at ¶ 33 ("The notice and administration expenses (up to the maximum of $1 million ($1,000,000)) are ***not recoverable by Defendants*** if this Settlement does not receive Final Approval . . . .") (emphasis added).

In short, the IPPs should proceed as both the settlement and the law provide: The parties should notify the class (at Defendants' expense), inform the Court and class members of the justifications for settlement, and move for final approval. *See* Settlement Agreement ¶ 26. As IPPs point out, they are fiduciaries to the proposed class, as they were when they agreed to that settlement. In carrying out their duty to the class, IPP counsel must weigh the benefits of the

proposed settlement, which the Court noted "does not amount to a nominal payment," ECF 289 at 13, against the risk that the class may recover far less or even *nothing* if trial and appeal do not proceed as hoped.  And even if IPPs ultimately obtain a similar or larger recovery for the class than the current settlement agreement provides, it will come only after they expend far more time and resources, including substantially more attorneys' and expert fees.  IPP counsel weighed those risks and benefits, and in doing so obtained a favorable settlement for the class members.  The Court should hold them to it and evaluate the settlement again at the final-approval stage as Rule 23 contemplates.

## CONCLUSION

IPPs' settlement with Defendants is "fair, reasonable, and adequate" and the "best possible settlement for [the] proposed class."  Mot. for Prelim. Approval, ECF 225, at 8–9; Oct. 8, 2020, Prelim. Approval Hr'g Tr. at 10:1–7.  Against the very real possibility that continued litigation might result in a reduced recovery, or even *no* recovery for the class, IPP counsel should honor their contractual obligations to support the substantial settlement that they achieved.


January 19, 2021                                Respectfully submitted,
                                                MASONITE CORPORATION

                                                By:  */s/ Lynn K. Brugh, IV*
                                                Lynn K. Brugh, IV
                                                Virginia State Bar No. 36778
                                                Counsel for Defendant
                                                WILLIAMS MULLEN
                                                200 South 10th Street, Suite 1600
                                                Richmond, Virginia 23219
                                                Telephone: (804) 420-6442
                                                Facsimile: (804) 420-6507
                                                lbrugh@williamsmullen.com

                                                Calvin W. Fowler, Jr., VSB No. 27982
                                                Brendan O'Toole, VSB No. 71329
                                                Gregory Crapanzano, VSB No. 93044

WILLIAMS MULLEN
200 South 10th Street, Suite 1600
Richmond, Virginia 23219
Telephone: (804) 420-6000
Facsimile: (804) 420-6507
wfowler@williamsmullen.com
botoole@williamsmullen.com
gcrapanzano@williamsmullen.com

Nathan P. Eimer (*admitted pro hac vice*)
Vanessa G. Jacobsen (*admitted pro hac vice*)
Benjamin Waldin (*admitted pro hac vice*)
EIMER STAHL LLP
224 S. Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Facsimile: (312) 692-1718
neimer@eimerstahl.com
vjacobsen@eimerstahl.com
bwaldin@eimerstahl.com

JELD-WEN, INC.

By: */s/ Seth A. Schaeffer*
Richard Cullen (VA Bar No. 16765)
Brian C. Riopelle (VA Bar No. 36454)
Seth A. Schaeffer (VA Bar No. 74509)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
Phone: (804) 775-1000
Fax: (804) 775-1061
rcullen@mcguirewoods.com
briopelle@mcguirewoods.com
sschaeffer@mcguirewoods.com

James H. Mutchnik (*admitted pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
jmutchnik@kirkland.com

Craig S. Primis (*admitted pro hac vice*)
Katherine R. Katz (*admitted pro hac vice*)
Matthew S. Owen (*admitted pro hac vice*)
Tracie Lynn Bryant (*admitted pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, DC 20004
Tel: (202) 389-5000
Fax: (202) 389-5200
cprimis@kirkland.com
katherine.katz@kirkland.com
matt.owen@kirkland.com
tracie.bryant@kirkland.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 19, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically e-mail notification of such filing to all counsel of record.

To the best of my knowledge, there are no other attorneys or parties who require service by U.S. Mail.

> */s/ Lynn K. Brugh, IV*
> Lynn K. Brugh, IV
> Virginia State Bar No. 36778
> Counsel for Defendant
> WILLIAMS MULLEN
> 200 South 10th Street, Suite 1600
> Richmond, Virginia 23219
> Telephone: (804) 420-6442
> Facsimile: (804) 420-6507
> lbrugh@williamsmullen.com